United States District court
For Massachusetts District

RECEIVED
DEC 30 2004

Suffolk, ss.

Plaintiff R.D. Glawson.

Vs.

Defendants, Massachusetts Attorney Generals Officers.
Loren Flashner for Suffolk County
Daniel Connoly for Suffolk county
Robert W. Nelson for Norfolk County
Robert W. Keaton.

## Varified civil complaint

1. The Plaintiff seeks civil Injunction against the Suffolk County prosecution SUCR-2001-10249-1-18 pursuant to The Younger V. Harris, principles developed by The U.S. Supreme Court, 401 U.S. 37\91 S.ct. 746 for bringing Two "Related prosecutions"- in "Bad faith" in 2, seperate proceedings in violation The Freedom From successive prosecution of The 5th amendment U.S.C.A. Constitutional "Life or Limb phrase Glawns Vs. Rives 70 U.S. App. D.C. 107\164 Fad 240 at 242. Where the prosecution in Bad faith seeks multiple penalties in multiple proceedings of "Related Offences; Applicable upon the states Albright Vs Oliver 114 s.ct. 807 (1994) And A civil Injunction is sought to stop the prosecution, Fo R. Civ. P. 65 snyder Sullivan Colo! 705 P. 2d. 510.

2.                        Facts

3.    On 2-16-04 According to the Attached state

(1)

Government prosecutions state of the case.

4. The Boston Police received a warrant for the defendants arrest and were actively looking for him in dedham when store security officers observed the defendant attempting fraudulent purchases at sears in dedham Mall and the Dedham police were notified.

5. A dedham police officer approached the defendant in an attempt to detain him, but ended up in a violent struggle that lasted several minutes. Glawson Then ran out of sears to the parking lot and fired one shot from a .38 charter Arms revolver Through the window of a white mustang being operated by a 20 year old man. He then carjacked this mans vehicle and took off with police in pursuit.

6. The chase went into west Roxbury and into center street where Glawson hit a car being driven by A woman with her eight year old daughter inside.

7. He jumped out of the stolen mustang and ran into a nearby yard with dedham Police officer Michael Buckley Chasing him on foot. Officer Buckley Kicked open the gate to the yard and saw Glawson crouched down and pointing a gun at him.

8. The defendant fired two shots; One struck officer Buckley in the right hand. The defendant fled the yard on foot and officer Buckley was Transported To the hospital.

9. After an extensive three hour search of the surrounding area by Boston, Dedham and state police units, the defendant was Located hiding inside a garage at 135 Eastwood circuit in west Roxbury.

Following a Brief struggle with police. the defendant was handcuffed and placed under arrest.

10. Found on the defendants person was a .38 caliber charter Arms revolver. several Live rounds of Amunition four Baas of Heroine. and wallet that was stolen From an employee of filene's at the chestnut Hill MAll on February 15th. 2001.

11. Subsequent ballistic testing of the gun found on Glawson revealed that it was the same gun used durring the incident of Feb. 15th inside 35 Murray Hill Road as well as the carjacking of the mustang on February 16th outside of sears in Dedham Mall.

12. On 2-20-03. The defendant Plead Guilty to 16 Norfolk Superior court Indictments Attached which were Based on the above Facts, Midway Through His Trial and Sentenced to 15 To 20 years on 8-9-03 which sentenced was stayed until 9-10-03 (see Judges Reasons) for staying case in His 8 page Memorandum.

13. While from the "same facts" (grew out) An 18 Count of Indictments in Suffolk County SUCR-2001-10249-1-18 and (6 count Indictment) in Cambridge superior court Based on the same facts once Litigated and punished for,

14. The defendant Avers The Bad Faith comes in where Before Indictments on Any of The 3 "Jurisdiction" Prosecutions The District Attorney's Deliberately & purpose-fully for The purpose of gaining a Tactical Advantage of multiple shots to gaining convictions and maliciously oppressed the defendant in to Four Plea Proffers Before and durring his Trial with Multiple Erronious promisses

(3)

To be given A "Clean Slate", and serve his prison Time in The Bureau of Prisons versus the state prisons where defendant has 28 single Enemy Issues Known to the D.A.s and court, And Lastly offering A "Future Concurrent" sentence of 15 To 20 years to run "Futuristicaly" with any sentence "serving or to be served, when the defendant was awaiting Trial on The 3 seperate Jurisdictional Indictments Pending. (see mittimus)

15. All 3 Cases should have been enjoined As reached In Willhauch Vs. Flannigan 102 S.Ct. 20; an Identicle match to the cases prosecution at Bar. where The defendant sought an Injunction from Prosecutors Failure to 'enjoin' multi-county Jurisdiction Prosecutions ussing Mass. R. Crim. P. 37(B)(2) As A Veto Power from mandatory joinder M.R.C.P. 9. as The cases were Linking by The Extraterritorial statute 41 § 98A - Mass. R. Crim. P. (2)(14) but the A.D.A. chose to use the Tactical Advantage at seperating The Indictment From 1 Arrest too 3 Jurisdictional Indictments for gaining multiple shots at convictions & penelties.

16. The seperation was in bad faith and An executive abuse of powers for the direct purpose of gaining a Tactical advantage,

17. The Commands of the 5th Amendment U.S.C.A. double Jeopardy argument is as Follows.

4

18.                    _Argument_

18. The Norfolk County Prosecutor & Suffolk County prosecutors abused there Authority in the selection of charges and well Knowing the offences in Both counties in relation To All Norfolk county with Suffolk county counts Indictments SUCR-2001-10249-"Counts 9-To-18" Only; Are Related by the Alleged chase and Extraterritorial Arrest Linking these crimes Together As M.R.crim.P.2-(4) Define as Related Offences, and Prosecutors were Required pursuant to the 5th amendment Double Jeopardy Clause Immunity Defense from successive prosecution; to Try All Offences or charges That grew out of The same Transaction;episode, conduct, occurance, in "one single proceeding". Harris Vs. Washington, 92 S.ct. 183 (1971) & The recognized exception to the rule announced in, Younger Vs. Harris, 91 S.ct. 746 (1971) and Harris Vs. Oklahoma, 97 S.ct. 2912 (1977). citing, Ashe V. Swenson 90 S.ct 1189 & Thompson Vs. Oklahoma, 97 S.ct 768 (1977) and cases cited There IN.

21. The commonwealths Return to Petitioners opposition is fruitless and does Not warrant Dismissal or a reply. It failes to oppose Petitioners main Line Issue That @Is; The Norfolk County "Trial;Invoked Jeopardy and a Conviction weather by plea or Jury Does Not waive The Immunity/of Double Jeopardy" Defense (see)... U.S. Vs. Broce 488 U.S. 563\109 S.ct. 757 (1989,) Holding: plea of guilty and ensuing conviction comprehend ALL the factual and Legal elements necessary To sustain

A Binding, Final Judgement of guilt and A Lawful sentence;
(Also Defining).... A guilty plea is more then A Confession
which admits that the accused did various Acts". Boykin Vs.
Alabama 89 S.ct. 1709 (1969) It is an admission that [He]
committed the crimes charged against him, (Also North
Carolina V. Alford 400 U.S. 25.32. 91 S.ct. 160 (1970)
by Entering a guilty Plea. The accused is not simply
stating that he did the descrete acts described in the
Indictments; He is admitting guilt of a substantive crime.
Notwithstanding The Plea-ommission record Here, clearly
shows the Court and Unwanted forced upon defendant
"stand by Counsel; Both Told Petitioner then defendant, that
(PStR=Plea --- Transcript at Page 24-L-19 to 22) Where
then defendant indicates to court as follows: "pStr -Line-19)
[1. Petitioner Glawson; All right, so nothing that I Plead]
[Guilty to today in this case can be Used against me]
[IN Suffolk County, Line -22 The Court: Answer,]
["Thats Right".]

22. Under these circumstances it cannot fairly
be said or held that defendant Petitioner waived his
right to the Double Jeapardy clause defense to be Free
From Successive Prosecution in seperate criminal Proceedings
of "Related Offenses The Commonwealth Failed to Consolidate
Suffolk County Indictment 9 Through 18 That grow out of
The claimed Chase from Dedham into Boston." and
9. Due to the Court & standby counsel answer, The
SJ- should give some Constitutional Consideration to

The Recorded Facts of The Plea-of-Guilty Conviction After Trial commenced; thus Attaching Legal Jeopardy, should not be said petitioner "Intentionaly" relinquished or "Abandoned" a "Known Right" or "privilege", Citing Authority Johnson Vs. Zerbst, 304 U.S. 458-464, 58 S.Ct. 1019-1023 (1938,) Claiming three Constitutional Rights: (1) The Right to the Double Jeopardy Defense Immunity to be free from successive prosecution of All Related offences, which Are Required by The 5th Amendment U.S.C.A. Double Jeopardy Clause together with the Due-process Clause in both 5th & 14th amendments U.S.C.A. made Applicable and eforcible upon the states Through the 14th amendment U.S.C.A. Albright Vs. Oliver 114 S.ct. 807. [1994] and Harris Vs. Oklahoma 97 S.ct. 2912, citing Ashe Vs. Swenson, 90 S.ct. 1189 & Thompson Vs. Oklahoma 97 S.ct. 768 (1977) and cases cited Therein.

22. (2) The defendant claims The constitional Double Jeopardy Clause Authorizes the Right Not to be Haled into court at All on The Related offenses, failed to be enjoined by the Prosecution who Both County's Well New or should have Known was a Requirement of Double Jeopardy Clause as Guarinteed Through The 5th and **14th** amendment Due-process Clause U.S.C.A. citing Blackledge Vs. Perry 417 U.S. 21 \ 94 Sct. 2098 (1975) at 417 U.S. at 30 \ & 94 S.ct at 2104. The Plea of Guilty did not forclose a subsequent challenge. The very Initiation of proceedings against him, operated to deny petitioner Due-process of Law. 417 U.S. at 30 \ 94 S.ct. at 2104.

23. (3) The Court & Standby Counsel Both Misinformed the defendant On Petitioners question about Double Jeopardy(supra).

(Attachment 6 Plea Colloquy.-page 24-L-19-22)

CONCLUSION

Willhauch V. Flannigan is an Identicle case in Question, 101 S. ct 10 (1980) That supports Plaintiffs "Proof of "Exception rule" to the Younger V. Harris principles developed by the U.S. s. ct court. (401 US, 37 \ 91 s.ct. 746 should apply here for An Injunction to Issue against SUCR-2001-10249 Counts 9 To 18 Only for a violation of Due-process against prosecutors malicious Tactical failure Not to joinder The Related offences on The same facts Once Litigated, Indicted, and Tried Through a Trial ending midway in a coerced Plea in the shadows of the Plaintiff free exercise to try The case before a selected Jury of his peers.

The Prosecutors Had several optional times to Consolidate The Related offences During The Norfolk County Indictment state or at Trial but did not purposefully To gain A Tactical advantage of a person interest Nature noting A Police officerer was shot and The Press was all over The case amounts to malicious prosecution and Violates due-process and Plaintiffs 5th amendment Freedom From being Haled into court on the related offences and Freedom From successive proceedings of the Related offences Thompson V. Oklahoma 98 s.ct. 768 (1977) & Harris Vs. Oklahoma 97 s.ct 2912 (1977), R.I.K.R. Rule 2-14 Attachments [9],[10][11],[12],[13].

Remedy

Plaintiff request an injunction Against the SUCR-2001 Counts 9 Through 18 As An Exception to Younger V. Harris (supra) citing Willhauch Vs. Flannigan 101 s.ct. 10 (1980.)

⑨

The above facts are varified by the Suffolk County District Attorney's statement of the case which supports The grounds for The "Exception Rule" To younger vs. Harris. citing Also "Specified Constitutional violations. Graham Vs. CONNORS 109 S.ct. 1378. Where Jeoparty has attached, IN ONE Related Proceeding That has subjected his Life, Liberty, & Limb phrase of the Fifth amendment U.S.C.A. AND An Injunction should Issue with respect to any charges That are related to the same facts in successive proceeding before A Trial. To satisfy the Double Jeopardy defense, & Immunity To be Free from being subjected A second time for Related offences That could & should have been Consolidated with the Plea Bargain midway Through Trial at the Commands of the Fifth Amendment double Jeopardy principles and Fifth amendment Due-substantive Due process of Law from Arbatary and capriscious prosecution successively in sepedate proceedings of related crimes by facts & Conduct surrounding the selected & severated charges instead of one proceeding As the Norms of Fundamental Fairness dictates in substantive due-process of Law of the Fifth & Fourteenth amendment U.S.C.A. Made applicable upon the states Through the fourteenth amenendment U.S.C.A. 114 S.ct.801(1994) See Commonwealths statement of Case. (Attachment #1)

   Wherefore the plantiff pray's this court Issue an Injunction against further prosecution for The specified counts Related. As soon as possible ON SUCK-2001-09-Through 018, date 12/3/04          by Richard Johnson Pro-se

(9)

# Index of Attachments

1. Commonwealth of Massachusetts Attorney's Statement of the Case. (3 pages)

2. Dedham Application of Complaints

3. Dedham citation

4. Dedham mittimusses & Dedham Indictments NOCR-2001 00117.-1-2.

5. Dedham Superior Court "Memorandum and Ruling of Judge Chernoff. (8 pages)

6. Dedham Plea-Colloquy (45-Pages)

7. Dedham Grand Jury Minutes (71 pages)

8. M.G.L.A.c. 41 § 98 A Extraterritorial Fresh & Continued pursuits, Statute.

9. RCRP 2. Definition of Terms (2-14) Related offense)

10. Thompson Vs. Oklahoma 97 s.ct. 768 (1977).

11. Harris Vs. Oklahoma 97 s.ct. 2912 (1977).

12. R.C.R.R. Rule 37 (B)(2)

13. Willhauch Vs. Flannigan 101 s.ct 10 (1980).

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

SUFFOLK, ss.                                        NO. 01-10249

COMMONWEALTH

v.

RICHARD GLAWSON

## COMMONWEALTH'S STATEMENT OF THE CASE

On Monday, February 12, 2001, the defendant broke into the first floor apartment of 60 Calumet Street in Roxbury and removed a safe that contained a .38 caliber Charter Arms revolver and several pieces of ammunition. On February 15, 2001, the defendant was observed on surveillance video at the Chestnut Hill Mall attempting to steal clothing from Filene's. When store security and Newton police tried to detain him, Glawson used the .38 caliber Charter Arms revolver taken from the apartment at 60 Calumet Street on February 12th to carjack a vehicle from a woman in the mall parking lot and escape arrest. Being chased by a Newton police officer, Glawson drove to Basile Street in Roslindale where he abandoned the stolen vehicle and fled on foot. He then broke through the front door of 35 Murray Hill Road in Roslindale where a 38-year-old disabled man lived. Once inside the apartment, the defendant knocked the man to the floor and fired one shot at the man's dog that bit Glawson on the hand. Glawson then ran out the rear door of the apartment and back over to Basile Street where he pointed the gun at a 77-year-old neighbor. He continued to run down Basile Street to Washington Street where he carjacked another vehicle from a 42 year old man who was about to enter his car outside a restaurant. Glawson drove away from the area and abandoned this stolen vehicle in

Dorchester, leaving bloodstains on the steering wheel. By means of the mall security video and photographic arrays, Glawson was identified by the Newton carjacking victim, the store security guard, and the Newton police officer that confronted him outside the Chestnut Hill Mall.

On February 16, 2001, the Boston Police received a warrant for the defendant's arrest and were actively looking for him in Dedham when store security officers observed the defendant attempting fraudulent purchases at Sears in the Dedham Mall and the Dedham police were notified.

A Dedham police officer approached the defendant, in an attempt to detain him, but ended up in a violent struggle that lasted several minutes. Glawson ran out of Sears to the parking lot and fired one shot from the .38 Charter Arms revolver through the window of a white Mustang being operated by a 20 year old man. He then carjacked this man's vehicle and took off with police in pursuit. The chase went into West Roxbury and onto Centre Street where Glawson hit a car being driven by a woman with her eight year old daughter inside. He jumped out of the stolen Mustang and ran into a nearby yard with Dedham Police Officer Michael Buckley chasing him on foot. Officer Buckley kicked open the gate to the yard and saw Glawson crouched down and pointing a gun at him. The defendant fired two shots; one struck Officer Buckley in the right hand. The defendant fled the yard on foot and Officer Buckley was transported to the hospital.

After an extensive three hour ground search of the surrounding area by Boston, Dedham, and State Police units, the defendant was located hiding inside a garage at 135 Eastwood Circle in West Roxbury. Following a brief struggle with police, the defendant was handcuffed and placed under arrest.

Found on the defendant's person was a .38 caliber Charter Arms revolver, several live rounds of ammunition, four bags of heroin, and a wallet that was

stolen from an employee of Filene's at the Chestnut Hill Mall on February 15, 2001.

Subsequent ballistic testing of the gun found on Glawson revealed that it was the same gun used during the incident on February 15th inside 35 Murray Hill Road as well as the carjacking of the Mustang on February 16th outside Sears in the Dedham Mall.

Respectfully submitted
for the Commonwealth

RALPH C. MARTIN, II
DISTRICT ATTORNEY

by _____
Daniel J. Hourihan
Assistant District Attorney
Senior Trial Division

March 29, 2001
statement of the case.dad

NDING INCIDENT
· 4 2

TYPE OF INCIDENT
F

CODE
515

ENT LOCATION OF DEPARTMENT
BRAND CENTRAL

ASSOCIATE
YE 1

STATE          ZIP CODE
MA

CIRCLE ONE
A   B   H   P   W

HAIR     EYES     GLASSES
BLK

TIME DEPARTED

TIME ARRIVED

TIME DEPARTED

f the merchandise listed below from

ssociation.

DATE _____

| PRICE EACH | TOTAL |
|------------|-------|
|            |       |
|            |       |
|            |       |
|            |       |
|            |       |
|            |       |
|            |       |
|            |       |
|            |       |
|            |       |

GRAND TOTAL   452.89

DATE _____
TURE

DATE _____
TURE

ear closing I began watching a white male in the men's department
atshirts, sweatpants and jeans. I received a call from APA Bill
watch a male in men's sportswear, I told Bill I was already watching
e to watch a female that came in with the male over in the junior's
ale was also picking up many tops and shirts from that area. The
tinued to pick up items without even looking at the price on some of
emale proceeded to our women's department were they placed the
The male went over to the cologne department and the female
The clerk scanned all the items-shirts, jeans, tops, sweatshirts and
male then proceeded to pay with a Sears charge. Both Bill and
type of fraud with this account. Once the transaction was complete
the purchase)I pulled a sales extract off the computer. I also dialed
l credit to check on a suspicious sale. I informed credit of the
sked him to contact the customer. The credit associate was
tting the customer at such a late hour, I asked him what year the
nd he stated 1978. I told him the female looked about 25 and he
le and female then made another purchase in cosmetics. The male
two large bags filled with the purchases the female made. The
ned the cardholder (Natalie Bosse 0350088845192) was at home
fraudulent. The female was still in our men's department making
he male was in the parking lot. Bill Punch called me to say he was
ll detail and I told him the female was heading out of the store and
. I stopped the female in the computer department, I told her I was
ad I needed to talk to her about her purchase. I asked her if she was
dy. The male had returned to the store, he told me to leave her
id for their merchandise and there was no problem and they were
ll needed to speak to her, and then APA Bill Punch and DPD
approached from the mall entrance. Officer Morris asked the male
I then the male started to run. I began a foot chase of the male with
Punch remained with the female. The male ran through hardware
knocking over racks. I was able the catch up to male in between
pped the male from behind and fell into a rack. We both got up
the back of his coat. I then pulled the male down and Officer
of the male. He continued to try to get away. He kicked Officer
e again knocked the male to the floor. Officer Morris asked the
behind his back several times but the male refused. I called Bill
back up. Officer Morris used his nightstick and pepper spray to
ut these attempts failed. I moved back as Officer Morris used the
then was up and started running towards men's jeans and
tinued reaching in his pants and I kept safe distance back from
ugh hardware and towards lawn and garden. The male
rtment where I saw a holster go flying out of his hand. I yelled to
to stay back. The male exited the door and I heard a loud sound
hot. I stayed back looking around the corner to see a white car at
ite car then pulled away from the curb with the tires squealing.



BIT
6
-0 3 PM

I radioed to Bill Punch that he had a gun and that I thought he left in a white car. I went outside to find a young white male tell me a man just shot out his window and carjacked his car.

Prepared By: Michael McSweeney          Signature

# CRIMINAL DOCKET

**DOCKET NO.** 0154CR000364

ATTORNEY NAME *Pachard*

| ☐ INTERPRETER REQUIRED | DATE and JUDGE | DOCKET ENTRY |
|---|---|---|

RT DIVISION
edham

ADDRESS AND ZIP CODE OF DEFENDANT
LAWSON, RICHARD D
O'BRIEN WAY
DEDHAM, MA 02026

100168

DOB AND SEX
/14/1966    M

OF OFFENSE(S)
16/2001

PLACE OF OFFENSE(S)
DEDHAM

AINANT
N, DOREEN A

POLICE DEPARTMENT (if applicable)
DEDHAM PD

COMPLAINT
20/2001

RETURN DATE AND **WARRANT ISSUED**

OFFENSE
265/15/A ASSAULT TO MURDER c265 §15

---

**DATE and JUDGE block (handwritten):**

2/27/01 A(Ch)

☐ Attorney appointed (SJC R. 3:10)
☐ Atty denied and Deft Advised per 211D §2A
☐ Waiver of counsel found after colloquy

Terms of release set
☐ PR  ☒ Bail: 5,000,000
☐ Held (276 §58A)  ☐ 500,000 surety  *Euch*
☐ See back for special conditions

Arraigned and advised:
☒ Potential of bail revocation (276 §58)
☐ Right to bail review (276 §58)
☐ Right to drug exam (111E §10)

Advised of right to jury trial:
☐ Does not waive
☐ Waiver of jury trial found after colloquy

Advised of trial rights as pro se (Supp. R. 4)

Advised of right of appeal to Appeals Ct (R. 28)

---

**OFFENSE: 265/15/A ASSAULT TO MURDER c265 §15**

| FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT ☐ WAIVED |
|---|---|---|---|---|

TION DATE and JUDGE
7/81  A/Cl

TION METHOD
uilty Plea or Admission
Sufficient Facts
cepted after colloquy
d 278 §29D warning
nch Trial
y Trial
ne of the Above

FINDING
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation    ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon: ☐ Request of Comm.    ☐ Request of Victim
☐ Request of Deft    ☐ Failure to prosecute    ☐ Other:
☐ Filed with Deft's consent    ☐ Nolle Prosequi    ☐ Decriminalized (277 §70C)

FINAL DISPOSITION
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE          DATE

---

**OFFENSE: 265/18B/A FIREARM IN FELONY, POSSESS c265 §18B**

| FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT ☐ WAIVED |
|---|---|---|---|---|

ION DATE and JUDGE
7/01  A/Cl

ION METHOD
ty Plea or Admission
ufficient Facts
pted after colloquy
278 §29D warning
sh Trial
Trial
of the Above

FINDING
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation    ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon: ☐ Request of Comm.    ☐ Request of Victim
☐ Request of Deft    ☐ Failure to prosecute    ☐ Other:
☐ Filed with Deft's consent    ☒ Nolle Prosequi    ☐ Decriminalized (277 §70C)

FINAL DISPOSITION
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE          DATE

---

**OFFENSE: 265/18B/A FIREARM IN FELONY, POSSESS c265 §18B**

| FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT ☐ WAIVED |
|---|---|---|---|---|

ON DATE and JUDGE
7/01  A/Cl

N METHOD
Plea or Admission
icient Facts
ted after colloquy
78 §29D warning
Trial
rial
of the Above

FINDING
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation    ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon: ☐ Request of Comm.    ☐ Request of Victim
☐ Request of Deft    ☐ Failure to prosecute    ☐ Other:
☐ Filed with Deft's consent    ☒ Nolle Prosequi    ☐ Decriminalized (277 §70C)

FINAL DISPOSITION
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE          DATE

---

**OFFENSE: 265/21A/B CARJACKING, ARMED c265 §21A**

| FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT ☐ WAIVED |
|---|---|---|---|---|

N DATE and JUDGE
2/01  A/Cl

METHOD
Plea or Admission
cient Facts
d after colloquy
8 §29D warning
rial
al
the Above

FINDING
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation    ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon: ☐ Request of Comm.    ☐ Request of Victim
☐ Request of Deft    ☐ Failure to prosecute    ☐ Other:
☐ Filed with Deft's consent    ☒ Nolle Prosequi    ☐ Decriminalized (277 §70C)

FINAL DISPOSITION
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE          DATE

---

☒ ADDITIONAL COUNTS ATTACHED

CLERK-MAGISTRATE/ASST. CLERK          ON (DATE)

COURT ADDRESS
Dedham District Court
631 High Street

# ADDITIONAL COUNTS

**COUNT-OFFENSE**

5. **265/15B/A  ASSAULT W/DANGEROUS WEAPON c265 §15B**

on 02/16/2001 did, by means of a dangerous weapon, a GUN, assault MICHAEL J CALLAHAN, in violation of G.L. c.265, §15B(b).  (PENALTY: state prison not more than 5 years; or jail not more than 2½ years; or not more than $1000.)

**COUNT-OFFENSE**

6. **265/15B/A  ASSAULT W/DANGEROUS WEAPON c265 §15B**

on 02/16/2001 did, by means of a dangerous weapon, a SHOD FOOT, assault CHARLES MOURIS, in violation of G.L. c.265, §15B(b).  (PENALTY: state prison not more than 5 years; or jail not more than 2½ years; or not more than $1000.)

**COUNT-OFFENSE**

7. **265/13D/A  A&B ON POLICE OFFICER c265 §13D**

on 02/16/2001 did assault and beat CHARLES MOURIS, a police officer who was then engaged in the performance of his or her duties, in violation of G.L. c.265, §13D.  (PENALTY: house of correction not less than 90 days, not more than 2½ years; or not less than $500, not more than $5000.)

**COUNT-OFFENSE**

8. **269/10/J  FIREARM, CARRY WITHOUT LICENSE c269 §10**

on 02/16/2001 did knowingly have in his or her possession, or under his or her control in a vehicle, a firearm, as defined in G.L. c.140, §121, or a rifle or shotgun, not then being present in or on his or her residence or place of business, and not having in effect a license to carry firearms or otherwise being authorized by law to do so, in violation of G.L. c.269, §10(a).  (PENALTY: state prison not less than 2½ years, not more than 5 years; or jail or house of correction not less than 1 year, not more than 2½ years; no continuance with a finding, filing, or suspended sentence; no reduction of sentence, probation, parole, furlough, or sentence deduction until 1 year served; §10(c): firearm, rifle or shotgun to be ordered forfeited.)

**COUNT-OFFENSE**

9. **888888  MISCELLANEOUS COMMON LAW VIOLATION**

on 02/16/2001 did CREDIT CARD FRAUD, in violation of the common law.  (PENALTY: see G.L. c.279, §5:)

**COUNT-OFFENSE**

10. **90/23/D  LICENSE SUSPENDED, OP MV WITH c90 §23**

on 02/16/2001 did operate a motor vehicle after his or her license or right to operate a motor vehicle without a license had been suspended or revoked, or after notice of such suspension or revocation had been issued by the Registrar of Motor Vehicles and received by the defendant or by his or her agent or employer, and prior to the restoration of such license or right to operate or the issuance to him or her of a new license to operate, in violation of G.L. c.90, §23.  (PENALTY: imprisonment for not more than 10 days; or not less than $500, not more than $1000; or both; and RMV shall suspend or revoke license for an additional 60 days.)

| COMPLAINANT | SWORN TO BEFORE CLERK-MAGISTRATE/ASST. CLERK | ON (DATE) |
|---|---|---|
| | X | |

FENDANT

AWSON, RICHARD B.
O'BRIEN WAY
DHAM, MA 02026

**Dedham District Court**

TO ANY JUSTICE OR CLERK-MAGISTRATE
OF THE DEDHAM DISTRICT COURT

The undersigned complainant, on behalf of the Commonwealth, on oath complains that on the date and at the location stated herein the defendant did commit the offense(s) listed below.

| OF BIRTH | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|
| 4/1966 | M | W | 5'06" | 160 | GRN | BRO |

| ENT REPORT # | SOCIAL SECURITY # |
|---|---|
| | 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 |

| OF OFFENSE | PLACE OF OFFENSE |
|---|---|
| 6/2001 | DEDHAM |

| LAINANT | POLICE DEPARTMENT |
|---|---|
| N, DOREEN A | DEDHAM PD |

| OF COMPLAINT | RETURN DATE AND TIME |
|---|---|
| 0/2001 | WARRANT ISSUED |

T-OFFENSE

5/15/A ASSAULT TO MURDER c265 §15

/16/2001 did assault MICHAEL J CALLAHAN with intent to murder such person, in violation of G.L. c.265, §15. (NO DISTRICT COURT FINAL SDICTION IN ADULT SESSION; must submit a DNA sample within 90 days of conviction pursuant to G.L. c.22E, §3.)

DEFENDANT COPY

T-OFFENSE

5/18B/A FIREARM IN FELONY, POSSESS c265 §18B

/16/2001, while in the commission of or the attempted commission of WITH INTENT TO MURDER, an offense which may be punished by imprisonment state prison, did have in his or her possession or under his or her control a firearm, rifle or shotgun, in violation of G.L. c.265, §18B. (NO DISTRICT T FINAL JURISDICTION IN ADULT SESSION; must submit a DNA sample within 90 days of conviction pursuant to G.L. c.22E, §3.)

-OFFENSE

5/18B/A FIREARM IN FELONY, POSSESS c265 §18B

/6/2001, while in the commission of or the attempted commission of INTENT TO COMMIT MURDER, an offense which may be punished by
nment in the state prison, did have in his or her possession or under his or her control a firearm, rifle or shotgun, in violation of G.L. c.265, §18B. (NO
ICT COURT FINAL JURISDICTION IN ADULT SESSION; must submit a DNA sample within 90 days of conviction pursuant to G.L. c.22E, §3.)

-OFFENSE

5/21A/B CARJACKING, ARMED c265 §21A

/6/2001, with intent to steal a motor vehicle, did assault, confine, maim or put in fear MICHAEL MCSWEENEY for the purpose of stealing a motor
while armed with a dangerous weapon, in violation of G.L. c.265, §21A. (PENALTY: state prison not more than 20 years; or jail or house of correction
than 1 year, not more than 2½ years; and not less than $5000, not more than $15,000. District Court has final jurisdiction under G.L. c.218, §26.)

| AINANT | SWORN TO BEFORE CLERK-MAGISTRATE | ON (DATE) | TOTAL COUNTS |
|---|---|---|---|
| | X | | 10 |

| NDANT COPY) | FIRST JUSTICE Hon. GERALD ALCH | COURT ADDRESS | Dedham District Court 631 High Street Dedham, MA 02026-1848 |
|---|---|---|---|
| CLERK-MAGISTRATE/ASST. CLERK X | ON (DATE) | | |

Exhibit 4
3 pages

Dedham District Court
631 High Street
P.O. Box 66
Dedham, Ma. 02026

The within named complainant requests that a complaint issue against the within
named defendant, charging said defendant with the offense(s) listed below.

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE | 300 Providence |
|---|---|---|---|
| 02/20/01 | 02/16/01 | Dedham Mall | Highway |

| NAME OF COMPLAINANT | NO. | OFFENSE | G.L. Ch. and Sec. |
|---|---|---|---|
| Charles Mouris | | | |
| **ADDRESS AND ZIP CODE OF COMPLAINANT** | 1. | Operating M/V after susp. of license | 90-23 |
| 600 High street | | | |
| Dedham, Massachusetts 02026 | 2. | | |
| **NAME, ADDRESS AND ZIP CODE OF DEFENDANT** | | | |
| Richard D. Glawson | 3. | | |
| 27 O'Brien Way | | | |
| Dedham, Massachusetts 02026 | 4. | | |

| COURT USE ONLY → | A hearing upon this complaint application will be held at the above court address on | DATE OF HEARING | TIME OF HEARING AT | COURT USE ← ONLY |
|---|---|---|---|---|

## CASE PARTICULARS — BE SPECIFIC

| O. | NAME OF VICTIM Owner of property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc. | VALUE OR PROPERTY Over or under $250. | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc. |
|---|---|---|---|---|
| 1 | Michael Callahan | 1986 Ford Mustang Mass reg 1898TC | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

**OTHER REMARKS:** Investigation of Officer Charles Mouris, Detective Fitzhenry

and Massachusetts State Trooper Steven McDonala

x _____
SIGNATURE OF COMPLAINANT

## DEFENDANT IDENTIFICATION INFORMATION — Complete data below if known.

| DATE OF BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NUMBER | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| 10/14/66 | Boston | 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 | M | W | 5/06 | 160 | grn | brn |
| OCCUPATION | EMPLOYER/SCHOOL | | MOTHER'S NAME (MAIDEN) | | FATHER'S NAME | | | |

### ▼ COURT USE ONLY ▼

| DATE | DISPOSITION | AUTHORIZED BY |
|---|---|---|
| | **NO PROCESS TO ISSUE** ☐ At request of complainant ☐ Complainant failed to prosecute ☐ Insufficient evidence having been presented | |
| | **PROCESS TO ISSUE** ☐ Sufficient evidence presented ☐ Defendant failed to appear | **TYPE OF PROCESS** ☐ Warrant ☐ Summons returnable _____ |
| | ☐ Continued to _____ | |

COMMENTS

C-CR2 (3/88)

The within named complainant requests that a complaint issue against the within named defendant, charging said defendant with the offense(s) listed below

Dedham District Court
Filed 12/29/2004  Page 20 of 166
631 High Street
P.O. Box 109
Dedham, Ma. 02026

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|---|
| 02/20/01 | 02/16/01 | Dedham Mall 300 Providence Highway |

**NAME OF COMPLAINANT**
Charles Mouris

**ADDRESS AND ZIP CODE OF COMPLAINANT**
600 High street
Dedham, Massachusetts  02026

**NAME, ADDRESS AND ZIP CODE OF DEFENDANT**
Richard D. Glawson
27 O'Brien Way
Dedham, Massachusetts  02026

| NO. | OFFENSE | G.L. Ch. and Sec. |
|---|---|---|
| 1. | Assault and battery by means /dangerous weapon to wit shod foot | 265-15A |
| 2. | Assault and battery on police Officer in perform of his duty | 265-13D |
| 3. | illegal possession of a firearm without a permit | 269-10 |
| 4. | Conspiracy on credit card fraud with Aleja Campbell | common la |

| COURT USE ONLY → | A hearing upon this complaint application will be held at the above court address on | DATE OF HEARING | TIME OF HEARING AT | COURT USE ← ONLY |
|---|---|---|---|---|

## CASE PARTICULARS — BE SPECIFIC

| NO. | NAME OF VICTIM Owner of property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc. | VALUE OR PROPERTY Over or under $250. | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc. |
|---|---|---|---|---|
| 1 | Charles Mouris | | | shod foot |
| 2 | Charles Mouris | | | |
| 3 | Michael McSweeney Michael Callahan | | | Hand gun |
| 4 | Natalie Bosse | stolen Sears card | over | |

**OTHER REMARKS:** Investigation of Officer Charles Mouris, Detective Fitzhenry and Massachusetts State Trooper Steven McDonald.

x _____
SIGNATURE OF COMPLAINANT

## DEFENDANT IDENTIFICATION INFORMATION — Complete data below if known.

| DATE OF BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NUMBER | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| 10/14/66 | Boston | 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 | M | W | 5/06 | 160 | grn | brn |

| OCCUPATION | EMPLOYER/SCHOOL | MOTHER'S NAME (MAIDEN) | FATHER'S NAME |
|---|---|---|---|
| | | | |

▼ COURT USE ONLY ▼  AUTHORIZED BY

| DATE | DISPOSITION | AUTHORIZED BY |
|---|---|---|
| | NO PROCESS TO ISSUE ☐ At request of complainant ☐ Complainant failed to prosecute ☐ Insufficient evidence having been presented | |
| | PROCESS TO ISSUE ☐ Sufficient evidence presented ☐ Defendant failed to appear  TYPE OF PROCESS ☐ Warrant ☐ Summons returnable _____ | |
| | ☐ Continued to _____ | |

COMMENTS

C-CR2 (3/88)

Exibit-3
3 page

within named complainant requests that a complaint issue against the within
named defendant, charging said defendant with the offense(s) listed below.

| OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|---|
| 2/20/01 | 02/16/01 | Dedham Mall |

300 Providence Highway

OF COMPLAINANT

. Charles Mouris

RESS AND ZIP CODE OF COMPLAINANT

600 High street

Dedham, Massachusetts 02026

, ADDRESS AND ZIP CODE OF DEFENDANT

Richard D. Glawson

27 O'Brien Way

Dedham, Massachusetts 02026

| NO. | OFFENSE | G.L. Ch. and Sec |
|---|---|---|
| 1. | Assault by means of a dangerous weapon with intent to murder | 265-15 |
| 2. | using a firearm while in the commission of/felony 2-counts | 266-18B |
| 3. | While being armed with firearm, put person in fear to steal motor vehicle | 265-21A |
| 4. | assault by means of a dangerous weapon | 265-13B |

| URT USE LY→ | A hearing upon this complaint application will be held at the above court address on | DATE OF HEARING | TIME OF HEARING AT | COURT USE ←ONLY |
|---|---|---|---|---|

## CASE PARTICULARS — BE SPECIFIC

| NAME OF VICTIM Owner of property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc. | VALUE OR PROPERTY Over or under .$250. | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc. |
|---|---|---|---|
| Michael J. Callahan | 1986 Ford Mustang window/interior | over | gun |
| Michael J. Callahan Michael McSweeney | 1986 Ford Mustang | | gun |
| Michael J. Callahan | 1986 Ford Mustang | over | gun |
| Michael McSweeney | | | gun |

ER REMARKS:    Investigation of Officer Charles Mouris, Detective Fitzhenry

d Massachusetts State Trooper Steven McDonald.

x _____
SIGNATURE OF COMPLAINANT

## DEFENDANT IDENTIFICATION INFORMATION — Complete data below if known.

| F BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NUMBER | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| /14/66 | Boston | 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 | W/M | W | 5/06 | 160 | grn | Brn |

| ATION | EMPLOYER/SCHOOL | MOTHER'S NAME (MAIDEN) | FATHER'S NAME |
|---|---|---|---|

### ▼ COURT USE ONLY ▼

| DATE | DISPOSITION | | AUTHORIZED BY |
|---|---|---|---|
| | NO PROCESS TO ISSUE ☐ At request of complainant ☐ Complainant failed to prosecute ☐ Insufficient evidence having been presented | | |
| | PROCESS TO ISSUE ☐ Sufficient evidence presented ☐ Defendant failed to appear | TYPE OF PROCESS ☐ Warrant ☐ Summons returnable_____ | |
| | ☐ Continued to _____ | | |

MENTS

3/88)

# SUMMONS TO DEFENDANT

**0154CR000364**

## District Court Department

| | | |
|---|---|---|
| DEFENDANT'S DOB | SEX | HOME PHONE | WORK PHONE | No. COUNTS |
| 10/14/1966 | M | | | 10 |

COURT NAME and ADDRESS

Dedham District Court
631 High Street
Dedham, MA 02026-1848

DEFENDANT'S NAME and ADDRESS

GLAWSON, RICHARD D
27 O'BRIEN WAY
DEDHAM, MA 02026

| DATE YOU MUST APPEAR | ←←←←← |
|---|---|
| | YOU MUST APPEAR AT ABOVE COURT AT THIS DATE and TIME |
| TIME YOU MUST APPEAR | ←←←←← |

SCHEDULED EVENT

**ARRAIGNMENT**

### FIRST SIX COUNTS:

1. 265/15/A   ASSAULT TO MURDER c265 §15
2. 265/18B/A   FIREARM IN FELONY, POSSESS c265 §18B
3. 265/18B/A   FIREARM IN FELONY, POSSESS c265 §18B
4. 265/21A/B   CARJACKING, ARMED c265 §21A
5. 265/15B/A   ASSAULT W/DANGEROUS WEAPON c265 §15B
6. 265/15B/A   ASSAULT W/DANGEROUS WEAPON c265 §15B

## TO THE ABOVE-NAMED DEFENDANT:

**You are hereby ordered to appear in this court on the date and time indicated above to answer to a criminal complaint that has been issued against you. Please report to the probation office upon your arrival at the court.**

| TESTE OF FIRST JUSTICE | DATE ISSUED | CLERK-MAGISTRATE |
|---|---|---|
| WITNESS:   Hon. GERALD ALCH | 02/20/2001 | SALVATORE PATERNA |

### INSTRUCTIONS TO DEFENDANT

1. **YOU ARE REQUIRED TO APPEAR IN COURT** on the date and time shown above. Please bring this summons with you to the court.

2. **IF YOU FAIL TO APPEAR** in court on the date and time shown above or on any future scheduled dates, you will be found in default, a warrant for your immediate arrest will be issued, and you may be assessed substantial costs and warrant fees. The Registry of Motor Vehicles will also refuse to renew your driver's license and (if you are charged with a motor vehicle offense) will suspend your driver's license. The court may also issue a new complaint against you under G.L. c.276, §82A, which is separately punishable by up to $50,000 in fines and up to 5 years imprisonment (if you are charged with a felony) or up to $10,000 in fines and up to 1 year imprisonment (if you are charged with a misdemeanor).

3. **THE CHARGES AGAINST YOU.** The number of counts (charges) in this criminal complaint are shown in the "No. Counts" box above, and the first six counts are listed above. If there are more than six counts, you may obtain the details of them from the clerk-magistrate's office prior to arraignment. At your arraignment, you or your lawyer will be given a copy of the complaint.

4. **LAWYER.** You have a right to be represented by an attorney at every state of the proceedings against you. If you are charged with an offense punishable by imprisonment and you are unable to afford an attorney, you may be entitled to the services of a court-appointed attorney at no or reduced cost to you. You may apply for a court-appointed attorney when you report to the probation office on the date and time shown above.

5. **TRIAL BY JURY OR TRIAL BY A JUDGE.** If your case is not disposed of at arraignment or as a result of a pretrial hearing by a guilty plea or other disposition, it will be scheduled for a jury trial by a jury of six persons. If you waive the right to a jury trial, your case will be scheduled for a trial by a judge without a jury.

| | |
|---|---|
| Atencion: | Notificación oficial del tribunal; si no entiende inglés, obtenga una traducción. |
| Attention: | Avis officiel du tribunal, Anglais limite, veuillez faire traduire. |
| Attenzione: | avviso ufficiale del tribunale. Chi non capisce l'inglese lo faccia tradurre. |
| Atenção: | Este é um anúncio jurídico oficial. Mande traduzi-lo se você não compreende o Inglês. |
| Atenção: | Es é um anúncio oficial di tribunal. Manda traduzil si bu ca ta entende Inglês. |
| Atansyon: | Se avi ofisyel Tribunal la. Fe tradwi'l souple, si'w pa kon Angle. |
| Внимание! | Это повестка из суда. Если Вы не читаете по-английски, обратитесь к переводчику. |

[additional lines in Khmer, Vietnamese, and Chinese scripts]

注意: 這是正式的法院通告。如果您不懂英語, 請找人代為翻譯。

*Exhibit-5*

RMV COPY (IF CIVIL) OR COURT COPY (IF CRIM.)

## MASSACHUSETTS UNIFORM CITATION

H 0388804

"PRESS HARD — You are making 5 copies."

(Exhibit-6)

# Commonwealth of Massachusetts
## County of Norfolk
## The Superior Court



**MITTIMUS TO Cedar Junction MCI (Walpole)**

Docket #NOCR2001-00117-001

To the Sheriff of said County of Norfolk, his deputies, the Officers hereinafter named and the Superintendent of the **Cedar Junction MCI (Walpole)**

GREETING:

    **Whereas**, by the consideration of the Superior Court Department of the Trial Court for Criminal Business, holden at **Dedham** within and for the County of **Norfolk**, on the **9th day of June** in the year of our Lord **2003**.

### Richard D Glawson

now in the custody of the Sheriff of said County of Norfolk, convicted of the crime(S) of
265:018:b.2  Assault, armed, intent to murder            02/16/2001

for which crime the said **Richard D Glawson** was sentenced to be confined in the **Cedar Junction MCI (Walpole)**,

    We therefore, **command you**, the said Sheriff, Deputies and Officers of the Court to remove the said **Richard D Glawson** from the Jail in **Dedham** in the said County of **Norfolk**, to the **Cedar Junction MCI (Walpole)**, and **we command you**, the said Superintendent to receive the said **Richard D Glawson** and immediately thereon to cause the said **defendant** to be confined therein for **a term of not exceeding 20 years or less than 15 years concurrent with sentence now being served or to be served - DNA sample - credit time 290 days - SENTENCE STAYED TO 9/10/03**

as aforesaid.

    **WITNESS, Suzanne V. DelVecchio**, Chief Justice of said Court and the seal thereof at **Dedham** aforesaid, this **9th day of June** in the year of our Lord **2003**.

.................................................
Assistant Clerk

## RETURN

Norfolk, SS.

Dedham
_____ 2003

In obedience to the within warrant, I have conveyed the within named defendant to the **Cedar Junction MCI (Walpole)**, and delivered him to the Superintendent thereof with a copy of this warrant.

Deputy Sheriff, of said County
Officer of the Court named within.

# Commonwealth of Massachusetts
## County of Norfolk
## The Superior Court



### MITTIMUS TO Cedar Junction MCI (Walpole)

Docket #NOCR2001-00117-002

To the Sheriff of said County of **Norfolk**, his deputies, the Officers hereinafter named and the Superintendent of the **Cedar Junction MCI (Walpole)**

### GREETING:

**Whereas,** by the consideration of the Superior Court Department of the Trial Court for Criminal Business, holden at **Dedham** within and for the County of **Norfolk**, on the **9th day of June** in the year of our Lord **2003.**

### Richard D Glawson

now in the custody of the Sheriff of said County of Norfolk, convicted of the crime(S) of

265/21A/C     CARJACKING, FIREARM-ARMED c265 s21         02/16/2001

for which crime the said **Richard D Glawson** was sentenced to be confined in the **Cedar Junction MCI (Walpole)**,

We therefore, **command you,** the said Sheriff, Deputies and Officers of the Court to remove the said **Richard D Glawson** from the Jail in **Dedham** in the said County of **Norfolk**, to the **Cedar Junction MCI (Walpole)**, and **we command you**, the said Superintendent to receive the said **Richard D Glawson** and immediately thereon to cause the said **defendant** to be confined therein for **a term of not exceeding 20 years or less than 15 years concurrent with #117- 001 and any sentence now being served or to be served - SENTENCE STAYED TO 9/10/03 - cred time 290 days**

**as aforesaid.**

**WITNESS, Suzanne V. DelVecchio**, Chief Justice of said Court and the seal thereof at **Dedham** aforesaid, this **9th day of June** in the year of our Lord **2003.**

..............................................
### Assistant Clerk

### RETURN

Norfolk, SS.

**Dedham**
_____ **2003**

In obedience to the within warrant, I have conveyed the within named defendant to the **Cedar Junction MCI (Walpole)**, and delivered him to the Superintendent thereof with a copy of this warrant.

Deputy Sheriff, of said County
Officer of the Court named within.

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                    At the SUPERIOR COURT, begun and holden

at DEDHAM, within and for the County of Norfolk,

on the third Thursday of March, 2001

THE JURORS for the Commonwealth of Massachusetts, on their oath present that

## RICHARD D. GLAWSON

of Dedham in the County of Norfolk
on or about February 16, 2001
at Dedham in the County of Norfolk

being armed with a dangerous weapon, to wit: a gun, did assault Michael J. Callahan, with intent
to murder the said Michael J. Callahan, in violation of MGL c.265, s.18 (b)

against the peace of said Commonwealth, and contrary to the form of the Statute in such case
made and provided.

A TRUE BILL

.................................................... { Foreman of the.
                                                       Grand Jury.

.................................................... { Assistant District Attorney
                                                       Norfolk District

0086v

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.            At the SUPERIOR COURT, begun and holden
at DEDHAM, within and for the County of Norfolk,

on the third Thursday of March, 2001

THE JURORS for the Commonwealth of Massachusetts, on their oath present that

### RICHARD D. GLAWSON

of Dedham in the County of Norfolk
on or about February 16, 2001
at Dedham in the County of Norfolk

that said Richard D. Glawson while being armed with a dangerous weapon, to wit: a gun,
with intent to steal a motor vehicle did assault, confine, maim or put in fear Michael J.
Callahan for the purpose of stealing the motor vehicle in violation of MGL c. 265, s. 21A,

against the peace of said Commonwealth, and contrary to the form of the Statute in such case
made and provided.

A TRUE BILL

.................................................. } Foreman of the
                                                     Grand Jury.

........ Assistant District Attorney
Norfolk District

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.

SUPERIOR COURT
CRIM NO. 01-0117-001-016

COMMONWEALTH          :
                      :
VS.                   :
                      :
RICHARD GLAWSON       :

# MEMORANDUM AND RULING

The defendant entered pleas of guilty to eleven Norfolk County indictments on February 20, 2003 and sentence was imposed on June 9, 2003.[1] The defendant is proceeding *pro se* with the assistance of court-appointed standby counsel. Moments before sentencing, the defendant filed motions to dismiss the indictments and to withdraw his guilty pleas. These motions are DENIED without further hearing. Moreover, on June 16, 2003, the defendant filed a Motion for a New Sentencing Hearing which is also DENIED[2]. A recitation of some of the case history is essential to an understanding of this Court's decisions.

The Norfolk indictments resulted from a series of events which allegedly originated in Suffolk County on February 12, 2001, were followed by transactions in Middlesex County and Suffolk County on February 15, 2001 and transactions in Norfolk County on February 16, 2001, and terminated with events leading to his arrest in Suffolk County also on February 16, 2001. In the

---

[1] Sentencing was continued with the defendant's assent on two occasions, May 5 and 29 of 2003, so that his standby counsel could further explore a resolution of the matters pending in Suffolk County.

[2] On the same date, the defendant also filed motions for findings and rulings, appointment of appellate counsel, free transcripts, reserving date for revise and revoke, objection to the government's *nolle prosequi*, and for copies of docket sheets. These motions are addressed in the Court's ORDER on Page 7.

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE.

Deputy Assistant Clerk

Fall of 2002, the defendant happened to appear for a status conference on the Middlesex County indictments in the Cambridge Superior Court session to which this judge was then assigned. This judge learned that the defendant, if convicted, faced a mandatory life sentence in Suffolk County, a mandatory minimum 20 year sentence in Middlesex County, a mandatory minimum 20 year sentence in Norfolk County, a substantial number of years on a probation surrender in Essex County, and a contempt sentence for spitting at a Superior Court judge in Lowell. This judge asked the defendant if he had an interest in consolidating all of his outstanding matters with a plea disposition in mind. This judge offered to meet with the defendant's standby counsel and the assigned assistant district attorneys from the three counties with untried indictments and to contact the probation department in Essex County. The defendant agreed, the meeting took place, and this judge, after consultation with Middlesex and Essex probation officers and reviewing the sentencing guidelines, indicated in writing the likely disposition. This judge indicated that he would impose an aggregate sentence of 18-20 years with a from and after probationary period upon the Commonwealth's agreement to dismiss, file or *nolle prosse* the habitual criminal indictments in each county. All sentences would be concurrent, the defendant would be given full jail credits, and the Essex probation violation and the Lowell contempt would be imposed concurrently so that the aggregate of 18-20 years would not be exceeded. The defendant rejected the offer.

In November 2002, Judge Cratsley, the motions and trial judge in the Norfolk Superior Court, began hearing the defendant's pre-trial motions. The defendant's Petition for a writ of Habeas Corpus was denied on December 13, 2002. His Motion to Dismiss for Lack of a Speedy Trial was also denied on December 12, 2002 as was his Motion to Dismiss challenging his pre-trial

2

confinement.  On January 27, 2003, hearings commenced on the defendant's motions to suppress

evidence.  These motions were denied on February 4, 2003 and interlocutory appeals were denied

by the Supreme Judicial Court on February 10, 2003.  A decision was issued on the defendant's

Motion to Clear the Playing Field at Trial on February 11, 2003 and his jury trial commenced on

February 12, 2003 before Judge Cratsley.  At all these pre-trial motions and at his trial, the

defendant was assisted by a court-appointed standby counsel, Mr. Luciano, who also serves as his

court-appointed standby counsel on the Suffolk County indictments.

This judge was assigned to the Middlesex County Lowell Superior Court during the first four

months of this year and was asked by the defendant's standby counsel and the prosecutors to

follow up his previous involvement with this defendant by conferencing the cases with the

defendant, his standby counsel, and the prosecutors from all three counties.  The first conference,

in Dedham, occurred during the week of February 11, 2003 and resulted in some plea

concessions from the government, but the defendant decided to reject the consolidated offer.  At

one point, the defendant wanted to plead guilty to the habitual criminal indictment in Norfolk

because it would provide for a more relaxed parole eligibility and this was unacceptable to the

Commonwealth.

On February 20, 2003, during the sixth day of the defendant's jury trial in Norfolk County,

this judge was sitting at the Lowell Superior Court when he was asked to travel to Dedham at the

defendant's request to accept a guilty plea.  This judge drove to the Norfolk Superior Court and

conferred once again with the defendant, his standby counsel, and the prosecutors.  The Norfolk

prosecutor had indicated that he would *nolle prosse* the habitual offender indictment, recommend

a 15-20 year sentence, and not insist on a from and after probationary term.  The district attorney

3

also indicated that he would assist in arranging for a sentence to be served, at the defendant's request, in the federal penal system. This judge indicated that he: (1) would not exceed a sentence of 15-20 years on the Norfolk indictments, (2) would not impose a from and after probationary term, (3) would continue sentencing and give the defendant the opportunity for a pre-sentence report, (4) would thereafter stay the execution of sentence for a reasonable period so that the defendant could attempt to work out an agreement with Middlesex and Suffolk Counties, (5) would insure that the Norfolk sentences would be run concurrent with Middlesex and Suffolk sentences as well as the Essex matters, and (6) would make a strong recommendation to the commissioner of correction that the sentence be served in the federal system (if the defendant so-requested). The defendant accepted those terms and entered pleas of guilty to most of the Norfolk indictments upon the representation that the remaining Norfolk charges would be filed, *nolle prossed*, or dismissed at sentencing. This judge offered the defendant the benefit of a pre-sentence report from the probation department and he accepted the offer. The plea was not contingent upon a future plea resolution of the Middlesex and Suffolk indictments although this judge agreed to assist if the parties desired . The defendant was advised of the rights that he would be giving up with the acceptance of a guilty plea and this judge specifically found that the guilty plea was made knowingly, voluntarily, and intelligently and that there was a factual basis for acceptance of the guilty plea.

Subsequently, the defendant, his standby counsel, and the prosecutors from Middlesex and Suffolk Counties met with this judge at the Lowell Superior Court on or about March 7, 2003 where it was anticipated that the Middlesex and Suffolk cases might be resolved by guilty pleas. This did not occur because the defendant was reluctant to plead guilty to the most serious Suffolk

4

indictment which carried a mandatory minimum term even with a dismissal of the habitual criminal charge. The defendant's position was that a guilty plea to that indictment would subject him to a maximum security prison setting during the entire period of sentence and that he would not be eligible for programs which could earn him good time deductions. The plea negotiations broke down at that point.

When the defendant appeared for sentencing on the Norfolk cases on May 5 and May 27, 2003, it was represented to this judge that there was a possibility that Suffolk would not insist on a guilty plea to the indictment which carried the mandatory minimum sentence. This judge, after consultations with the defendant's standby counsel, the prosecutor, and the defendant in open court, continued the Norfolk sentencing to allow the defendant, through standby counsel, to pursue resolution of the Suffolk indictments with the prosecutor and the sessions judge. It was later reported that no offer from Suffolk would be made until sentencing had occurred in Norfolk.

On June 9, 2003, the defendant appeared for sentencing before this judge. The defendant first sought to argue a previously filed (and denied) motion to vacate the guilty plea of one of the predicate offenses underlying the habitual criminal indictments. When this judge informed the defendant that he was not hearing that matter and that sentencing recommendations were in order, the defendant then filed two motions, one to dismiss and one to withdraw his guilty pleas[3]. He argued that his motions and trial judge in Norfolk had threatened him with 50 years in prison

---

[3] The docket sheet shows the filing on 4/08/03 of a "Petition for the Great Writ of Liberty" and on 5/5/03 of a "Motion to Withdraw Guilty Plea before Sentencing and Plead Anew" (in addition to 5 other motions on that date). Neither the judge nor the assistant district attorney had seen these motions before the June 9, 2003 sentencing. The docket sheet shows the filing of about 150 defense motions in the six and one-half months preceding sentencing.

if he did not enter the guilty pleas before this judge. He also argued that his lawyer was engaged in a conspiracy against him, that this judge was in a conspiracy with the complaining police witness, and that his plea was not knowing and voluntary. This judge heard a sentencing recommendation from the Commonwealth and noted that the defendant had refused to speak to the probation officer who was consequently unable to submit a pre-sentence report. The defendant argued that the guidelines were considerably lower than the sentence recommended by the Commonwealth. This judge then imposed sentence of an aggregate term of 15-20 years. The execution of the sentence was stayed three months so that the defendant could make appearances in Suffolk County and Middlesex County.

The accusation that the motions and trial judge threatened the defendant with a fifty-year sentence is preposterous and unworthy of comment as is the accusation that his standby counsel and this judge conspired against him. This defendant was more knowledgeable than counsel or the court as to the pros and cons of entering a guilty plea. He understood all of the ramifications of a the proposed sentence. This judge stands ready to follow up on his commitments to the defendant whether he resolves the Suffolk and/or Middlesex matters by plea or trial. That is, the Norfolk sentence will be concurrent with any sentence from Suffolk or Middlesex on the outstanding indictments there, the recommendation that the sentence be served in the federal penal system will continue until or unless the defendant changes his mind, and the Essex matters will, upon the defendant's request, be resolved with a concurrent term.

Judge Cratsley allowed the defendant to stay at the Norfolk Jail pending resolution of his Norfolk case because of difficulties that he was reporting at MCI Concord. This judge agreed to stay the execution of the defendant's sentence for a reasonable period and remand him to the

Norfolk County Jail so that he would not be in state custody while attempting to resolve his outstanding cases in Suffolk and Middlesex Counties. At some point, the sessions judges in Suffolk and/or Middlesex will have to address the defendant's pre-trial custody status. The stay of execution on the Norfolk sentence expires on September 10, 2003.

# ORDER

Given the case history and for the reasons stated above, no further hearing is indicated and the defendant's Motion to Dismiss, Motion to Withdraw his Guilty Pleas, and Motion for a New Sentencing Hearing are DENIED.

As to the defendant's other motions filed on June 16, 2003: (1) the Motion for a free transcript of the sentencing hearing is ALLOWED; (2) The Motion for a Reservation Date to Revise and Revoke is DENIED as Rule 29 is specific as to its time parameters; (3) Motion objecting to the government's *nolle prosequi* is DENIED as the government needs neither the court's permission nor the defendant's permission to *nolle prosse* an indictment; (4) Motion for docket sheets is ALLOWED in that the Clerk's Office is to mail two sets of updated typed docket sheets to the defendant; (5) Motion for Finding of Facts & Ruling of Law is DENIED as the pertinent facts and ruling are set out herewith; and (6) Motion for appointment of appellate counsel is DENIED as the defendant to date has discharged two court-appointed attorneys in Norfolk County and states that his Norfolk stand-by counsel is conspiring against him. The defendant's motion will be forwarded to the Committee for Public Counsel Services which, as a discretionary matter, may appoint private counsel. Otherwise, the defendant's recourse is with the Appeals Court.

_____
JUDGE

Dated: July 16, 2003

8

# Asset Protection Department Incident Report

INCIDENT # : 01-41

| UNIT CITY / STATE | CUSTOMER | ADULT | REFERENCE / CORRESPONDING INCIDENT |
|---|---|---|---|
| 1125  DEDHAM, MA | ✓ | ASSOCIATE | ✓ | JUVENILE | 01-42 |

**DOLLAR AMOUNT AT SELLING:**
- A. Proven Loss ...... $ _____
- B. Admitted ...... $ _____
- C. Recovered ...... $ 452.89
- D. Net Loss ...... $ _____

☑ PROSECUTED
☐ RELEASED
☐ PRODUCTIVE RECOVERY
☐ REPORT ONLY

TYPE OF INCIDENT: E

| DATE | TIME OF DETAINMENT | LOCATION OF DETAINMENT |
|---|---|---|
| 2-16-01 | 21:00 | BRAND CENTRAL |

CODE: 515

**ASSET PROTECTION ASSOCIATE:** Bill Punch

| MERCHANDISE REMOVED FROM | WHERE CONCEALED | WITNESSES (ASSOCIATES, OTHER A.P. ASSOCIATE) |
|---|---|---|
| DISPLAY RACKS | N/A | MIKE McSWEENEY |

**NAME (LAST, FIRST, M.I.)** | **ALIAS**

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | NATICK | MA | |

| TELEPHONE # | SOCIAL SECURITY # | SL / ID # (INCLUDE STATE) | RACE: A B H P W |
|---|---|---|---|
| ( ) | | | A |

| PLACE OF BIRTH | D.O.B. | AGE | SEX | HEIGHT | WEIGHT | HAIR | EYES | GLASSES |
|---|---|---|---|---|---|---|---|---|
| | | | F | 5-5 | 115 | BLK | | — |

| CLOTHING | OCCUPATION | PLACE OF EMPLOYMENT |
|---|---|---|
| LEATHER BLACK COAT | | |

| POLICE NOTIFIED | TIME CALLED | TIME ARRIVED | OFFICER RESPONDING |
|---|---|---|---|
| ☑ YES   NO | 21:15 | 21:17 | OFF MOURIS |

BADGE # | POLICE REPORT #

**COMPLETE FOR JUVENILE**
(PARENT / GUARDIAN / PERSON NOTIFIED)

| | TIME NOTIFIED | TIME ARRIVED |
|---|---|---|
| JUVENILE RELEASED TO: (SIGNATURE REQUIRED) | DATE / TIME | TIME DEPARTED |

**STATEMENT:**

I, _____ admit to the theft of the merchandise listed below from
          NAME

Sears _____ in _____
          UNIT NAME                        CITY / STATE

I understand that this information may be submitted to United States Employers Mutual Association.

SIGNATURE _____          DATE _____

| DIV | QTY | ITEM / SKU | DESCRIPTION | PRICE EACH | TOTAL |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | GRAND TOTAL | 452.89 |

PREPARED BY  WILLIAM PUNCH          DATE 2-17-01          WITNESS _____  DATE _____
                                                                         SIGNATURE
                                                         WITNESS _____  DATE _____
                                                                         SIGNATURE

16711 (REV 8/99)

**SEARS** Case 1:04-cv-12025-MLW    Document 5    Filed 12/29/2004    Page 37 of 166 

Unit # 1123   Incident # 01-044

p. 1 of 2

# Narrative Report of Investigation

AT APPROXIMATELY 9:15 PM ON 2-16-01, I OBSERVED A WHITE MALE SUBJECT AND AN ASIAN FEMALE ENTER THE STORE VIA THE BRAND CENTRAL ENTRANCE AND PROCEED DIRECTLY TO THE MEN'S DEPARTMENT. I OBSERVED THIS FROM THE SALESFLOOR. I RADIOED MY PARTNER APA McSWEENEY TO COMMENCE SURVEILLANCE OF THE SUBJECTS VIA THE CCTV SYSTEM. THE MALE SUBJECT WAS DESCRIBED AS A WHITE MALE WEARING A WHITE BASEBALL CAP AND HILFIGER SWEATS. WHEN SURVEILLANCE VIA CCTV WAS CONFIRMED BY APA McSWEENEY I LOOKED FOR THE FEMALE SUBJECT. FROM THE SALESFLOOR, I OBSERVED HER IN THE WOMEN'S DEPARTMENT. TAKING POSESSION OF MULTIPLE ARTICLES OF CLOTHING. APA McSWEENEY INFORMED ME THE MALE SUBJECT WAS ALSO TAKING POSESSION OF MULTIPLE ARTICLES OF MEN'S CLOTHING. I THEN RETURNED TO THE AP OFFICE AND OBSERVED VIA CCTV BOTH SUBJECTS AT A WOMEN'S DEPARTMENT CASH REGISTER. I OBSERVED THE FEMALE PRODUCING A SEARS CREDIT CARD AND PRESENT IT TO THE ASSOCIATE FOR PAYMENT OF MDS. THE ASSOCIATE RANG UP ALL OF THE WOMEN'S CLOTHING AND MEN'S CLOTHING THAT EACH SUBJECT HAD TAKEN POSESSION OF. THE TRANSACTION WAS COMPLETED AND THE FEMALE SUBJECT SIGNED THE RECEIPT. THE FEMALE TOOK BACK POSESSION OF THE SEARS CARD AND PLACED IT IN HER SLACKS POCKET. I THEN OBSERVED THE MALE SUBJECT TAKE POSESSION OF THE BAG OF MERCHANDISE. I FOLLOWED THE SUBJECT OUT OF THE STORE VIA THE MAIN MALL ENTRANCE. I OBSERVED HIM PLACING THE BAG OF MERCHANDISE IN A VEHICLE. THE VEHICLE WAS A LATE MODEL BLACK MERCURY MYSTIQUE WITH MASS PLATE      VI. APA McSWEENEY INFORMED ME THAT HE CONFIRMED WITH SEARS CREDIT THAT THE CARD WAS FRAUDALANTLY USED. THE MALE SUBJECT

Completed by _____ Signed _____ Date _____

Reviewed by _____ Signed _____ Date _____

10026 (Rev 8/99)



Unit # __1123__   Incident # __01-4142__

p. __2__ of __2__

# Narrative Report of Investigation

RE-ENTERED THE STORE WHILE SUMMONED THE MALL DEDHAM
POLICE OFFICER MOURIS. APA McSWEENEY INFORMED
ME HE HAD CONTINUED MONITORING THE FEMALE
SUBJECT COMPLETING TWO MORE TRANSACTIONS
    AT THIS TIME MYSELF, OFFICER MOURIS AND APA McSWEENE
DETAINED BOTH SUBJECTS IN THE BRAND CENTRAL DEPARTMEN
THE MALE SUBJECT FLED ON FOOT TOWARD THE MEN'S
DEPARTMENT. OFFICER MOURIS GAVE CHASE WITH APA
McSWEENEY FOLLOWING. I RETURNED TO THE AP OFFICE
WITH THE FEMALE SUBJECT AND SUMMONED A FEMALE
MANAGER AS A FEMALE WITNESS. I CALLED DPD
DISPATCH VIA PHONE TO INFORM THEM OF THE INCIDENT
APA McSWEENEY INFORMED THE FOOT PURSUIT TURNED INTO
A PHYSICAL CONFRONTATION ENSUED IN THE MEN'S DEPARTMENT
AND THAT ANOTHER FOOT PURSUIT WAS CONTINUEING TO THE
ROUTE 1 DOOR. HE THEN TOLD ME THE SUBJECT DREW
A HANDGUN FROM HIS WAISTBAND, CONTINUED OUT
THE ROUTE 1 DOOR AND FIRED A SINGLE ROUND INTO
A CAR THAT WAS AT THE CURB. HE FURTHER STATED
HE LEFT THE SCENE IN THE VEHICLE AFTER PULLING
THE OCCUPANT OF THE CAR OUT OF THE VEHICLE.
THE VEHICLE WAS DESCRIBED AS AN OLDER MODEL
WHITE FORD MUSTANG LAST SCENE HEADED NORTH IN
THE PARKING LOT. I RELAYED THIS INFORMATION TO DPD
    THE FEMALE SUBJECT WAS LATER ARRESTED BY DPD.

    THE AUTHENTIC CARD HOLDER IS
        NATALIE BOSSE            TEL# 508 376 8605
        4 VILLAGE AVE
        MILLIS, MA 02054

Completed by _WILLIAM PUNCH_  Signed _____   Date _7-17-01_

Reviewed by _____   Signed _____   Date _____

10026 (Rev 6/99)

COMMONWEALTH OF MASSACHUSETTS


Norfolk, ss.                                    Superior Court
                                                Chernoff, J.


* * * * * * * * * * * * * * * * * *
                                  *
The Commonwealth of Massachusetts *
                                  *
- vs. -                           *    No. 01-0117-001
                                  *
Richard D. Glawson                *
                                  *
* * * * * * * * * * * * * * * * * *


APPEARANCES:


        Robert W. Nelson, Assistant District Attorney, Norfolk
County, Dedham, Massachusetts, 02126; on behalf of the
Commonwealth of Massachusetts.

        Mr. Richard D. Glawson, Pro Se

        Paul Luciano, Esquire, 101 Tremont Street, Suite 1100,
Boston, Massachusetts, 02108; as stand-by counsel for Defendant
Richard D. Glawson.




                                Norfolk County Court House
                                650 High Street
                                Dedham, Massachusetts 0202
                                Thursday, February 20, 200




                        Gayle Grayson, CVR-CM
                          P.O. Box 365355
                          Boston, MA 02136
                          (617) 364-5555

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Plea | | | | |

| EXHIBITS: | | I.D. | EVIDENCE |
|---|---|---|---|
| None | | | |

P R O C E E D I N G S

1

THE CLERK:  This is Norfolk Criminal

2

Docket Numbers NOCR 01-117, Counts 1 through 3;

3

Counts 5 through 9, and Counts 11 through 13, the

4

case of the Commonwealth versus Richard Glawson,

5

who is before the Court pro se, with his stand-by

6

counsel, Mr. Luciano.  And Mr. Nelson is present

7

representing the Commonwealth.

8

THE COURT:  Mr. Luciano, I know you

9

are stand-by counsel in this case, but I will make

10

the inquiry to you.  Does your stand-by client

11

wish to be inquired of as far as a change of plea

12

is concerned?

13

MR. LUCIANO:  Yes, he does, your

14

Honor.

15

THE COURT:  All right.  As to what

16

indictments?

17

MR. LUCIANO:  All of them, with three

18

exceptions, the conspiracy indictment, the

19

habitual indictment, and the driving under the

20

influence charges.

21

THE COURT:  Very well.  You may

22

inquire.

23

THE CLERK:  Thank you.

24

GAYLE GRAYSON CVR-CM

```
 1                        Mr. Glawson, please stand, sir.  Mr.

 2          Glawson, you originally pled guilty on the -- all

 3          the indictments --

 4                        THE COURT:  Not guilty.

 5                        THE CLERK:  I'm sorry.  You originally

 6          pled not guilty -- thank you, your Honor -- on all

 7          the indictments except Count 4, which is the

 8          habitual criminal; Count 10, the conspiracy to

 9          commit larceny; and Counts 14, 15 and 16, the

10          operating under license suspended charges.

11                        Is Count 13 included, Mr. Nelson?  I

12          don't believe we were proceeding on -- I believe

13          we were proceeding on 13.

14                        DEFENDANT GLAWSON:  Your Honor, are

15          you going to allow me to plea to Alford?

16                        THE COURT:  I don't think -- unless

17          the Commonwealth would agree to an Alford plea,

18          and they would not, last time --

19                        MR. NELSON:  No.

20                        THE COURT:  No.  I will not take it as

21          an Alford plea.

22                        THE CLERK:  Do you wish to proceed,

23          Mr. Glawson.  You originally pled not guilty.  Do

24          you wish to have a colloquy with the Court at this
```

GAYLE GRAYSON CVR-CM

```
1        time about changing your plea?  "Yes" or "no",
2        sir?
3                    DEFENDANT GLAWSON:  I do.
4                    THE CLERK:  Raise your right hand as
5        best you can.
6    Defendant Richard Glawson, Sworn
7                    THE CLERK:  Thank you.  Would you come
8        up and take the witness stand.
9                    THE COURT:  Would you prefer to stand
10       or to sit?
11                   DEFENDANT GLAWSON:  Sit.
12                   THE COURT:  Counsel, would you come
13       over here as well, please.
14                   Mr. Glawson, as you know, my name is
15       Judge Chernoff, and I am going to ask you some
16       questions that are designed to help me determine
17       if you know the full meaning and effect of
18       entering a plea of guilty.
19                   I know you are not shy about asking
20       questions to judges or attorneys, and so I am just
21       going to tell you don't be shy.  If I say
22       something that doesn't make sense, or something
23       you don't understand, I want you to tell me.  If
24       you wish to talk to your stand-by attorney at any
```

1          time, you are welcome to speak with him, and you

2          are welcome to speak with him in private.

3                    I have to ask you some questions for

4          the record, and I think you will understand that,

5          even though I know the answer to many of the

6          questions.  For the record, what is your full

7          name.

8                    DEFENDANT GLAWSON:  Richard David

9          Glawson.

10                   THE COURT:  All right.  How old are

11         you, Mr. Glawson?

12                   DEFENDANT GLAWSON:  Thirty-seven.

13                   THE COURT:  Where were you born?

14                   DEFENDANT GLAWSON:  In Boston.

15                   THE COURT:  And where were you raised?

16                   DEFENDANT GLAWSON:  In Boston.

17                   THE COURT:  How far did you go in

18         school?

19                   DEFENDANT GLAWSON:  The sixth grade.

20                   THE COURT:  Is english your first

21         language?

22                   DEFENDANT GLAWSON:  It is.

23                   THE COURT:  All right.  What is the

24         status of your health today?

                    GAYLE GRAYSON CVR-CM

1              DEFENDANT GLAWSON:  I'm a little sick,

2    but other than that -- the flu.

3              THE COURT:  All right.  Are you

4    suffering from any illness which impedes or

5    interferes with your thinking and decision-making

6    process?

7              DEFENDANT GLAWSON:  Not that I'm aware

8    of.

9              THE COURT:  All right.  Have you

10   consumed any alcoholic beverage, any drug, or

11   medication before coming to court today?

12             DEFENDANT GLAWSON:  No, I haven't.

13             THE COURT:  Has anybody threatened you

14   or coerced you or otherwise forced you into

15   entering a plea of guilty?

16             DEFENDANT GLAWSON:  No, they have not.

17             THE COURT:  You have stand-by counsel

18   in this case.  Are you satisfied with the services

19   of your stand-by counsel insofar as these Norfolk

20   matters are concerned?

21             DEFENDANT GLAWSON:  I am.

22             THE COURT:  I really don't have

23   standing to ask you about your Middlesex or

24   Suffolk matters at this point, except insofar as

                    GAYLE GRAYSON CVR-CM

1       how they might dovetail with this particular case.

2       And so we can talk about that a little more in

3       just a moment.

4                   A couple of other things.  There is

5       a -- oh, one other thing.  You were born and

6       raised in the United States, and that leads me to

7       believe that you are an American citizen.

8       However, there is a statute in the Commonwealth

9       that in any event requires me to advise you of

10      three things.

11                  One, if it turned out that you are not

12      a citizen, then convictions of serious felonies

13      would probably result in your being deported to

14      your native country.

15                  Two, if it turned out that you were

16      not a citizen and you were outside of this country

17      trying to come back into this country, a

18      conviction on a serious matter might result in

19      your being denied entry back into the United

20      States.

21                  And thirdly, if it turned out that you

22      are not an American citizen, and you wanted to

23      become an American citizen, a conviction of a

24      serious crime could make it nearly, if not

                        GAYLE GRAYSON CVR-CM

1          definitely, impossible to obtain citizenship

2          through a naturalization process.  Do you

3          understand that?

4                    DEFENDANT GLAWSON:  I do.

5                    THE COURT:  Lastly, on administrative

6          matters, there is a relatively new law in the

7          Commonwealth of Massachusetts that gives the

8          Commonwealth the right to request of an

9          individual, and the individual must comply with a

10         request, for what is known as a tissue sample,

11         either a lock or a few locks of hair, or a saliva

12         sample, or a blood sample.  It is used for the

13         limited purpose of classification.  It is like a

14         super fingerprint.

15                   What comes out of that sample is a

16         very lengthy number and letter which -- or letters

17         and numbers which get put into a computer

18         someplace.  And it is used for classification

19         purposes.  It applies to anyone who is convicted

20         of a felony, I believe.

21                   Sometimes the Commonwealth doesn't

22         come knocking and asking for it.  I think it has

23         to do with resources.  But sometimes they do.  And

24         if they do, there would be a requirement that you

1      give up such a sample.  Do you understand that?

2                 DEFENDANT GLAWSON:   I do.

3                 THE COURT:  All right.  You have a

4      right to have all of these cases, I think as you

5      know, tried before a judge or a jury.  If you

6      elected to have the case tried before a judge, you

7      could not be found guilty unless the judge was

8      convinced of guilt beyond a reasonable doubt on

9      whatever number it is that is under consideration.

10                 If the case were tried before a jury,

11     which it is in the process of being tried at this

12     juncture, you could not be found guilty on any

13     indictment unless each and every one of the twelve

14     jurors found beyond a reasonable doubt that you

15     were guilty of that particular offense under

16     consideration.

17                 If you had a trial, you would have the

18     right to face your accusers, to have your lawyer

19     question each and every witness appearing against

20     you, a right for you yourself -- since you are

21     going without an attorney -- to ask questions of

22     each and every person appearing against you.  You

23     would have a right to present evidence in your own

24     favor, meaning physical evidence, and testimonial

GAYLE GRAYSON CVR-CM

1       evidence.  You would also have a right to

2       represent yourself in closing statements in the

3       case.

4               And you would have a right not to

5       testify.  And if you elected not to testify, that

6       would not be held against you.  In fact, the judge

7       would specifically inform the jury that they could

8       not hold it against you, the fact that you had

9       elected not to testify.

10              If you elected not to present any

11      evidence on your own in the trial, that also would

12      be something that the jury could not hold against

13      you because the burden is on the government to

14      prove you are guilty beyond a reasonable doubt.

15              If I accept your guilty pleas, then

16      the only thing left would be for me to make a

17      determination as to what the appropriate sentence

18      would be in this case.

19              This case has gone through a number of

20      conferences in the case, and I think maybe for the

21      record I ought to review at least my contact with

22      the case.

23              And that is I happened to see you in

24      session 12B, I believe in November or December,

GAYLE GRAYSON CVR-CM

1          when you came through for scheduling of your

2          Middlesex matters, and maybe for the filing of

3          motions in Middlesex matters.  And at that point I

4          indicated to you that I knew you had a case in

5          Norfolk.  I wasn't sure, but I learned very

6          quickly you had a case in Suffolk, and that these

7          were all intertwined with a probation surrender

8          matter at Essex County, which paled in comparison

9          to these cases here.

10               And I indicated to you at that time

11          that if you had an interest, or your stand-by

12          counsel had an interest in wanting to further a

13          discussion if all of the cases might be resolvable

14          to spare the government three trials, and to spare

15          you three trials; I would be willing to, at least,

16          be the focus of trying to find out what different

17          people's interests are, including your interests,

18          the interest of the Norfolk County District

19          Attorney's Office, the interest of the Middlesex

20          County District Attorney's Office, and the

21          interest of the Suffolk County District Attorney's

22          Office.

23               I know that you came very close to an

24          agreement with people a few months -- a couple of

1    weeks ago, or a week ago, and it fell through.

2    And of course, that is your decision as to whether

3    you plead guilty or not in the case.

4            The agreement that I made, because I

5    cannot speak for the district attorneys' offices,

6    nor would I want to.  And I cannot speak for the

7    Department of Correction, nor would I want to.

8    But I said that if I was going to resolve your

9    Norfolk County case here, I would not give you a

10   sentence greater than recommended by the

11   government, that what I would do is, if I accepted

12   a guilty plea from you, I would not sentence you

13   today.  I would send you back to whatever

14   institution is holding you to see whether or not

15   the Middlesex and Suffolk matters could be

16   resolved.

17           As I said, I would not give you a

18   sentence greater than recommended by the

19   government.  If you or your stand-by counsel

20   wanted, I would order a presentence report from

21   the Probation Department, and I would keep an open

22   mind on these matters, and that my resolve on

23   these cases would be to give concurrent sentences

24   and give you credit for every day that you have

GAYLE GRAYSON CVR-CM

1    been in custody, which I understand is about two

2    years at this juncture.

3         So, my understanding is -- and I will

4    ask the Commonwealth's attorney right now, for the

5    record, to tell me what his recommendation is.

6    But I understand it is fifteen to twenty years MCI

7    Cedar Junction.  I can tell you I will not

8    sentence you to more than that, and whatever I

9    sentenced you to would be concurrent with your

10   probation surrender time, since that is based upon

11   the transactions in this case.  And I would start

12   it from day one, so that if there has been any

13   kind of intervening issues between two years ago

14   and today, you should know that your time would

15   start back on the first day in which you were

16   incarcerated.

17        And one of the reasons why I would not

18   sentence you today on this is so that I would

19   still be able to keep open running other sentences

20   concurrent with the same starting date.  Do you

21   understand that?

22        DEFENDANT GLAWSON:  I do.

23        THE COURT:  Mr. Nelson, for the

24   record, what is the Norfolk County District

GAYLE GRAYSON CVR-CM

1    Attorney's recommendation on a resolution of these

2    charges?

3    MR. NELSON: What the Court had

4    indicated to the defendant, that is a correct

5    interpretation. The Commonwealth's

6    recommendation, on the first two indictments, 001

7    and 002, would be fifteen to twenty years to run

8    concurrent. And then the other indictments would

9    be run concurrent with those.

10    THE COURT: Very well. I would not

11    exceed that sentence. And as I said, if you want,

12    I would ask for a presentence report.

13    I think what will probably drive what

14    my ultimate sentence would be in this case would

15    be what happens with the other counties. And I

16    would be happy to be a presence in those counties

17    to try to arrange for concurrent sentences to

18    resolve this matter. Do you understand that?

19    DEFENDANT GLAWSON: I do.

20    THE COURT: All right. So what will

21    happen is, if I accept a guilty plea in this case

22    today, I am going to continue it for sentencing

23    probably for thirty days. And then -- or I may

24    sentence -- I may continue it to the first week of

GAYLE GRAYSON CVR-CM

1        May because I am scheduled to try a civil -- I am

2        sitting in Lowell right now.  And I am scheduled

3        to start in Norfolk County the first week of May.

4        And so I would find a date that would be

5        convenient with the Commonwealth's attorney and

6        with your stand-by attorney in May.  And by that

7        time, perhaps you would have resolved your

8        Middlesex and Suffolk matters, or you would be

9        close to resolution in those matters.

10                    Do you understand that?

11              DEFENDANT GLAWSON:  I do.

12              THE COURT:  Okay.  Mr. Nelson, would

13       you please, for the record and for Mr. Glawson,

14       perhaps for the last time for him, as far as the

15       Norfolk issues are concerned, and for me -- I've

16       been briefed on this a couple of times, but it

17       would be helpful for me to know a brief sketch as

18       to what the Commonwealth's case is, what the facts

19       are which support the indictments to which he is

20       pleading guilty.

21              MR. NELSON:  Yes, your Honor.

22              THE COURT:  Just wait a second.

23       please.   Yes?

24              MR. LUCIANO:  My client has a

                    GAYLE GRAYSON CVR-CM

1   question.  And I think the answer is "no".  If he

2   can't work out -- if he goes to trial in Suffolk

3   County, can they use his testimony here in the

4   trial there?

5          THE COURT:  Can they use his testimony

6   at a guilty plea?

7          MR. LUCIANO:  Yes.

8          THE COURT:  I don't think so.  I don't

9   think so.

10          MR. LUCIANO:  In other words, can they

11   get a transcript as part of their case?

12          THE COURT:  I do not believe so.

13          MR. LUCIANO:  That is my opinion also.

14          THE COURT:  Yes, Mr. Nelson.

15          MR. NELSON:  Your Honor, this incident

16   is alleged to have taken place on February 16 of

17   the year 2001.  On that date the Commonwealth

18   alleges that the defendant, with the assistance of

19   a female by the name of Aleja Campbell, entered

20   the employee room at Jo-Ann Fabric Store, which is

21   located at the Walpole Mall.  And while inside

22   that room, that the defendant stole the credit

23   cards and other identification cards of a woman by

24   the name of Natalie Bosse, who was an employee of

GAYLE GRAYSON CVR-CM

1        the store.

2                        Those cards were used to purchase

3        items at the Walpole Mall at the Olympia Sports

4        and at Barnes & Noble.

5                        Later on, the same day, the defendant,

6        again with the assistance of Aleja Campbell, who

7        was using the Natalie Bosse cards, purchased in

8        excess of two hundred and fifty dollars worth of

9        merchandise at the Sears store located at the

10       Dedham Mall in Dedham, Massachusetts.

11                       The defendant was observed taking bags

12       of merchandise that had been handed to him from

13       Aleja Campbell out to a motor vehicle in the

14       parking lot at that location.  And when he

15       returned to the mall, both he and Aleja Campbell

16       were approached by a Sears security guard who was

17       questioning Aleja Campbell about the use of

18       Natalie Bosse's credit cards.

19                       While that officer was questioning Ms.

20       Campbell, a second security officer went out into

21       the mall and summoned a Dedham Police Officer who

22       was detailed at that location.  And that officer's

23       name was Charles Mouris.

24                       When Officer Mouris arrived in the

                         GAYLE GRAYSON CVR-CM

1    Sears store, he requested that the defendant

2    approach him.  And at that time the defendant fled

3    through the store.  The defendant was chased by

4    Officer Mouris and Sears security officer Michael

5    McSweeney, and was brought to the floor in another

6    section of the store.

7         The defendant struggled with Officer

8    Mouris, kicking Officer Mouris in the head with

9    his shod foot, and punching Officer Mouris.  The

10   defendant was able to get up and continue running

11   out of the store, but not before Officer Mouris

12   was able to pull one of his shoes off of his foot.

13        Just prior to the defendant exiting

14   the store, a holster was seen thrown from his

15   person.  And that was observed by security officer

16   McSweeney.

17        As the defendant exited the store, an

18   individual by the name of Michael Callahan -- and

19   Mr. Callahan is seated in the back of the

20   courtroom -- was seated in his white Mustang

21   outside of the door to Sears.  He was waiting for

22   a friend of his to get off work.

23        His car was idling.  It was parked

24   just outside of one of the exits.  And the

GAYLE GRAYSON CVR-CM

1        defendant aimed a firearm that he had in his

2        possession at Michael Callahan, and fired the gun.

3        The driver's side window of Mr. Callahan's vehicle

4        was shattered, and the defendant, Mr. Glawson,

5        ordered Mr. Callahan out of his vehicle.  And the

6        defendant then got into the vehicle and drove off

7        in Mr. Callahan's vehicle.

8                Dedham Police Officer Michael Buckley,

9        who is also seated in the courtroom, your Honor,

10       heard the broadcast of the carjacking at the

11       Dedham Mall and the description of the vehicle,

12       which included the color of the vehicle, the make

13       of the vehicle, and a partial license plate.  And

14       while in his marked cruiser, Officer Buckley was

15       at the intersection of Grove and Washington Street

16       in West Roxbury when he saw the vehicle

17       approaching his location.  The vehicle then was

18       observed taking a left-hand turn from Washington

19       onto Grove Street.  And Officer Buckley followed

20       it and activated his blue lights.

21               Officer Buckley observed the vehicle

22       spin out of control.  And as he approached the

23       vehicle, he observed the driver of the vehicle

24       climb out of the driver's side window of that

GAYLE GRAYSON CVR-CM

1    vehicle.  Officer Buckley then got out of his

2    cruiser and chased the suspect who jumped a fence

3    next to a nearby home.

4         As Officer Buckley opened the gate at

5    that location, the gate to the fence, which opened

6    to Officer Buckley's right, as he was coming

7    around, he noticed behind the gate in the yard a

8    dark object crouched behind the gate.

9         At that time there were two shots

10   fired.  Officer Buckley observed the muzzle blast.

11   And Officer Buckley was struck once in each hand.

12        Officers from Boston and Dedham and

13   the State Police and State Police Canine Units

14   then converged on this area and searched the area

15   for the suspect.  And they were able to follow

16   footprints in the snow which showed one shod foot

17   and one foot with apparently just a sock.

18        More than three hours after the

19   incident at the Dedham Mall, a number of officers

20   came upon a garage at a home in West Roxbury on

21   Eastwood Circuit.  And they noticed what appeared

22   to be an object sitting -- they looked through the

23   windows of a garage and noticed what appeared to

24   be an object sitting -- an object sitting on a

1    chair, a wicker chair, which was covered with a

2    blanket.

3    The officers entered the garage and

4    actually some of the officers indicated that they

5    saw wet footprints leading up to this wicker

6    chair. And they removed -- one of the officers

7    removed a blanket from the chair, and under the

8    blanket they found the defendant Mr. Glawson

9    sitting with his arms folded.

10    The defendant was taken to the ground

11    and handcuffed. And handcuffs were also placed

12    about his ankles. And when he was searched at the

13    scene he was found to be in possession of a

14    handgun and ammunition, bullets, and there were

15    some spent bullets as well.

16    The handgun was later tested and found

17    in fact to be a firearm. It was also found to be

18    the firearm that discharged the bullet that was

19    taken out of Michael Callahan's vehicle. That

20    bullet had lodged in the door.

21    Officer Mouris also had checked the

22    defendant with the registry of motor vehicles and

23    determined that the defendant's license had been

24    suspended. So that when he was operating Mr.

GAYLE GRAYSON CVR-CM

1    Callahan's vehicle, he was doing that with a

2    suspended license.

3              There were also some bullets that were

4    taken out of the defendant's pockets.  I think

5    that there were two that fell out, fell off of his

6    person as he was being transported.  He was taken

7    over to a station in Hyde Park.

8              The Commonwealth would allege that at

9    the time that the defendant was placed under

10    arrest, he was not asked any questions, but did

11    state to the police officers:  I didn't shoot no

12    cop.  Or words to that effect.

13              That basically would be the

14    Commonwealth's case, your Honor.

15              THE COURT:  Thank you.  Madam Clerk,

16    may I please see the indictments?

17              THE CLERK:  Yes, your Honor.

18              (Pause.)

19              DEFENDANT GLAWSON:  Your Honor,

20    there's a problem.

21              THE COURT:  I cannot hear you.

22              DEFENDANT GLAWSON:  There's a problem

23    with the plea because under this rule it says that

24    they can use this against me in another case.  The

                GAYLE GRAYSON CVR-CM

1      only charge that it says that they can't use it

2      for is, if I withdraw, is perjury.

3                  MR. LUCIANO:  It is the exact

4      opposite.

5                  THE COURT:  No, it's the exact

6      opposite.  What it means is this.  Nobody can ever

7      be protected in court from a charge of perjury,

8      even if a person is given immunity.  You can't lie

9      in court.

10                 So what this means is that anything

11     that would happen here today cannot be used in any

12     further criminal proceeding such as Middlesex

13     County, the indictments there, or such as Suffolk

14     County, the indictments there.  But nothing that

15     you say in this court or in any other court can

16     protect you from a perjury charge, if there is

17     ever a perjury charge in the future.

18                 But it seems to me you are not --

19                 DEFENDANT GLAWSON:  All right.  So

20     nothing that I plead guilty to today in this case

21     can be used against me in Suffolk County --

22                 THE COURT:  That's right.

23                 DEFENDANT GLAWSON:  -- or in Norfolk

24     (sic) County?

                      GAYLE GRAYSON CVR-CM

1          THE COURT:  That's right.

2          DEFENDANT GLAWSON:  Okay.

3          THE COURT:  And for the record, we are

4    referring to the Massachusetts Rules of Criminal

5    Procedure.  And we are focusing on Rule 12.

6          MR. LUCIANO:  Section F.

7          THE COURT:  Thank you.  Section F.

8    12F.  All right.

9          Mr. Glawson, there are a number of

10   indictments here.  The district attorney's office

11   has just given me an outline, and you an outline,

12   as to what the operative facts are in this case

13   from the standpoint of the Commonwealth.

14         The first thing that the judge has to

15   be concerned with is the issue of identification.

16   And the question is in pleading guilty are you

17   admitting that you were the individual who was

18   involved at all stages of the events as far as the

19   Norfolk County indictments are concerned?

20         Obviously, you were the person at the

21   end, because you were arrested at the end.  So the

22   question is do you acknowledge, as far as

23   identification is concerned, that you are the

24   individual who is the -- who was the actor from

GAYLE GRAYSON CVR-CM

1          the time of the events at the Chestnut Hill Mall

2          (sic) until the apprehension here in Norfolk

3          County.

4                    DEFENDANT GLAWSON:   I don't think this

5          has anything to do with the Chestnut Hill Mall,

6          your Honor.   Dedham Mall?

7                    THE COURT:   Dedham Mall.   I'm sorry.

8          Dedham Mall, excuse me.   You're right.

9                    DEFENDANT GLAWSON:   Yes.

10                   THE COURT:   Now the government has set

11         out for me facts, which if those facts were

12         believed by a jury, to my mind there would be a

13         sufficient basis for the jury to find you guilty.

14         Now triers of fact, meaning judges or juries, make

15         determinations based upon direct and indirect

16         evidence.   The direct evidence is:   were you an

17         individual who got into somebody's car and had a

18         gun with you at the time or a weapon with you at

19         the time.

20                   And those are -- that's physical

21         evidence or testimonial evidence that -- that

22         proves that.   The issue is to whether or not

23         that -- that action put somebody in fear.   That's

24         for a jury to determine.   The question is whether

GAYLE GRAYSON CVR-CM

1    or not you were the one who did it -- is certainly

2    a matter for evidence at trial.

3            Whether or not there was an intent to

4    steal a motor vehicle by the assailant is an issue

5    for a jury to draw reasonable inferences on.  If

6    you plead guilty to the crime of armed carjacking,

7    you would be admitting to the government's case

8    that says that you were armed with a dangerous

9    weapon and you had the intention of taking another

10   individual's car without right, and that you

11   assaulted, confined, or put somebody in fear for

12   the purpose of taking that motor vehicle.  And

13   that is in violation of a statute.

14           As far as that is concerned, do you

15   have any issue with the facts as far as this case

16   is concerned?

17           DEFENDANT GLAWSON:  I'd just ask that

18   the Commonwealth read into the record the evidence

19   which it would rely upon on the facts --

20           THE COURT:  Okay.  But --

21           DEFENDANT GLAWSON:  -- the physical

22   evidence, actually.

23           THE COURT:  But do you have -- do you

24   contest the -- that you committed this particular

                    GAYLE GRAYSON CVR-CM

1           offense, that you were responsible for the armed

2           carjacking that is set out in the indictment,

3           given that what is required for proof in an armed

4           carjacking case is that the individual who is

5           charged was armed at the time of the events.

6                    At the time that they were armed, that

7           they took somebody's vehicle without right with an

8           intention of stealing that vehicle.  And that they

9           put the owner of that vehicle or the occupant of

10          that vehicle in fear.  Do you contest that?

11                   DEFENDANT GLAWSON:  I asked the

12          Commonwealth to read the evidence, your Honor,

13          into the case as far as the facts were to go, and

14          they agreed to do that.  Could we just do that?

15                   THE COURT:  Yes.  But my question is

16          do you contest those facts?

17                   DEFENDANT GLAWSON:  No.

18                   THE COURT:  I am not going to have --

19                   DEFENDANT GLAWSON:  No.

20                   THE COURT:  You do not contest those

21          facts?

22                   DEFENDANT GLAWSON:  No.

23                   THE COURT:  All right.  And as to the

24          charge of --

                        GAYLE GRAYSON CVR-CM

1        DEFENDANT GLAWSON:  I just don't know

2    what evidence they're based on.  They didn't say

3    the evidence that they were based on.  Those are

4    just the facts.

5        THE COURT:  Would you want me to ask

6    Mr. Nelson to set out who would be the source of

7    the information as far as meeting the elements of

8    those offenses?

9        DEFENDANT GLAWSON:  Yes.

10        THE COURT:  Mr. Nelson, could I impose

11    on you to, in your description of the offenses,

12    just tell me basically what would be the source of

13    your evidence?  Let's start with the armed

14    carjacking.  Who would be the source of your

15    evidence that Mr. Glawson, while armed with a

16    dangerous weapon, intended to steal a vehicle, and

17    did so by placing a person in fear?

18        MR. NELSON:  That would be Michael

19    Callahan, who was sitting in the car when it was

20    shot into, and was ordered out of the vehicle by

21    the defendant.

22        And then Officer Buckley, who follows

23    after the vehicle until such time as it spins out

24    of control.  It actually hit another vehicle in

1    West Roxbury.  And he observed the driver jump out

2    of the vehicle.

3                 And then ultimately, it is Officer

4    Slyne, I believe it was, from the Boston Police,

5    who took the gun off the defendant.

6                 And then Tyrone Camper, who is a

7    detective with the Ballistics Unit in the Boston

8    Police Department, who examined the firearm that

9    was taken off the defendant, and who examined the

10    bullet that was taken out of the white Mustang,

11    Michael Callahan's Mustang, and determined that

12    that bullet was fired from the gun that was taken

13    from the defendant.

14                 THE COURT:  So those are four

15    witnesses that would prove the sequence of events

16    according to the Commonwealth's case.

17                 MR. NELSON:  Yes.

18                 DEFENDANT GLAWSON:  And that firearm

19    would be that .38 caliber they spoke of?

20                 MR. NELSON:  We would have the actual

21    firearm here when the ballistic's officer came

22    here.  Right now we have, not in evidence as yet,

23    but in the motion to suppress that we had heard,

24    there was a photograph of the firearm.

GAYLE GRAYSON CVR-CM

1          THE COURT:  So in pleading guilty, if

2     I were to accept your guilty plea, I would have to

3     be satisfied that you are the individual who

4     committed those acts.  And the Commonwealth has

5     just explained to you what the sequence of

6     evidence is in order to prove that.

7               And my question is, is there anything

8     that you have heard that you disagree with, or

9     anything else you would like to tell me about the

10    Commonwealth's case as far as the armed carjacking

11    is concerned?

12          DEFENDANT GLAWSON:  Not at this time.

13          THE COURT:  All right.  On the charge

14    of being armed with a dangerous weapon, to wit, a

15    gun; assaulting Michael Callahan with the intent

16    to murder the said Michael Callahan in violation

17    of the statutes of the Commonwealth.

18              May I ask the prosecutor to tell me

19    your sequence of evidence in this case and your

20    witnesses who would go to prove that.

21          MR. NELSON:  This would be actually

22    similar to the first indictment.  It would, again,

23    be Michael Callahan.  There would be some other

24    photographs.  There is a photograph that shows a

GAYLE GRAYSON CVR-CM

1    bullet hole in the passenger's seat.  And the

2    bullet ultimately lodged in the door, I believe on

3    the passenger's side.

4              THE COURT:  Insofar as that particular

5    charge is concerned, I would ask you the same

6    question.  Is there anything that you heard that

7    you disagree with, or anything else you would like

8    to tell me about the merits of this particular

9    charge?

10             DEFENDANT GLAWSON:  Not at this time.

11             THE COURT:  This is the only time we

12   will be discussing this particular issue, just so

13   you know that.

14             DEFENDANT GLAWSON:  That is my answer.

15             THE COURT:  The other charges fall in

16   line here in the sense that the -- and I will just

17   ask Mr. Nelson to tell me if there are any other

18   witnesses.

19             Mr. Nelson, on the charge which

20   alleges using a firearm in commission of a felony,

21   that is in the armed carjacking; are there any

22   other witnesses, other than those --

23             MR. NELSON:  No.  At some point in

24   time -- there was -- the -- the codefendant.

                GAYLE GRAYSON CVR-CM

1    There was a codefendant with the defendant,

2    female.  She would have testified, actually -- or

3    was going to testify today -- who has seen that

4    firearm, could identify that firearm.  I think she

5    may have actually been the individual who

6    originally takes the firearm out of a safe.

7            That happened, maybe, a week or so

8    earlier in Suffolk County.  That has nothing to do

9    with Norfolk County.  But she could identify the

10   firearm and identify the fact that the defendant

11   had the firearm.

12           THE COURT:  All right.  On the assault

13   with a dangerous weapon, which is the allegation

14   that the defendant with a gun, did assault Michael

15   Callahan.

16           MR. NELSON:  That would be Mr.

17   Callahan.

18           THE COURT:  All right.  And on the

19   indictment which alleges carrying a firearm

20   without a license, who would be the -- the

21   Commonwealth's case would be made with whom?

22           MR. NELSON:  Basically the same

23   witnesses with the ballistician.  The fact that

24   the defendant was found in possession of a firearm

GAYLE GRAYSON CVR-CM

1          and that a ballistician would indicate that that

2          was the firearm that fired the bullet that was

3          taken from Michael Callahan's vehicle.  And the

4          testimony would be that that happened in Dedham at

5          the Dedham Mall.

6                    THE COURT:  And is that the same order

7          of proof as far as the possession of ammunition?

8                    MR. NELSON:  It is.  Actually, there

9          would be one added -- there was a search done of a

10         motel room that the Commonwealth alleges that the

11         defendant and the codefendant stayed in the night

12         previous.  And there was a bullet that was found

13         in a dresser drawer in that motel room.

14                   THE COURT:  As far as the indictment

15         on assault and battery with a dangerous weapon

16         involving Charles Mouris, and the charge of

17         assault and battery on a police officer, also

18         Charles Mouris, your case would be made by?

19                   MR. NELSON:  Officer Mouris himself as

20         well as a security guard by the name of Michael

21         McSweeney.

22                   THE COURT:  On the stealing of

23         property, larceny over, from Sears.  That case is

24         made by whom?

GAYLE GRAYSON CVR-CM

1                    MR. NELSON:  Actually, I believe it

2          was Officer Punch, who has already testified

3          during the course of the trial.  And there is in

4          evidence at this time the sales receipts as to

5          what was purchased and the items that were taken

6          out to the vehicle by the defendant which I

7          believe were somewhere in the three to four

8          hundred dollar range in clothing.

9                    THE COURT:  And the larceny less than

10         two hundred and fifty dollars?

11                   MR. NELSON:  Those are the credit

12         cards that belong to Natalie Bosse that were

13         stolen at the Walpole Mall.

14                   THE COURT:  And that part of your case

15         would be made by what witnesses?

16                   MR. NELSON:  Natalie Bosse would

17         testify that -- first of all, that she did not

18         authorize either the defendant or the codefendant,

19         Aleja Campbell, to use those credit cards.  And

20         Aleja Campbell would indicate that what took place

21         at the mall, the defendant went into this employee

22         room.  And when he came out he handed her these

23         identification cards and credit cards of Natalie

24         Bosse.

                    GAYLE GRAYSON CVR-CM

1          THE COURT:  And finally on the

2     indictment, operating a motor vehicle after

3     suspension.

4          MR. NELSON:  That would be Officer

5     Mouris.

6          THE COURT:  All right.  Sir, these are

7     the lesser offenses but, nevertheless, important

8     issues.  My question is that based upon the

9     proffer made by the Commonwealth and the source of

10    their information here at trial, is there anything

11    that you heard about the assertions in the

12    Commonwealth's case as far as those indictments

13    are concerned, is there anything that you have --

14    that you disagree with, or anything else you would

15    like to tell me about the merits of any one of

16    those cases?

17          DEFENDANT GLAWSON:  No.

18          THE COURT:  Is there anything else

19    that you would want to tell me about your

20    activities as far as these indictments are

21    concerned, which may reflect on your being

22    culpable or not culpable as far as these offenses

23    are concerned?

24          DEFENDANT GLAWSON:  No.

           GAYLE GRAYSON CVR-CM

1          THE COURT:  Mr. Luciano, let me ask

2     you this.  I know you are not counsel, you are

3     stand-by counsel.  And your involvement in this

4     case, at least as far as time and effort is

5     concerned has got to be less than parallel, if not

6     exceed that which actual counsel would have

7     served.  So let me ask you this.

8          Are you satisfied that there is a

9     basis in the evidence for this Court to accept a

10    plea of guilty in this case?

11         MR. LUCIANO:  Yes, sir.

12         THE COURT:  And do you have any

13    reservations as to why this Court should not

14    accept a guilty plea?

15         MR. LUCIANO:  None.

16         THE COURT:  Thank you very much,

17    counsel.

18         Mr. Glawson, let me just say a couple

19    of other things, and that is this.  There were

20    other things that I agreed that I would do, and I

21    would like to put them on the record, and this is

22    really for your protection.

23         I agreed that if I accepted a guilty

24    plea, that I would hold you on the same bail and

GAYLE GRAYSON CVR-CM

1          that I would give you an option as to whether or

2          not you wanted a presentence report.  But in any

3          event, I would not sentence you until it appeared

4          that your Middlesex and Suffolk matters were going

5          to be resolved or were in fact resolved short of a

6          trial.

7                    Obviously, if your Suffolk matter goes

8          on for years, I cannot hold this case off.  But I

9          would do everything I could to -- and as I told

10         you, I would run this case here concurrent with

11         anyone else's case.  And I can't say I am certain,

12         but I would certainly hope and expect that those

13         other matters will get resolved now that this

14         matter here seems to be close to being resolved.

15                    The other thing that I agreed to is

16         that the Essex probation matter, which is a matter

17         that is much less than this, and a matter where

18         you have a lot of time in as far as service of

19         time is concerned, that that will not impede the

20         sentence in this case.  In other words, I would

21         run this concurrent with that, or I would run that

22         concurrent with this so that it would not be, it

23         would not affect your sentence.

24                    I also agreed that since -- and I know

GAYLE GRAYSON CVR-CM

1    that Mr. Nelson has discussed this with his first

2    assistant district attorney, and we've also made

3    at least a preliminary inquiry with the Department

4    of Correction, is that there would be an effort to

5    see -- once your matters are resolved here --

6    assuming they're at the end of the line here -- we

7    would do what we can to see you get a fresh start

8    in another system, such as the federal system.

9                    And I know that is your first

10   priority.  And we have no objection to that.  And

11   we would work toward that end.  Do you understand

12   that?

13                    DEFENDANT GLAWSON:  I do.

14                    THE COURT:  Do you have any questions

15   of me at this juncture?

16                    DEFENDANT GLAWSON:  The recommendation

17   for the Department of Corrections --

18                    THE COURT:  Recommendation for a clean

19   slate.

20                    DEFENDANT GLAWSON:  Yes, for a clean

21   slate.

22                    THE COURT:  That would be part of that

23   letter.  We would hope that you would not spend

24   much time in the Department of Corrections here.

                    GAYLE GRAYSON CVR-CM

1    We would hope that they would be able to arrange

2    for a transfer of you out of the Massachusetts

3    prison system.

4            But since I am in the judiciary and

5    have no control over the executive, I would tell

6    you that that letter that asks for -- that would

7    ask -- it would ask for a clean slate and for

8    serious consideration for a transfer to the

9    federal system.  And if not the federal system,

10    another state.

11            DEFENDANT GLAWSON:  I'd ask only for

12    the federal system.  I wouldn't want to go to

13    another state.

14            THE COURT:  Okay.

15            DEFENDANT GLAWSON:  I don't think that

16    would protect the interests of the security.

17            There is one more issue about the

18    habitual offender and the other three indictments.

19    Are those going to be nolle processed?

20            THE COURT:  Are you going to nolle

21    pros that?

22            MR. NELSON:  I would do that, your

23    Honor.  Whenever we could do the sentencing, I

24    could file an actual written nolle pros on that

GAYLE GRAYSON CVR-CM

1  date.

2          THE COURT:  The government will nolle

3  pros it.

4          DEFENDANT GLAWSON:  All right.

5          THE COURT:  Mr. Clerk, the Court finds

6  that the pleas are knowingly and voluntarily

7  offered, and that there is a basis in the facts

8  for the plea.  So the Court accepts the plea of

9  guilty and will not ask the Commonwealth to move

10  for sentencing, although we do know that the

11  Commonwealth will not exceed a certain sentencing

12  request.

13          THE CLERK:  Just for the record, Mr.

14  Glawson, on Indictment No. NOCR 117, Counts 1

15  through 3, Counts 5 through 9, and Counts 11

16  through 13, what say you, sir?  Are you guilty or

17  not guilty?

18          DEFENDANT GLAWSON:  Guilty.

19          THE CLERK:  Thank you, sir.

20          THE COURT:  All right.  At this

21  juncture, what I am going to do is continue the

22  matter.  Do we have a date in May that is

23  convenient?

24          MR. NELSON:  May fifth.

          GAYLE GRAYSON CVR-CM

1          MR. LUCIANO:  May 5 is good.

2          THE COURT:  Now one other logistical

3     matter.  The next thing on your plate is your

4     Middlesex issue.  I can bring you into Middlesex

5     and meet you in Cambridge with the prosecutor

6     there, or we could cordially invite them out here.

7     I don't know -- I mean, all the paperwork is in

8     Middlesex.  I would be willing -- I am going to

9     Middlesex to do another matter I think within the

10    next week or two.

11         Would it be your preference for us to

12    habe you in there?

13         DEFENDANT GLAWSON:  Yes.

14         THE COURT:  All right.  Mr. Nelson, I

15    wonder if you could call your counterpart in

16    Middlesex, ask him to please call my clerk in

17    Lowell to arrange for an afternoon when I have

18    another matter in Middlesex, and I will do this

19    when I -- I will conference this matter at the

20    time I --

21         MR. NELSON:  I will do that, Judge.  I

22    will do that today.

23         THE COURT:  Very well.

24         DEFENDANT GLAWSON:  Your Honor, could

                    GAYLE GRAYSON CVR-CM

1    you place (sic), your Honor, that I be forwarded a

2    copy of this transcript?

3              THE COURT:  I'll order a copy of this

4    transcript.

5              DEFENDANT GLAWSON:  Thank you.

6              THE COURT:  All right.  Anything else?

7    Did I forget anything?

8              MR. NELSON:  No.  Thank you.

9              THE COURT:  Mr. Glawson, did I forget

10   anything.

11             DEFENDANT GLAWSON:  That's it, sir.

12             THE COURT:  All right.  Good luck.

13             DEFENDANT GLAWSON:  Thank you.  Have a

14   nice day.

15             THE COURT:  Did you want a presentence

16   report?

17             DEFENDANT GLAWSON:  Sure.

18             THE COURT:  All right.  I'll order a

19   presentence report, sir.

20             THE CLERK:  Presentence evaluation to

21   be done on Mr. Glawson.  Mr. Glawson, your case is

22   continued to May 5 of 2003 for disposition at

23   nine-thirty, sir.  You are held on the same bail

24   at the Dedham House of Correction.

              GAYLE GRAYSON CVR-CM

1                          DEFENDANT GLAWSON:  All right.

2                          THE COURT:  Good luck, sir.

3                          DEFENDANT GLAWSON:  Thank you.

4                          MR. NELSON:  Thank you, Judge.

5                          MR. LUCIANO:  Thank you.

6                          (Whereupon, the hearing in the above-

7              entitled matter was concluded.)

## C E R T I F I C A T E

I, Gayle Grayson, CVR-CM, do hereby certify that the foregoing record, Pages 1 through 44 is a complete, accurate and true transcription of my Stenomask notes taken in the aforesaid matter to the best of my skill and ability.

_Gayle Grayson_
Gayle Grayson, CVR-CM

GAYLE GRAYSON CVR-CM

Bates

171    22-29
172    29-38
173    39-44
174    44-48
195    49-69

1

2    Before the Grand Jury of Norfolk County

3

4

5                              March 15, 2001 - Thursday

6                              Dedham, Massachusetts

7

8

9

10

11

12    In the matter of:        RICHARD D. GLAWSAN

13                             ALEJA CAMPBELL

14

15

16

17

18

19                             ROBERT NELSON, ESQUIRE

20                             Assistant District Attorney

21                             Norfolk County

22

23

24

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

## WITNESSES

| NAME | PAGE |
|------|------|
| Michael McSweeney | 5 |
| William Punch | 22 |
| Charles Mouris | 29 |
| Michael Callahan | 39 |
| Michael D. Buckley | 44 |
| Steven McDonald | 49-67 |

## EXHIBITS

| NUMBER | | PAGE |
|--------|---|------|
| 1 | Videotape | 49 |
| 2 | Boston Police Department report | 60 |
| 3 | Certificate of Examination and Test Firing | 60 |
| 4 | Photocopy of credit cards | 62 |
| 5 | Conviction record | 68 |
| 6 | Conviction record | 69 |
| 7 | Conviction record | 69 |

3

1   MR. NELSON: Good morning.

2   My name is Robert Nelson. I'm an

3   Assistant District Attorney here in

4   Norfolk County.

5   And I have the following presentment

6   regarding, first, Richard D. Glawsan,

7   that's G-L-A-W-S-A-N, and the first

8   indictment — the first presentment is for

9   the charge of assault with intent to

10  murder a Michael J. Callahan. Next is a

11  presentment for armed car jacking. The

12  next is a charge of conspiracy to commit

13  larceny with — and the conspiracy being

14  with an individual by the name of Aleja

15  Campbell, that's A-L-E-J-A, Campbell,

16  C-A-M-P-B-E-L-L. The next presentment

17  is again, on Richard Glawsan, while

18  committing the crime of armed car

19  jacking, having in his possession a

20  firearm. The next presentment is assault

21  by means of a dangerous weapon against

22  Michael Callahan. The next is assault

23  and battery by means of a dangerous

24  weapon, that being a shod foot, against

Charles Mouris. The next is for assault and battery of a police officer, that police officer being Charles Mouris. The next is for possessing under his control, in a vehicle, a firearm. The next is larceny under $250.00, that being credit cards. The next is larceny over $250.00, that being clothing, that's the property of Sears. The next is for possession of ammunition without having an identification card. The next is for operation of a motor vehicle with a suspended license.

And then Aleja Campbell, on the same date, this is on February 16th of 2001, she's charged with larceny over $250.00, that being, again, the clothing of Sears. The next presentment against Aleja Campbell is for uttering, that being a credit card receipt, knowing that to be forged, false of altered. The next against Aleja Campbell is, again, for forging an instrument, purporting to be a credit card that was issued to a Natalie



SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

100170

5

1    Bosse, that's N-A-T-A-L-I-E, last name

2    B-O-S-S-E. The next is for larceny for

3    under $250.00, that being the credit

4    cards. And the next is for conspiracy

5    with Richard D. Glawsan to commit

6    larceny over $250.00.

7        We then have presentments against

8    Richard Glawsan for a separate dated,

9    that being September the 9th of 2000, in

10   which he's charged with operating under

11   the influence of intoxicating liquor.

12   He's also charged with negligent

13   operation of a motor vehicle. And he's

14   also charged, again, with operating a

15   motor vehicle with a suspended license.

16       BY MR. NELSON:

17       MICHAEL MCSWEENEY, SWORN

18   Q    And would you identify yourself for

19   the members of the Grand Jury, please.

20   A    My name is Michael McSweeney.

21   Q    And, Mr. McSweeney, could you tell

22   the members of the Grand Jury how

23   you're employed?

24   A    I work at Sears Roebuck in Dedham.

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

6

1   Q    And were you working in Sears

2   Roebuck, in Dedham, on the evening of

3   February 16th of this year?

4   A    Yes. I was.

5   Q    And sometime after 9:00 on that

6   evening did you become — or sometime

7   during that evening did you become

8   involved in the investigation of two

9   individuals purchasing items with a

10   credit card at Sears?

11   A    Yes. I did.

12   Q    Do you recall about what time you

13   first —

14   A    It was near closing, about — roughly

15   about 9:20 or so.

16   Q    Now, are you familiar with security

17   cameras that are located within Sears?

18   A    Yes. I am.

19   Q    And did you do anything in reference

20   to the security cameras in Sears as you

21   were investigating these two individuals?

22   A    Yes. We — I was taping an individual

23   in our men's department, a white male

24   that we picked up, that was picking up

7

many articles of clothing, jeans, pilling
them up on top of racks. And at that
time my partner called me, Bill Punch
called and asked me to pick up the same
individual. And he also stated there was
a female with him on the other side of
the store doing the same thing, picking
up several shirts without looking at
prices, pilling them up on a rack.

Q       And Mr. Punch, when you had
communication with him where was he
located?

A       He was out on the sales floor. So, at
that point, I asked him to come back to
the office, 'cause we have two monitors,
and I had him on one and I on the other.
And I wanted to make sure we could
watch them both.

Q       And that the area where you were
viewing them, where is that located
within Sears?

A       It's in the Lost Prevention, Asset
Protection.

Q       Now, prior to making observations of

8

1        these individuals, had they purchased

2        any items that you were aware of?

3  A      Not at that point. No.

4                (tape being played)

5  Q      And if you would, please, if you just

6        tell the members of the Grand Jury, what

7        they're looking at now?

8  A      Okay. This is a videotape of our

9        men's department. And this is the

10       individual that we first — first I was

11       watching, and then Bill called him in

12       'cause he was — it's very suspicious the

13       way he was shopping. He's just pilling

14       up items. It's not like he's really

15       looking for anything in particular.

16  Q      And do you recall, approximately,

17       how long you watched this individual?

18  A      I want to say maybe five minutes, but

19       I'm not sure unless the videotape will

20       show. But what he ends up doing is

21       taking the items that he had and meeting

22       up with the female individual with the

23       items that she had, and he gave her the

24       items he possessed at that time.. And she

9

1    brought them to a register.

2    Q    Now, the part of the video I just

3    forwarded to, that still shows the same

4    individual —

5    A    Yes. It does.

6    Q    -- getting the clothes in the men's

7    department?

8    A    Yes. It does.

9    Q    And would it be fair to say that now

10    this individual is placing a large number

11    of those items in his arms?

12    A    Yes. He does. Usually right near

13    closing someone comes in and they

14    usually picking up maybe one item, it's

15    not anything where they're picking up

16    several items.

17    Q    Is that a close up view of that same

18    individual?

19    A    Yes. It is.

20    Q    And the area of the tape that I fast

21    forwarded to now, would it be fair to say

22    that this individual now has left the

23    men's department?

24    A    Yes. He has.

10

Q        And he's walking through another part of the store?

A        Yup.  He's going through our junior's department and then into the women's department.

Q        And now it shows that individual now again in the store?

A        Yes.

Q        And is he with another individual now?

A        Yes.  He is.  A female that ends up making the purchase of the items.  He meets up with her in our women's department.

Q        And the point where I now – where the female is making the purchase?

A        Yes.  It is.  At this point the male walked away from the female, and he went to our cologne department.  And she stayed over at the main register to make the purchase.

Q        Now, the point of the video that we're on now, does that show the male and the female?

11

1   A       Yes.  It does.

2   Q       And would it be fair to say that the

3   female has now handed a bag to the male?

4   A       Yes.  She has.

5   Q       And were those items that had just

6   been purchased?

7   A       That's correct.  She had — at the

8   register it was rung up — all the items

9   were rung up.

10  Q       And that was at least some of the

11  clothing that we saw him —

12  A       Yes.  It was.

13  Q       -- gathering and —

14  A       Yup.  The items that he passed to her

15  she — was rung up at the register.  And

16  she used a Sears' charge to pay for those

17  items.

18  Q       And does this show the female again

19  purchasing —

20  A       Yes.

21  Q       -- some items?

22  A       Yes.  At that point she made another

23  purchase for, I believe, some cologne.

24  But, again, she used the Sears' charge

1       again.

2   Q       And now we see her signing for the

3       item?

4   A       Yes.  At the end of the transaction

5       the screen will come up, the monitor, --

6       see that they sign.  And your signature

7       appears on the screen.

8   Q       And now do we see the female in this

9       —

10  A       Yup.  The female again hands the

11      male the bag of purchases that she made.

12  Q       And now they're walking along

13      together?

14  A       Yes.

15  Q       Would it be fair to say now, in this

16      particular part of the video, the female

17      no longer has any of the bags, is that

18      correct?

19  A       That's correct.

20  Q       Does this now show the male?

21  A       That's the same individual.  Yes.

22      He's leaving the store towards our --

23      through our hardware department into the

24      appliance area.

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

13

Q        And is there an exit to the store located in the appliance area?

A        Yup.  If you go straight out through out appliance area it exits into the mall. And then there's a set of mall doors that exit into the parking lot to the right.

Q        And that's him leaving the store now?

A        That's him leaving the store.  He went out to the right and headed out into the parking lot.

Q        And now is that a photo from outside of the store?

A        That's our outside camera of the store.  It appears to be getting most of the side of the building and the back area of our dock.  But we have him going out into the parking lot to a vehicle.

Q        Now, at this point in time what are you doing?

A        To back up a little more, he was in colognes, and she finished the transaction.  As soon as the transactions totaled, I'm able to use our computer to pull an extract down.  So, what I did is I

14

1    pulled an extract of the charge

2    account, 'cause we were suspicious of

3    the sale. And I contacted our Asset

4    Protection Credit Department. And on

5    the phone the individual was reluctant to

6    call the customer, 'cause I wanted to

7    verify the account was good. But he said

8    the account was open in 1978, and she

9    just looked to young, she looked like she

10   was about twenty-five. So, he called the

11   customer at his house, and it was

12   actually a male that answered the phone,

13   it was his wife's card. And his wife was

14   at home. So our Asset Protection

15   Department determined that it was a

16   fraudulent account.

17   Q    And at that time the woman was – did

18   you know, at that time, that the woman

19   was still in the store?

20   A    Yes. I still had her in the men's

21   department where she made one more

22   purchase, but I don't think we see in

23   here – of the shirt. It might have been

24   the item she had. And then she started

15

1    heading out through our hardware

2    department, down towards our computers

3    in — and our appliance area. And that's

4    when I —

5    Q       And the male that was shown in the

6    video —

7    A       At that time he was still out in the

8    parking lot.

9    Q       Did he, at some point in time, come

10   back into the store?

11   A       He did. My partner, Bill, was

12   watching him outside. And then Bill

13   went to get the mall detail, Officer

14   Mouris, that was working that night.

15   At this point I had headed out of the

16   office to — to stop her, 'cause I did not

17   want her to exit the store. And I met up

18   with her in our — right in front of our

19   computer department. I asked her if she

20   was Natalie, she wouldn't answer me.

21   But I told her there was a problem with

22   her purchase and she'd have to come with

23   me, that I was with Sears Asset

24   Protection.

16

Q        Now, does this —

A        That's her.

Q        And at some point in time did she
meet up with — with the male?

A        When I was talking to her he came
back in from the parking lot.  And, as I
said, I said I was from Asset Protection,
there was a problem with her purchase,
and I needed to speak with her.

He approached me and told me that
there was no problem, she was leaving
with him.  They had paid for the
merchandise, and that they were leaving
at that point.

And at that point Officer Mouris any
my partner, Bill Punch, came back in
from the mall, in the exit that you saw
him leaving.  So they came in that way.

Q        I'd ask you to look at this part of the
video now that I've fast forwarded to.

A        (witness complied)

Q        Can you tell me what we saw in that
part of the video?

A        That was when we approached the

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

hardware department.

Let's back up a little bit, when we were at — in front of the computers. When Officer Mouris came in I believe he said to this individual to come on over to him. And the individual was just shacking his head. His eyes were all glassy. And he started to run. But when he ran he ran back the way he came into — he actually ran into the store as opposed to going out of the store. And that was —

Q    Now, on that part again. Now, the officer that's running there, is that Officer Mouris?

A    Yes. It is. And he chased him down through our men's department. We slipped a little. And then we actually caught up to him in-between men's and junior's, which is our women's department.

(tape concluded)

Q    All right. Now, were you alone with Officer Mouris when the individual is

1    running?

2  A        Yes.

3  Q        And at some point in time did you

4  catch up to the person?

5  A        I did.  I caught up to him in between

6  men's — it's a rug on the floor, and then

7  to the tile, and he kind of stumbled a

8  little, I was able to — he kind of fell

9  towards the rack.  I was able to grab him

10  from the back, and kind of threw him to

11  the side.  And that's when Officer Mouris

12  was right there with me, and a struggle

13  pretty much ensued right there.

14  Q        And can you tell the members of the

15  Grand Jury what happened during the

16  course of the struggle?

17  A        The individual, we had him down that

18  first time.  He was able to get up.  He

19  actually was kicking.  He struck Officer

20  Mouris in the face.  At that time I ran

21  around, I grabbed his other leg 'cause he

22  was actually up.  And Officer Mouris was

23  — kind of had one leg.  And I pulled his

24  other leg out.  We knocked him down

again on the ground. Officer Mouris is
on top of him again. I used my radio —
we have a walkie-talkie to our office —
stating we needed some more help in the
store, that we were having trouble with
him. He got up again. We knocked him
down another time. And he still was
struggling. And then Officer Mouris
used his night-stick and mace to try to
prevent him from struggling anymore.
And that still did not subdue him. He
got up with the mace. You know, his hat
come off. I think his — you know, there
was a lot going on at that time. And he
stumbled. He had mace dripping down
his face. And he stumbled and he started
heading back through our hardware
department, which you saw.

But as soon as he got up he kept
reaching for his pants, and reaching for
his pants. So, at that point, I — I mean,
I knew we had done everything we could.
I mean, we had him down. Officer
Mouris had his night-stick on him, told

20

him to put his hands behind his back. He refused. He kept struggling to get loose. So we started stumbling and heading out, but he kept reaching to his pants. So, at that point, I kind of stayed back from him. I just followed him mainly because I thought someone might be down the other end that might try to stop him.

Q    And as you were following him, could you tell us what observations you made as you were following him?

A    He ran right through the hardware back the way he came. He kind of took a right, went down through our carpet department.

At that time I saw a holster come flying out from his left hand, and landed in our carpet area. And if you look at the store, the carpet area is here, he headed straight to an exit that was right outside.

Q    And did you exit at that time?

A    At that time, once I saw the holster,

I moved to the side, 'cause it's a corner. I called — I radioed to Bill, to tell him that he had a gun. I could see a white car parked out at the curb. I heard a loud pop, which was a gun shot. And then I heard the tires squealing in the car as it pulled away from the curb.

MR. NELSON: Any questions of Mr. McSweeney?

Q    (Juror) What was the girl doing all this time?

A    At that time when we approached him, I was here, she was in the middle, and the other store detective, Bill Punch, was on this side, and he was over here, and Officer Mouris was there. So when he ran I ran this — he was on my side, so I ran along after him. And he (sic) stayed with Bill. And Bill took her to our Asset Protection office.

MR. NELSON: Any other questions?

(no response)

MR. NELSON: Thank you.

100171
22

1          (witness excused)

2          BY MR. NELSON:

3          WILLIAM PUNCH, SWORN

4     Q       Would you identify yourself for the

5     members of the Grand Jury, please.

6     A       William Punch.

7     Q       And, Mr. Punch, can you tell the

8     members of the Grand Jury how you're

9     employed?

10    A       I work for Sears Roebuck & Company,

11    in the Dedham Mall, as an Asset

12    Protection Associate.

13    Q       And directing your attention to the

14    16th day of February of this year, and the

15    evening on that date, were you working?

16    A       Yes. I was.

17    Q       And sometime after 9 PM did you

18    become involved in the investigation of

19    two individuals who were purchasing

20    items with a credit card at Sears?

21    A       Yes. I was.

22    Q       And could you tell the members of

23    the Grand Jury what you did in regards to

24    your investigation initially?

1   A        I observed two individuals, a male

2   and a female, to get multiple pieces of

3   clothing and merchandise. They had no

4   regard for the sizes or the prices or

5   anything. So, I determined that they

6   were suspicious. I called my partner by

7   a two-way radio, and told him to observe

8   the subjects via the closed circuit TV

9   system. And then I returned to out Asset

10  Protection office once I understood that

11  he did maintain surveillance on the CC

12  TV system.

13  Q        And when you say – when you first

14  made these observations, where were you

15  located?

16  A        I was on the sales floor in the men's

17  department.

18  Q        And then at some point in time you

19  went back to your office?

20  A        That's correct.

21  Q        And could you tell the members of

22  the Grand Jury what you did once you

23  returned to your office?

24  A        Once I returned to the office my

1    partner observed each one of the
2    individuals on the camera system. I took
3    over one camera, my partner took over
4    the other camera. Then we observed both
5    parties coming together with merchandise
6    at one common cash register. We
7    observed a transaction. The transaction
8    was paid for with a Sears' credit card.
9        At that time, after the transaction
10   was complete, I obtained the account
11   number of the credit card. And I called
12   my partner via radio with the account
13   number, and he called our credit
14   department on the phone.
15   Q    Are you aware of the amount of the
16   items that were purchased?
17   A    Yes. I am.
18   Q    And how much was that?
19   A    The total amount was approximately
20   $452.00, there were three transactions
21   involved.
22   Q    Now, at some point in time did you
23   eventually return to the sales floor after
24   the observations that you made?

25

A        Eventually I did return to the sales floor, after the credit was verified that it was fraudulently used.

Q        Okay. And do you remember – do you recall the name of the individual whose credit card it was?

A        Can I refer to my report?

Q        Sure.

A        The credit card holder was a Natalie Bosse from Millis, Massachusetts.

Q        When you returned to the sales floor, what did you do then?

A        I observed Mr. Glawsan, a male subject, walking away from the register with multi bags of articles of clothing. I followed him to his car on the Route 1 side of Sears in the parking lot. I observed him place the articles in the car and then return into the store.

Q        And when he returned into the store can you tell us what happened then?

A        At that time my partner radioed me, and indicated that the – the transaction was a credit fraud, it was confirmed a

1    credit fraud.

2    Q    Now, earlier you said that you — you

3    used the name of Mr. Glawsan, at that

4    time you actually didn't —

5    A    No.  I didn't.

6    Q    -- know who the individual was, is

7    that correct?

8    A    I observed him as a white male.

9    Q    Did he — at some point you said that

10    you observed him going — taking these

11    items out to a car.

12    A    That's correct.

13    Q    And can you tell us whether or not he

14    returned to the store after doing that?

15    A    Yes.  He did.

16    Q    And when he returned to the store

17    where were you located then?

18    A    I was at the main mall entrance.

19    Q    And can you tell us what happened

20    when he returned to the store?

21    A    After I was informed that it was

22    confirmed a credit fraud, I went and

23    looked for the Dedham Police Officer, a

24    detail officer, in the mall.  And I

27

observed Officer Charles Mouris at Center Court, I informed him of the incident.  And I returned to the store with him.

Q       And what happened when you returned to the store with him?

A       Well, we entered — reentered the store, I observed my partner talking to the two subjects that had completed the transaction.  Officer Mouris and I approached those three individuals, my partner and the two subjects.  And at that time we approached them I had the female to my left.  Officer Mouris had the male in front of him.  My partner had the male in front of him.

Q       And can you tell us what the male was doing at that time?

A       When we approached him the male started backing up, taking a few steps backwards.

Q       Okay.  What happened after that?

A       I observed a foot pursuit between my partner and Officer Mouris, chasing the

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

28

1    male subject.

2    Q      And in reference to the female, what

3    happened with the female?

4    A      She stayed with me. She was to my

5    left.

6    Q      And did she remain with you?

7    A      Yes. She did. And I requested that

8    she return to our Asset Protection Office

9    with me.

10   Q      And did that take place?

11   A      Yes.

12   Q      At some point in time were you able

13   to determine her identification?

14   A      Not that evening. No.

15   Q      When you returned to the office with

16   her had your partner returned at that

17   time?

18   A      No. He was involved in the foot

19   pursuit with Officer Mouris.

20   Q      So when you went to the office with

21   the female, it was just you and the

22   female at that time?

23   A      And when I returned to the office I

24   also had a female manager from our

1       store, just to be in our office.

2   Q       And at some point in time did Officer
3   Mouris return to your office?

4   A       Only at the very end of the entire
5   incident.

6   Q       Can you tell us what, if anything,
7   happened regarding the female that
8   evening?

9   A       She was eventually arrested.

10  Q       And was Officer Mouris involved in
11  that?

12  A       Yes.

13          MR. NELSON: Thank you. I have
14  no other questions of Mr. Punch. Any
15  questions of Mr. Punch?

16          (no response)

17          MR. NELSON: Thank you, sir.

18          (witness excused)

19      BY MR. NELSON:

20      CHARLES MOURIS, SWORN

21  Q       And would you identify yourself for
22  the members of the Grand Jury, and could
23  you just spell your last name.

24  A       My name is Charles Mouris, M-O-U-

1    R-I-S, police officer in the Town of

2    Dedham for twenty-five years.

3  Q      And, Officer Mouris, directing your

4    attention to the 16th day of February of

5    this year, on that date did you happen --

6    on the evening on that date, did you have

7    occasion to be in the Dedham Mall?

8  A      Yes. I was working a paid detail, in

9    uniform, 5 to 10:00 PM that night in the

10   Dedham Mall.

11 Q      And at some point in time, after 9:00

12   on that date, were you approached by a

13   security individual from Sears?

14 A      Yes. Around 9:20, 9:25. Most of the

15   stores had closed early, it was a snowy

16   night, there weren't to may people left in

17   the mall.

18       And Mr. William Punch, the Sears'

19   security, who I've known and done

20   business with before, approached me in

21   the hallway. He said, "Officer Mouris,

22   we have a couple in the store, a white

23   male and a white female, that purchased

24   several items of clothing with a stolen

credit card. They signed for it and they put the articles in the car." I said, "How do you know their credit card is stolen?" He said, "We confirmed it through Sears' telephone system." I said, "How do you know they stole the merchandise?" He said, "We watched them put it in the car. They made several trips back and forty. My partner, Michael McSweeney, is holding them in the store." As he was speaking he was walking faster with a sense of urgency.

Following him I entered the store, and I saw Ms. Campbell and Mr. McSweeney standing thirty feet inside the doorway from where I was. Another fifteen feet back from them, a total of forty-five feet, was Mr. Richard Glawsan. And the – Mr. Glawsan, he looked at me, he started shacking his head, backing up. I saw his breathing increase, his shoulders hunched up, brought his hands up in front of his chest, at about this (indicating) position

1    here, and he started looking around.  I

2    thought he was going to go into flight.

3  Q    And when you first entered the store

4    and saw this individual, you didn't know

5    that it was — the names of the individuals

6    at that time, is that —

7  A    No.  I didn't.

8  Q    And could you tell us, when you

9    entered the store, do you have a memory

10    of how Mr. — the male was dressed?

11  A    He had on — what was described as a

12    jogging suit with stripe marks, similar to

13    a jogging suit with stripes.

14  Q    Do you recall if he had anything on

15    his head?

16  A    He had a white baseball cap on.

17  Q    And after you observed him backing

18    up what happened then?

19  A    I gave him the command to stop.  I

20    thought a good verbal command, a sound

21    of authority, would freeze him in his

22    tracks.  I said, "Stop.  Stay where you

23    are.  Dedham Police Officer."  He shook

24    his head and said, "No, no," and turned,

33

1    and he ran fifty-one feet — I later

2    measured it — towards the door. Then he

3    turned right and ran two hundred and

4    twenty-seven feet down a long corridor

5    to the back of the store.

6    Q    And at the time that he was doing

7    that, what were you doing?

8    A    Myself and Mr. McSweeney were in

9    foot pursuit, we were chasing him close

10    behind him.

11    Q    At any point in time did you catch up

12    with him?

13    A    We did, a total of three hundred and

14    twenty-five feet later, fly and tackle,

15    brought him to the ground hard. And we

16    rolled on the ground. I tried to pin him

17    down and place him under arrest. I gave

18    him orders to put his hands behind his

19    back, which he refused to comply with.

20    And the three of us struggled.

21    Q    And can you describe what took place

22    during the course of the struggle?

23    A    I had him down on the ground.

24    Again, I tried to handcuff him on the

1    ground, it's a better technique rather

2    than standing up. He was able to get up.

3    He started kicking me in the face. I

4    blocked his kicks with my hand. He

5    continued to kick me. And in an effort

6    to catch his ankle, to twist it, and to

7    stop him from kicking me, I did that.

8    Unfortunately his sneaker came off at

9    that point. Now, he's kicking me with a

10   bare foot in the face. Again, I wanted

11   him on the ground, so I brought him down

12   to the ground. I was sitting on his back.

13   I had my night-stick across his neck. I

14   gave him orders, again, to put his hands

15   behind his back, he was under arrest. I

16   wanted to handcuff him. He brought his

17   hands in front by the groin area, and

18   then he slowly — what I'd describe as a

19   pushup position, raised himself up with

20   myself sitting on his back. I saw his

21   shoulders hunch and tighten, his neck

22   muscles. He threw me off on the ground.

23   We exchanged punches on the floor. I

24   next — we were up again, we went down

again.  I had him — he was on his back.
He was kicking me.  At this point I was
getting kind of tired, and I said to
myself, "Okay, no more kicks.  I'm going
to stop blocking the kicks.  I'm going to
take my mace out and spray him."  Before
I could do that he kicked me more
violently, he started hitting me.  So I
took out my night-stick, my baton,
department issued baton.  I struck him on
his bare foot, because his shoe was off.
And there was no response at all.  I
struck him on his ankle, nothing.  His
shin, nothing.  I couldn't strike him in
the groin or the face at that point.  You
can never strike them on the groin or the
face.  I put the stick away.  I took more
kicks and punches while I maced him.
That stopped him for a second.  We all
stood up.  I said to Mr. McSweeney,
"Give him a few seconds.  He's not going
anywhere."  I fully believed the mace
would take affect and holt him, but it
didn't.  To my surprise and shock he

1    continued running towards the front of

2    the store, where I followed in foot

3    pursuit quite far behind.

4    Q    And as you followed behind did he

5    make — tell us what observations you

6    made of him as you were chasing after

7    him.

8    A    He was running. Mr. McSweeney was

9    in front of me. I had picked up my

10    uniform parts, my hat, brushed myself

11    off. Again, I was confident that he

12    wasn't going to be going to far. I

13    thought I'd find him in the store.

14        As I entered near the exit to the

15    store Mr. McSweeney was halted with a

16    look of shock on his face. I observed a

17    holster on the ground. I went outside the

18    door and I was met by Mr. —

19    Q    Michael Coleman (sic)?

20    A    -- Michael Coleman (sic), who stated

21    he — in a very excited manner, "Officer,

22    some guy just stole my car. He pointed a

23    gun at me. He fired a shot at me."

24    Q    Strike that. Was that a Michael

Callahan?

A      Michael Callahan. Let me look at my report. That's correct.

Q      And you spoke with Mr. Callahan at that time?

A      Yes. I did.

Q      At some point in time did you return to the store?

A      After I spoke to Callahan I obtained a description of the car. And I broadcast it over the — the incident over the police radio, to the station and all the cruisers.

I next entered the store where I went to the Sears' security office, where I was met by Mr. William Punch, a security employee who I know. And he had Ms. Campbell in his possession in their store office.

Q      And at some point in time did you — were you able to obtain her identity?

A      Yes. I was. She had a license on her.

Q      And what was her name?

A      Her name is — she was identified as

1       Aleja, A-L-E-J-A, Campbell, C-A-M-P-

2       B-E-L-L, of Natick, Massachusetts.

3   Q       From Natick, Massachusetts?

4   A       3 Brigham Court, Natick,

5   Massachusetts.

6   Q       Now, at some point later in the

7   evening, did you have occasion to look at

8   a photographic array?

9   A       Yes. I did. Approximately four

10  hours later, five hours later, the Boston

11  Police showed me a photographic lineup.

12  Q       And as a result of looking at that,

13  did you select an individual who was —

14  you identified as the individual that you

15  had confronted at the mall?

16  A       Yes. I did.

17  Q       And did you obtain the name of that

18  individual?

19  A       Yes. I did. I was informed it was

20  Mr. Richard Glawsan.

21          MR. NELSON: Any questions of

22  the officer?

23              (no response)

24          MR. NELSON: Thank you.

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

(witness excused)

BY MR. NELSON:

MICHAEL CALLAHAN, SWORN

Q    Would you identify yourself for the members of the Grand Jury, please.

A    Michael Callahan.

Q    And would you spell your last name?

A    C-A-L-L-A-H-A-N.

Q    And, Mr. Callahan, can you tell us where you live?

A    20 Cotton Street.

Q    And where is that?

A    In Rosenlindale, Massachusetts.

Q    And directing your attention to February the 16th of this year, sometime after 9:00 on that date, did you have occasion to be in the vicinity of the Dedham Mall?

A    Yes.

Q    And can you tell the members of the Grand Jury what you were doing there at —

A    I was meeting with one of my friend — worked.  That's it.

1    Q          You have a friend that works in

2    Sears?

3    A          Uh-hum.

4    Q          And where at the mall were you?

5    A          In front of Sears.  Parked in front of

6    Sears.

7    Q          Parked in front of Sears?

8    A          Uh-hum.

9    Q          And can you describe the vehicle that

10    you were in?

11    A          '86 Mustang convertible, white.

12    Q          White?

13    A          Uh-hum.

14    Q          And while you were parked in front

15    of Sears on that evening did something

16    happen?

17    A          Yes.

18    Q          Can you tell the members of the

19    Grand Jury what --

20    A          I was parked in front of the mall

21    listening to the radio.  And then I heard

22    a loud noise, the window broke.  And

23    there -- the guy standing there saying,

24    "Get out."  I get out of the car and he

took off.

Q        And he took off in your car?

A        Uh-hum.

Q        Did you see your car again?

A        Yea.

Q        And when was the next time you saw your car?

A        At the police station.

Q        What police station?

A        Headquarters.

Q        Where?

A        In Downtown Boston.

Q        And can you tell us the time you saw your — the next time you saw your car, what condition was your car in at that time?

A        It was pretty bad. I don't know.

Q        Keep your voice up.

A        It was banged up.

Q        It was banged up?

A        Yea. It was totaled.

Q        It was totaled?

A        Yea.

Q        Okay. When you got out of the car,

42

1    out of the car you were in, --

2    A    Uh-hum.

3    Q    -- where - did you go somewhere

4    then?

5    A    I just went to - towards the Sears,

6    where the cop was standing.  And he

7    came out right afterwards.

8    Q    And you talked to a police officer at

9    that time?

10    A    Yea.

11    Q    And the police officer you talked to,

12    was he in a policeman's uniform?

13    A    Uh-hum.

14    Q    You have to answer yes or no.

15    A    Okay.  Yes.

16    Q    He was?

17    A    He was.

18    Q    The individual that had taken your

19    car, had you seen that individual before?

20    A    No.

21    Q    Were you asked to identify that

22    individual at some point?

23    A    No.  Not really.

24    Q    Would you be able to identify --

1   A       I doubt it. I mean, I seen a picture

2   of him on the news, that's about it.

3   Q       So you've seen a picture of him on

4   TV?

5   A       Uh-hum. Yes.

6   Q       Have you ever been asked to look at a

7   photographic array?

8   A       No.

9           MR. NELSON: I have no further

10  questions of Mr. Callahan. Questions?

11  Q       (Juror) Did the person who took your

12  car have any kind of a weapon that you

13  could see?

14  A       I didn't see anything, no.

15  Q       (Juror) So he shouted at you?

16  A       Yea. He shouted, "Get out of the

17  car." And I got out of the car.

18  Q       (Juror) Did you feel threatened?

19  A       Of course.

20          BY MR. NELSON:

21  Q       After you heard a bang, --

22  A       Uh-hum.

23  Q       -- was there a window in your car

24  that was broken?

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

1    A        Yes.

2    Q        And where was that located?

3    A        The driver's side window.

4    Q        So the window right next to you?

5    A        Uh-hum.  Yes.

6            MR. NELSON:  Thank you.

7                (witness excused)

8        BY MR. NELSON:

9        MICHAEL D. BUCKLEY, SWORN

10   Q        And would you identify yourself for

11   the members of the Grand Jury.

12   A        Yes.  Officer Michael D. Buckley, B-

13   U-C-K-L-E-Y.

14   Q        And, Officer, can you tell us where

15   you're employed?

16   A        I'm a police officer in the Town of

17   Dedham.

18   Q        And, Officer, directing your attention

19   to the evening of February the 16th of

20   this year, were you on duty on that date?

21   A        Yes.  I was.

22   Q        And at some point in time during the

23   evening were you engaged in a pursuit of

24   a motor vehicle?

A      Yes. I was.

Q      And where did you pick up the motor vehicle?

A      I observed a white Mustang travelling down Washington Street, heading towards the intersection of Grove Street. I was actually on Grove Street.

Q      And the Grove Street that we're talking about, is that located in West Roxbury?

A      Yes. It is.

Q      And can you tell us what you did from that point in time after you picked up the car at Washington and Grove Street?

A      Yes. Myself and Officer Munchback observed the car go through the intersection of Washington Street at Grove Street. We observed it take a left hand turn onto Grove Street. We followed the Mustang. And I was able to get close enough to the Mustang to read off the license plate number, and it was 1898TC. I was able to radio to my

1    dispatch the license plate number.  And

2    the Mustang actually began to gain

3    distance on us.  We followed it further

4    down Grove Street to the intersection of

5    Center Street.

6  Q    At that time that you had picked up

7    this motor vehicle, were you aware of an

8    incident that had taken place at the

9    Dedham Mall?

10 A    Yes.  I had heard a radio traffic

11    between Officer Mouris and Dedham

12    Control, that a white Mustang was wanted

13    in connection with an incident at the

14    Dedham Mall, and also involved in a

15    shooting at the Dedham Mall.

16 Q    So when you were to the point where

17    the vehicle is now at the intersection of

18    Center Street in West Roxbury -- that's

19    with Grove Street, --

20 A    Yes.

21 Q    -- Center and Grove?

22 A    Yes.

23 Q    And what took place after that?

24 A    The Mustang had considerable

distance on us at that time. And in the distance, as we rounded the corner, we saw that the Mustang had lost control. And we saw the headlights spin around and actually were facing at us.

And as we approached we saw the suspect come out the driver's side window, crawl out the driver's side window. There was a brief foot pursuit. I followed the suspect around the corner. He jumped over a wooden stockade fence. I ran into this wooden stockade fence, the gate, and forced it — forced it open about ninety degrees. I looked around the gate. At that time I saw the suspect in a crouched position with his gun aimed at me, and he fired two shots. He hit me in the — at the time I thought only in the right hand. He hit me in the right hand and also hit me in the left thumb. And my partner, Officer Munchback, was right behind me. I had yelled to him to get back.

And there was a group of people

1    behind us at this point. We got the

2    people out of the way. And I went

3    around the left hand side of the house,

4    and was unable to see the suspect

5    anymore.

6  Q     At some point in time, later on that

7    date, or early the following – the

8    following date, were – did you obtain the

9    identity of the individual that you were

10   chasing after?

11 A     Yes. Richard Glawsan.

12 Q     And were you asked at any point in

13   time to look at a photographic array?

14 A     No. I was not.

15 Q     Do you recall how the individual that

16   you were chasing was dressed?

17 A     Yes. He was dressed in either a dark

18   black or dark like charcoal gray, or like

19   running-type jacket, with light gray on

20   the sleeves, on both sleeves.

21 Q     And as you were chasing him were

22   you able to notice anything regarding his

23   – what was on his feet?

24 A     No. I didn't observe that.

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

1    MR. NELSON: Any questions of

2    the officer?

3                    (no response)

4    MR. NELSON: Thank you, sir.

5    WITNESS: Thank you.

6                    (witness excused)

7    MR. NELSON: Before we

8    preceded with the next witness I'd like

9    to have the video that we showed earlier

10   marked as Exhibit No. 1.

11                   (Videotape marked as

12                   Exhibit 1 as of this date.)

13   BY MR. NELSON:

14   STEVEN MCDONALD, SWORN

15   Q    And would you identify yourself for

16   the members of the Grand Jury.

17   A    My name is Steven McDonald, M-C-D-

18   O-N-A-L-D. I'm a State Trooper

19   assigned to the Norfolk County District

20   Attorney's Office.

21   Q    And, Trooper McDonald, directing

22   your attention to February the 16th of

23   this year, did you become involved in the

24   investigation of an incident that had

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

1          taken place at the Dedham Mall?

2     A          Yes.  I did.

3     Q          And when did you first become

4     involved with that, if you recall?

5     A          I believe – it was probably around

6     10:00 at night I received a call from

7     headquarters ordering me to do the

8     shooting that occurred at the Dedham

9     Mall – approximately a half hour earlier

10    then that.

11    Q          And after you received that call what

12    did you do?

13    A          I preceded to the Dedham Mall.

14    Q          And did you meet with someone

15    there?

16    A          Yes.  I did.

17    Q          Who'd you meet with?

18    A          I believe it was Officer Charles

19    Mouris.

20    Q          And was there anyone else that you

21    met with at that location?

22    A          I believe it was Security Guard

23    William Punch, I also spoke with him.

24    Q          Now, at some point in time did you

meet up with an individual by the name of Aleja Campbell?

A    Yes.  I did.

Q    And when was it that you met with her?

A    That was at the Dedham Police Department the following day, I believe that was on the 17th, a Saturday.

Q    Just going back to when you met Officer Mouris and the individuals at the Dedham Mall, did you receive anything from them?

A    As far as?

Q    Did they hand anything over to you at that location?

A    I don't believe so there.  I believe we received something at the Dedham Police Station.

Q    And when you went over to the Dedham Police Station Ms. Campbell was located there at that time?

A    Yes.  She was.

Q    Did you have occasion to speak with her on that date?

1   A        Yea – not on the 16th. On the 17th,

2        it's a Saturday, I did, the following day.

3   Q        All right. And when you spoke to her

4        on the following Saturday, on the 17th,

5        did – prior to speaking to her did you

6        advise her of her rights?

7   A        Yes. I did.

8   Q        And did she indicate to you that she

9        understood the rights that she had?

10  A        Yes. She did.

11  Q        And after advising her of her rights

12       can you tell the members of the Grand

13       Jury the conversation that you had with

14       her?

15  A        Yes. I advised her – what we were

16       trying to do is we wanted to find out the

17       chain of events that led up to the

18       shooting at the Dedham Mall.

19           At that time she told me that the

20       previous evening she was – her, Aleja

21       Campbell, and Richard Glawsan had

22       stayed in a motel room down in Walpole,

23       the Boston View Motel. From there they

24       left the Boston View Motel, went to the

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

Walpole Mall. And they went into a fabric store there. And while they were in the fabric store she was keeping watch and distracted this woman that was working there while Richard Glawsan went into the backroom and rummaged through a woman's purse, and came out, stole some credit cards, ID, things like that.

At dinnertime they left the Walpole Mall. They tried to register in a couple of different malls – I mean, a couple of different hotels in the area with this woman's credit card. Her name is Natalie Bosse, who was the woman that was the victim whose credit cards were stolen. They had no success registering in those hotels.

They finally ended up at the Holiday Inn in Dedham where they did register. And he rented a room with Natalie Bosse's credit cards. Ms. Campbell was the one who forged her name on the – the receipt. And as the – they checked into

1    that room.

2         They immediately left and went to the

3    Dedham Mall.  When they went to the

4    Dedham Mall Ms. Campbell and Glawsan

5    went in, they started shopping, picking

6    out clothes.  And Ms. Campbell actually

7    was the one that was signing for the

8    clothes.  I think there was three separate

9    transactions that Ms. Campbell forged

10   Ms. Bosse's signature on, on the

11   receipts.

12        At some point security guards came

13   and called out the name Natalie.  She got

14   nervous.  At that time Officer Mouris

15   came around the corner, and Mr. Glawsan

16   tried to flee the scene.  He was tackled

17   by one of the security guards.  And he

18   later got away.  He ended up going out

19   and car jacking a car and leaving.

20        At that time Ms. Campbell stayed

21   there.  And she told me instead of

22   running she stood there like an idiot and

23   got arrested.

24   Q        Now, after you had received this

1   information from Ms. Campbell, did

2   you have occasion to execute a search

3   warrant for the hotel or motel in

4   Walpole?

5 A     Yes.  I did.

6 Q     And as a result of that did you seize

7   certain items from the room?

8 A     Yes.  I did.  We executed a search

9   warrant on Room 201 at the Boston View

10  Motel.  When we executed the search

11  warrant I found a — it was like a cloth

12  bag containing address books that

13  belonged to Aleja Campbell.  And also in

14  the nightstand, in a drawer in the

15  nightstand was one thirty eight caliber

16  bullet, which was marked on the bottom

17  of it, marked Norma, N-O-R-M-A.  And I

18  think it was .38, the designation of the

19  caliber.

20 Q     And were there any other — any other

21  items that you took out of that room at

22  that time?

23 A     No.  There was not.

24 Q     Now, at some point in time did you

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

1    receive information that an individual

2    had been arrested, the individual that

3    had taken the white Mustang?

4    A      Yes.  I did.

5    Q      And did you -- were you able to

6    determine the identity of that person?

7    A      Yes.  I was.

8    Q      Okay.  Who was that?

9    A      It was Richard Glawsan.

10   Q      And at that time did you receive

11   further information that a firearm had

12   been found in relation to Mr. Glawsan at

13   the time of -- that he was placed under

14   arrest?

15   A      Yes.  I did.

16   Q      And would it be fair to say that the

17   firearm that was taken from Mr. Glawsan,

18   that was submitted to the Ballistics Unit

19   in the Boston Police Department?

20   A      That's correct.

21   Q      And do you have a copy of that report

22   with you?

23   A      I believe you have it.

24   Q      I show you this report here.  And

first of all if I could ask you, at the time that the white Mustang was recovered, was the white Mustang at some point in time examined?

A    Yes. I believe it was examined by the Boston Police, the forensic people.

Q    And during the examination of the white Mustang was a bullet found lodged in one of the doors of the Mustang?

A    Yes. It was.

Q    In fact, did that — that particular bullet pass through the headrest of the passenger side of the vehicle?

A    That was the information I had, yes.

Q    And now the firearm that was obtained from in the possession of Mr. Glawsan at the time he was arrested by officers in Boston, can you tell us the type of firearm that that was?

A    Yes. Reading from the Boston Police Ballistics report it was a Charter Arms model, undercover five shot, thirty-eight caliber revolver, Serial No. 186951. At that time it was loaded with one round of

1    led round nose ammunition, head stamp

2    Norma, N-O-R-M-A, thirty-eight special.

3    Q    And the bullet that was taken out of

4    the white Mustang, was that also

5    examined by the Ballistics Unit in

6    Boston?

7    A    Yes.  It was.

8    Q    And can you tell us the results of the

9    examination of that -- of that bullet in

10   reference to the gun that was taken from

11   Mr. Glawsan.

12   A    Yes.  The bullet -- the projectile, the

13   bullet that was recovered from the

14   passenger door of the Mustang was fired

15   by the gun that was recovered from Mr.

16   Glawsan.  Forensic tests showed that it

17   was the same -- it was a match.

18   Q    Now, did you have occasion yourself

19   to submit the bullet that you recovered

20   from the hotel or motel room in Walpole

21   --

22   A    Yes.  I did.

23   Q    -- to the State Police Ballistics Unit?

24   A    Yes.

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

Q    And just showing you this document. Can you identify — first of all, can you tell us what that document is?

A    This is a Certificate of Examination and Test Firing done by Sergeant Doug Weddleton of the Mass. State Police Ballistics Unit.

Q    And can you tell us what the result of the examination was of the bullet that you turned into the State Police Ballistics Unit?

A    Yes. It was a Norma thirty-eight special bullet recovered from — recovered from 201 Boston View Motel, Route 1.

Q    And would it be fair to say that that bullet the same type of bullet that had been recovered actually inside the one round that was remaining inside of the gun when it was recovered from Mr. Glawsan?

A    Yes. It's the same — same brand.

MR. NELSON: And I'd like to submit these two documents as Exhibits 2

and 3.

(Boston Police Department
report marked as Exhibit 2
as of this date.)

(Certificate of
Examination and Test
Firing marked as Exhibit 3
as of this date.)

BY MR. NELSON:

Q       And were there other items that were
turned over to you by the Dedham Police?

A       Yes.

Q       And can you tell us whether or not
you received the baseball cap?

A       Yes. I received a baseball cap.

Q       And whether or not you received a
shoe or a sneaker or something of —

A       Yes. I did receive one sneaker.

Q       And the credit card that was used on
the 16th of February, was that also turned
over to you?

A       I believe so. I believe that I have
one of the credit cards.

Q       And did you make a photocopy of

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

that?

A    Yes.  This photocopy was provided to me by the Dedham Police.

Q    And this is the credit card of — two credit cards of Natalie Bosse?

A    That's correct.

Q    And a driver's license in the name of Natalie Bosse?

A    Yes.  It is.

Q    And were you told where these items — how these items were recovered by the police?

A    I believe they were recovered from Ms. Campbell.  The Sears card was confiscated at the time of the purchases. And the other card, I believe, was taken from Ms. Campbell.

Q    And there's also — it appears a receipt from the Holiday Inn, is that correct?

A    Yes.

Q    And that's also in the name of Natalie Bosse?

A    Correct.

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

1    Q    Can you tell the members of the

2    Grand Jury -- that your investigation as

3    far as the Holiday Inn is concerned?

4    A    Yes.  Not myself, but other officers

5    went to the Holiday Inn, the room in

6    question, and it was registered to Natalie

7    Bosse.  And, as a result, later on Ms.

8    Campbell told me that she did register

9    for the room, and sign the receipt for

10    that room.

11    Q    And did she tell you that she ever

12    went to the room?

13    A    Yes.  She did.  They went to the room

14    briefly, and they left right away and

15    went to the Dedham Mall.

16    MR. NELSON:  And I just ask that

17    this document, which is a photocopy of

18    the credit cards and the license, and the

19    Holiday Inn receipt, be marked as a

20    exhibit as well.

21                    (Photocopy of credit cards

22                    and license and Holiday

23                    Inn receipt marked as

24                    Exhibit 4 as of this date.)

BY MR. NELSON:

Q    At any point in time were you able to speak with Mr. Glawsan?

A    No.  I wasn't.

Q    Now, directing your attention to another incident regarding Mr. Glawsan, September of the year 2000, did you become familiar, after investigating Mr. Glawsan regarding this incident, of an incident that had occurred in September of 2000 in the Town of Westwood?

A    Yes.  I did.

Q    And did you become — did you become familiar with a police report that was made out by a Trooper Steven Lopes of the Massachusetts State Police?

A    Yes.  I'm familiar with that.

Q    And can you tell the members of the Grand Jury that incident that took place — and actually do you have the date that it took place?

A    Yes.  It was September 9th, 2000, at 2145 hours, which is 9:45 PM.  Trooper Lopes wrote in this report that he was on

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

patrol on Route 128, southbound, in the Town of Westwood, when he saw a vehicle that was a green Mitsubishi traveling in the left lane, doing about ninety to a hundred miles an hour, weaving in and out of traffic.

Trooper Lopes stopped the vehicle and approached the operator, who identified himself as Richard Glawsan through a license.  At that time Trooper Lopes noticed that he was glassy-eyed, he could smell an alcoholic beverage on his breath.  He asked him some questions.  He asked him where he was coming from.  And Mr. Glawsan replied, "You know where I'm coming from.  You've been following me since I left where I came from, my sister's house."  Trooper Lopes then again asked him for his license and registration, and Mr. Glawsan mumbled, "This is bullshit," and then had trouble locating his wallet.  Glawsan asked him, he said, "Why did you stop me?"  And Trooper Lopes

responded that — he told Glawsan that he was speeding. And Glawsan responded, "No way. Fucking bullshit." Trooper Lopes stated that Glawsan looked like he had been drinking. And he also asked him to get out of the car. When he asked again if he'd been drinking he said, "What the fuck did I just tell you." Glawsan became belligerent and was later removed from the car and placed under arrest, where he continued his belligerent attitude.

Q    And did Trooper Lopes determined at that time that — that Mr. Glawsan's license was suspended?

A    Yes. His license was also suspended.

Q    And, in fact, on the date of February the 16th of this year, when the incident happened at the Dedham Mall, was it determined that Mr. Glawsan's license was suspended at that time as well?

A    Yes. It was still suspended.

MR. NELSON: Any questions of the Trooper?

156

1    Q      (Juror)  Yes.  You mentioned a

2    serial number that you found on the gun?

3    A      Yes.

4    Q      (Juror)  Did you trace who that

5    belonged to?

6    A      No.  We have other information where

7    — where the gun came back to.

8         MR. NELSON:  Question?

9    Q      (Juror)  What resulted as — from that

10   September incident?

11   A      He was — he was arrested for OUI,

12   and I believe endangering or — and he

13   was in default.  He had not gone to court

14   to clear that up yet.

15        MR. NELSON:  Any other

16   questions?

17             (no response)

18        MR. NELSON:  Thank you.

19        WITNESS:  Thank you.

20             (witness excused)

21             (Assistant District

22             Attorney and court

23             reporter leave room.)

24        MR. NELSON:  One final

presentment regarding Mr. Glawsan,
which I — and this charges him with
being a habitual criminal.

BY MR. NELSON:

STEVEN MCDONALD, RECALLED

Q    Trooper McDonald, I just remind you
that you're still under oath.

A    Yes.

Q    And would you tell the members of
the Grand Jury what — would it be fair to
say that I requested you to obtain a
certified copy of a conviction regarding
Richard Glawsan from the Suffolk
Superior Court?

A    Yes.

Q    And as a result of that did you obtain
a certified copy of the conviction on
Indictment No. 061089, which charged
Mr. Glawsan with armed robbery?

A    Yes. I did.

Q    And would it be fair to say that on
that particular indictment, on the 26th
day of March of 1987, that Mr. Glawsan
was found guilty of that charge and

1    sentenced to not less than four years,

2    no more than seven years at MCI Cedar

3    Junction?

4  A        That's correct.

5  Q        And did I also request of you that —

6            MR. NELSON:   And I ask that that

7    be marked as an exhibit.

8                        (Conviction records

9                        marked as Exhibit 5 as of

10                       this date.)

11           BY MR. NELSON:

12 Q        And did I also request of you that

13   you obtain certified copies of

14   convictions regarding Mr. Glawsan from

15   the Norfolk County Superior Court?

16 A        Yes.  I did.

17 Q        And as a result of that did you obtain

18   copies of — certified copies of

19   convictions on Indictment 96977

20   regarding Mr. Glawsan, which charged

21   him with breaking and entering in the

22   daytime?

23 A        Yes.  I did.

24 Q        And also 96978, which charged Mr.

Glawsan with breaking and entering in the daytime?

A     That's correct.

Q     And would it be fair to say that on October the 4th of 1994, that Mr. Glawsan was found guilty on those two indictments and sentenced to not more than ten years, no less than eight year at MCI Cedar Junction, with five years and nine months of that sentences to be served?

A     That's correct.

Q     And those two sentences would be served concurrent with one another?

A     Correct.   Yes.

          MR. NELSON:  And I'd ask that those two documents be marked as exhibits.

                    (Conviction records marked as Exhibit 6 as of this date.)
                    (Conviction records marked as Exhibit 7 as of this date.)

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

1          MR. NELSON:  Thank you,

2     Trooper.

3               WITNESS:  Thank you.

4                    (witness excused)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*16656 M.G.L.A. 41 § 98A

# MASSACHUSETTS GENERAL LAWS ANNOTATED
## PART I. ADMINISTRATION OF THE GOVERNMENT
### TITLE VII. CITIES, TOWNS AND DISTRICTS
### CHAPTER 41. OFFICERS AND EMPLOYEES OF CITIES, TOWNS AND DISTRICTS
### POLICE OFFICERS

Current through Ch. 73 of the 2004 2nd Annual Session.

## § 98A. Arrest on fresh and continued pursuit

A police officer of a city or town who is empowered to make arrests within a city or town may, on fresh and continued pursuit, exercise such authority in any other city or town for any offence committed in his presence within his jurisdiction for which he would have the right to arrest within his jurisdiction without a warrant. Said officer may return any person so arrested to the jurisdiction wherein said offence was committed. Nothing contained in this section shall be construed as limiting the powers of a police officer to make arrests and in so far as possible this section shall be deemed to be declaratory of the common law of the commonwealth.

### CREDIT(S)

*Added by St.1967, c. 263.*

<General Materials (GM) - References, Annotations, or Tables>

### REFERENCES

### LIBRARY REFERENCES

### 2003 Main Volume

Arrest ☞66.
Westlaw Topic No. 35.
C.J.S. Arrest §§ 52 to 53.

### RESEARCH REFERENCES

### 2003 Main Volume

Treatises and Practice Aids

12 Mass. Prac. Series § 24.17, Operating Under The Influence-Field Sobriety Tests, Arrest And Booking.

12 Mass. Prac. Series § 24.23, Search & Seizure Of Motor Vehicle And Occupants.

12 Mass. Prac. Series § 24.26, Search And Seizure Of Motor Vehicle And Occupants-Failure To Stop And Hot Pursuit.

14A Mass. Prac. Series § 9.6, Arrest Without A Warrant-Extraterritorial Arrest.

17B Mass. Prac. Series § 52.66, Self Defense-Arrest By A Private Person.

17B Mass. Prac. Series § 52.80, Constitutional Defenses-Arrest.

18A Mass. Prac. Series § 845, Powers And Duties.

*16657 30 Mass. Prac. Series § 100, Limitations On Power Of Arrest Without A Warrant As To Places.

30 Mass. Prac. Series § 101, Power To Arrest Without A Warrant While Engaged In Fresh Pursuit-Between Cities And Towns Of The Commonwealth.

32 Mass. Prac. Series § 25, Power Of Arrest.

44 Mass. Prac. Series § 9, Applicability Of Constitutional Guarantees-Privilege Against Self-Incrimination; Admissibility Of Statements; "Interested Adult" Protections; Voluntariness; Order On Motion To Suppress (Form).

### ANNOTATIONS

### NOTES OF DECISIONS

In general 1
Collective knowledge 4
Commission of offense 6
Failure to stop 5
Fresh pursuit 3
Instructions 2

1. In general

Generally, police officer may not make arrest without warrant beyond boundaries of governmental unit he serves unless engaged in fresh pursuit of suspect concerning arrestable offense, whether it be felony or misdemeanor, initially committed in arresting officer's presence and within his jurisdiction. Com. v. Trudel (1997) 674 N.E.2d 262, 42 Mass.App.Ct. 903. Arrest ☞66(2); Arrest ☞66(3)

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Although police officer's powers to execute arrest warrant are state wide, power to arrest without warrant is limited to officer's governmental unit unless he is in fresh and continued pursuit. Com. v. Owens (1993) 609 N.E.2d 1208, 414 Mass. 595. Arrest ⚖══66(3)

Discovery upon search of defendant of illegally possessed firearm and ammunition which did not match weapon gave police detective cause to search vehicle of defendant for other concealed objects. Com. v. Owens (1993) 609 N.E.2d 1208, 414 Mass. 595. Searches And Seizures ⚖══68

Police officers may make extraterritorial "fresh pursuit" arrests for any arrestable offense, be it felony or misdemeanor, initially committed in the arresting officer's presence and within his jurisdiction. Com. v. Dise (1991) 583 N.E.2d 271, 31 Mass.App.Ct. 701, review denied 588 N.E.2d 691, 412 Mass. 1102. Arrest ⚖══66(2)

*16658 When police officer makes warrantless arrest outside his territory and he is not "on fresh and continued pursuit" of suspected felon and has not been specially sworn in as police officer in neighboring territory, officer acts only with the authority he would have as a private citizen. Com. v. Kerr (1991) 565 N.E.2d 1201, 409 Mass. 284. Arrest ⚖══66(2); Arrest ⚖══66(3)

Police officer did not have authority to arrest defendant outside city boundaries where he had no reason to believe that defendant committed arrestable offense of driving under influence at time he followed defendant outside jurisdiction; officer had only observed defendant commit nonarrestable traffic violation. Com. v. LeBlanc (1990) 551 N.E.2d 906, 407 Mass. 70. Automobiles ⚖══349(12)

2. Instructions

Instruction requested by defendant in trial on charges of assault of police officer that Massachusetts law limited arresting authority of police officers to their territorial jurisdiction and that, in absence of proof of fresh pursuit, officers were acting solely as private citizens on defendant's premises was properly refused; instruction would have improperly removed question from jury, transferring factual issue into erroneous conclusive legal determination on record. Com. v. McCrohan (1993) 610 N.E.2d 326, 34 Mass.App.Ct. 277. Criminal Law ⚖══761(11)

3. Fresh pursuit

Police officer who had observed motorist driving through a red light without stopping, after which motorist failed to stop when officer activated lights and siren and directed him to pull over, was authorized to commence fresh pursuit of motorist, and to stop motorist after he drove outside of officer's jurisdictional territory. Com. v. Head (2000) 730 N.E.2d 891, 49 Mass.App.Ct. 492. Automobiles ⚖══349(12)

Officer was in "pursuit" of driver at time driver left officer's jurisdiction, within scope of officer's statutory authority to make arrest outside his jurisdiction, despite fact that officer did not activate his siren or lights or attempt to overtake and stop driver while driver was within his jurisdiction, where officer's reasons for following driver out of his jurisdiction were based upon his observations of an arrestable offense, commission of which continued into officer's jurisdiction. Com. v. Magazu (2000) 722 N.E.2d 488, 48 Mass.App.Ct. 466. Automobiles ⚖══349(12)

Police officer's power to arrest without warrant outside boundary of his governmental unit is limited unless he is in fresh and continuous pursuit. Com. v. Gray (1996) 667 N.E.2d 1125, 423 Mass. 293. Arrest ⚖══66(2)

*16659 Police officer's official authority to make warrantless arrest is limited to territorial jurisdiction of his appointment, unless officer is on fresh and continued pursuit of felon for any offense committed in his presence within his jurisdiction. Com. v. Claiborne (1996) 667 N.E.2d 873, 423 Mass. 275. Arrest ⚖══66(3)

Extraterritorial "fresh pursuit" arrests are permissible for any arrestable offense, whether felony or misdemeanor, initially committed in arresting officer's presence and within his jurisdiction. Com. v. Zirpolo (1994) 639 N.E.2d 1083, 37 Mass.App.Ct. 307. Arrest ⚖══66(3)

Arrest of defendant across town line was permissible where police officer of neighboring town had been in "fresh and continued pursuit" of defendant. Com. v. Zirpolo (1994) 639 N.E.2d 1083, 37 Mass.App.Ct. 307. Arrest ⚖══66(3)

Fresh pursuit doctrine authorized police detective's stop and arrest of defendant without a warrant outside of officer's jurisdiction, where detective was within his jurisdiction when he received information regarding outstanding warrant and had reason to believe that suspect had committed arrestable offense when he began his pursuit which ultimately ended in defendant's arrest outside of police officer's jurisdiction. Com. v. Owens (1993) 609 N.E.2d 1208, 414 Mass. 595. Arrest ⚖══66(3)

Town officer who observed motor vehicle travel in town at speeds varying from ten to thirty-seven miles per hour and cross over center line of roadway on two occasions had "some reason to believe" that motorist was operating a motor vehicle either while under the influence or negligently so as to endanger, both arrestable offenses, thus justifying officer's "fresh pursuit" of vehicle across town line to make arrest. Com. v. O'Hara (1991) 571 N.E.2d 51, 30 Mass.App.Ct. 608, review denied 576 N.E.2d 685, 410 Mass. 1103. Automobiles ⚖══349(12)

4. Collective knowledge

Fact that arrestable offenses were not committed in arresting officer's immediate presence, but rather were communicated to him by radio from officer who did observe offenses, did not remove authority of officer to perform extraterritorial arrest after pursuing defendant across town line; both officers acted in joint effort. Com. v. Zirpolo (1994) 639

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

N.E.2d 1083, 37 Mass.App.Ct. 307.  Arrest ☜66(3)

"Collective knowledge doctrine," under which knowledge of one police officer is knowledge of all, applied to determine whether officer had authority to perform extraterritorial arrest where a fellow officer's jurisdiction, and not arresting officer himself, observed defendant's offenses.  Com. v. Zirpolo (1994) 639 N.E.2d 1083, 37 Mass.App.Ct. 307. Arrest ☜66(2)

**\*16660** 5. Failure to stop

Defendant's failure to stop for police officer who pursued defendant in unmarked police cruiser with its strobe lights flashing, while displaying his badge, gave officer authority to arrest defendant outside of officer's jurisdiction, and therefore evidence discovered as result of limited pat-down search of defendant was properly admitted at trial, though charge of failing to stop for police officer was dismissed. Com. v. Gray (1996) 667 N.E.2d 1125, 423 Mass. 293. Arrest ☜66(3); Criminal Law ☜394.4(9)

6. Commission of offense

Officer had reason to believe driver was committing offense of driving under the influence of intoxicating liquor in officer's presence and within his jurisdiction, within scope of officer's statutory authority to make arrest outside his jurisdiction, where officer and driver were outside officer's jurisdiction at time officer first observed driver driving in manner indicating he was intoxicated, and driver continued to drive and entered officer's jurisdiction moments later. Com. v. Magazu (2000) 722 N.E.2d 488, 48 Mass.App.Ct. 466. Automobiles ☜349(12)

Police officer, who first observed pickup truck in bar parking lot that was partially in neighboring town, could pursue vehicle into neighboring town and make warrantless arrest of driver, based on his observations of truck lurching back and forth in manner consistent with drunk driving while it was still in officer's town.  Com. v. Trudel (1997) 674 N.E.2d 262, 42 Mass.App.Ct. 903.    Automobiles ☜349(12)

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

**\*3856** Massachusetts Rules of Criminal Procedure (Mass.R.Crim.P.), Rule 2

## MASSACHUSETTS GENERAL LAWS ANNOTATED
## MASSACHUSETTS RULES OF CRIMINAL PROCEDURE
## FOR DISTRICT AND SUPERIOR COURTS
## RULES OF CRIMINAL PROCEDURE

*Current with amendments received through Jan. 1, 2004*

## Rule 2. Purpose; Construction; Definition of Terms

< (Applicable to District Court and Superior Court) >

(a) Purpose; Construction.   These rules are intended to provide for the just determination of every criminal proceeding.   They shall be construed to secure simplicity in procedure, fairness in administration, and the elimination of expense and delay.

(1) Words or phrases importing the singular number may extend and be applied to several persons or things, words importing the plural number may include the singular, and words importing the masculine gender may include the feminine and neuter.

(2) When in these rules reference is made to a subdivision of a rule, that reference is to that subdivision and to any subdivisions thereof.

(b) Definition of Terms.   In construing these rules the following words and phrases shall have the following meanings unless a contrary intent clearly appears from the context in which they are used:

(1) "Indigent" means any defendant who is unable to procure counsel with his funds as defined in Supreme Judicial Court Rule 3:10.

(2) "Indigent but able to contribute" means any defendant who is unable to procure counsel with his funds but is able to contribute funds for the cost of counsel as defined in Supreme Judicial Court Rule 3:10.

(3) "Capital Crime" means a charge of murder in the first degree.

(4) "Commonwealth" includes the prosecuting office or agency and all officers or agents responsible thereto.

(5) "Court" includes a judge, special magistrate, or clerk.

(6) "District Attorney" or "Attorney General" include assistant district attorneys or assistant attorneys general and other attorneys specially appointed to aid in the prosecution of a case.

**\*3857** (7) "District Court" includes all divisions of the District Court Department of the Trial Court, the Boston Municipal Court Department of the Trial Court, and the Juvenile Court Department of the Trial Court, or sessions thereof for holding court.

(8) "Interested Person" includes the adverse party, a co-defendant, and a witness who is to be deposed.

(9) "Judge" includes a judge of a court or one properly assigned to a court or a special magistrate when in the performance of those duties imposed and authorized by these **rules**.

(10) "Juvenile Court" means a division of the Juvenile Court Department of the Trial Court, or a session thereof for holding court.

(11) "Mailing" means the use of regular mail and shall not require registered or certified mail.

(12) "Prosecuting Attorney" means the attorney general or assistant attorneys general, district attorney, assistant district attorneys, special assistant district attorneys, or legal assistants to the district attorney, or other attorneys specially appointed to aid in the prosecution of a case.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

(13) "Prosecutor" means any prosecuting attorney or prosecuting officer, and shall include a city solicitor, a police prosecutor, or a law student approved for practice pursuant to and acting as authorized by the rules of the Supreme Judicial Court.

(14) "Related Offense" means one of two or more offenses which are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan.

(15) "Return Day" means the day upon which a defendant is ordered by summons to first appear or, if under arrest, does first appear before a court to answer to the charges against him, whichever is earlier.

(16) "Special Magistrate" means any person who is appointed pursuant to, and empowered to administer those functions authorized by, rule forty-seven of these rules.

(17) "Summons" means

(A) criminal process issued to a person requiring him to appear at a stated time and place to answer to criminal charges; or

(B) process issued to a person requiring him to appear at a stated time and place to give testimony in a criminal proceeding; or

*3858 (C) process issued to a person requiring him to appear and produce at a stated time and place books, designated papers, documents, or other objects for use in a criminal proceeding.

(18) "Superior Court" means the Superior Court Department of the Trial Court, or a session thereof for holding court.

CREDIT(S)

*Amended May 29, 1986, effective July 1, 1986.*

HISTORICAL NOTES

REPORTER'S NOTES

2002 Main Volume

Rule 2 is perhaps the most significant of the rules in advancing the trend toward a high degree of procedural fairness in the administration of criminal justice. This is so because the rule not only permits but requires the rules to be construed and applied in a manner which provides for fairness in their administration to the end that a just determination in every criminal proceeding shall be achieved. The rules must be approached with sympathy for this purpose; they must be interpreted with common sense.

The rules were not intended to be administered inflexibly without regard for the circumstances of the particular case. Where a literal interpretation of a rule and its application in a specific situation would lead to unnecessary expense or delay, would unduly complicate the proceedings, or would operate unfairly or produce an unjust result, that interpretation is to yield to the principle enunciated in Rule 2(a).

This is not to imply that the rules were conceived as merely guidelines or suggested procedures to which the courts and counsel need adhere only as will further their particular interests. They have the force and effect of law.

The appellate courts have made it increasingly clear that abuse of power by the prosecution or by trial judges is not to be tolerated. See e.g., S.J.C. Rule 3:22A, Disciplinary Rules Applicable to Practice as a Prosecutor or as a Defense Lawyer, PF 1-14 (Feb. 14, 1979); Commonwealth v. St. Pierre, Mass.Adv.Sh. (1979) 834, 387 N.E.2d 1135; Commonwealth v. Soares, Mass.Adv.Sh. (1979) 593, 387 N.E.2d 499; Commonwealth v. Ellison, Mass.Adv.Sh. (1978) 2072, 379 N.E.2d 560; Commonwealth v. Earltop, Mass.Adv.Sh. (1977) 532, 539, 361 N.E.2d 220 (Hennessey, C.J., concurring); Commonwealth v. Redmond, 370 Mass. 591, 351 N.E.2d 501 (1976); Commonwealth v. Sneed, Mass.Adv.Sh. (1978) 3156, 383 N.E.2d 843. It is equally apparent that a high standard of conduct is demanded of defense counsel. See S.J.C. Rule 3:22A, supra, DF 1-15. A disregard for these rules of court or a failure to adhere to their provisions are abuses of the system which can be expected to produce problems in the administration of justice and unfairness to the Commonwealth, defendants, and the public, and which, therefore, should not be tolerated by either the trial or appellate courts.

*3859 Subdivision (a). The language of the first paragraph is drawn virtually without change from Fed.R.Crim.P. 2. These rules are intended to minimize complicated proceedings and needless expense and delay and are to be construed so as to achieve that goal.

The principle of construction stated in subdivision (a)(1) is taken from G.L. c. 4, § 6, cl. fourth, which relates to the construction of the General Laws.

Subdivision (a)(2) is designed to avoid any confusion in reading references to subdivisions. Included in a reference to a subdivision are all

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

paragraphs, subparagraphs, and clauses of that subdivision.

Subdivision (b). These definitions are to be used in construing these rules unless a contrary interpretation is clearly demanded by the context within which the term is used. See G.L. c. 4, § 7; c. 3, § 63.

(1) Appointed Counsel. This definition is suggested by Superior Court Rule 53(3) (1974); it is to be distinguished from "Assigned Counsel," infra.

(2) Assigned Counsel. The terms "appointed counsel" and "assigned counsel" have been used interchangeably in the case law. See e.g., Costarelli v. Municipal Court of the City of Boston, 367 Mass. 35, 323 N.E.2d 859 (1975). However, for the purposes of these rules, each term has been given a separate and distinct definition. In these rules, "assigned counsel" means a member of a publicly funded or charitable organization, such as the Massachusetts Defenders Committee (G.L. c. 221, § 34D. See Rule 8[b] ), or a county defender. "Appointed counsel" denotes a private attorney who is designated by a judge or magistrate to represent a defendant who cannot afford counsel. Both assigned and appointed counsel may include senior law students appearing without compensation on behalf of indigent defendants as permitted by S.J.C. Rule 3:11 (1974: 366 Mass. 867, as amended, 1975; 367 Mass. 914).

(3) Capital Crime. This definition is drawn from existing case law, e.g., Commonwealth v. Capalbo, 308 Mass. 376, 32 N.E.2d 225 (1941); Commonwealth v. Ibrahim, 184 Mass. 255, 68 N.E. 231 (1903); Green v. Commonwealth, 94 Mass. (12 Allen) 155 (1866). Compare G.L. c. 278, § 33E (capital crime defined "for the purposes of ... [appellate] review" only). General Laws c. 274, § 2 provides that, "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon." Therefore, an indictment of a defendant as an accessory before the fact of first degree murder sets out a capital crime. Grady v. Treasurer of the County of Worcester, 352 Mass. 702, 704, 227 N.E.2d 490 (1967).

*3860 (4) Commonwealth. The definition of this term reflects the meaning of the word as commonly used in the case law and statutes.

(5) Court. This term is used in the rules to include those officials most intimately involved in the process of adjudicating cases. When so generically used, the word is not to be construed so as to expand or limit those duties traditionally or by law within the prerogative of certain officials.

(6) District Attorney or Attorney General. As with "Commonwealth," supra, these terms are used both in the sense of the office and the personnel thereof in their official capacity.

(7) District Court. General Laws c. 211B, § 1 (inserted by St.1978, c. 478,§ 110) established the Trial Court of the Commonwealth which consists in part of the Superior Court Department, the District Court Department, the Boston Municipal Court Department, and the Juvenile Court Departments. For ease of reference throughout these rules, the latter three Departments are included within the term "District Court."

It is in keeping with the policy of these rules to secure simplicity and uniformity in procedure to make the Juvenile Court Department subject to these rules, insofar as they are consistent with juvenile practice. See District Court Special Rule 2 (1974), which applies the rules of the District Court to juvenile proceedings insofar as they are "pertinent."

(8) Interested Person. This term specifies those persons who are entitled to notice of, for example, the filing of motions, Mass.R.Crim.P. 13, 32, or the taking of a deposition, Mass.R.Crim.P. 36.

(9) Judge. In addition to its accepted meaning, for purposes of these rules this term is to include a magistrate when used in reference to a function which that official is authorized to perform by Mass.R.Crim.P. 48.

(10) Juvenile Court. See G.L. c. 211B, § 1 (inserted by St.1978, c. 478, § 110), c. 218, §§ 57-60 (St.1978, c. 478, §§ 212-16).

The divisions of the Juvenile Court Department, within their respective jurisdictions, have and exercise the same powers, duties and procedures as the District Court or Municipal Court Departments and are subject to the laws relating thereto, so far as applicable. G.L. c. 218, § 59 (as amended, St.1978, c. 478, § 215).

*3861 (11) Mailing. It is intended that unless specifically provided for elsewhere in these rules, neither registered nor certified mailing is required.

(12) Prosecuting Attorney. This term includes those attorneys who prosecute the majority of criminal cases in the Commonwealth.

(13) Prosecutor. This definition is broader than that of "prosecuting attorney," and reflects the fact that many cases in the District Courts are prosecuted by a police prosecutor. Under these rules, some prosecutorial functions can be carried on only by a district attorney or attorney general. See e.g., Mass.R.Crim.P. 15(d)(1)(B). A prosecutor may include senior law students appearing on behalf of the Commonwealth pursuant to S.J.C. Rule 3:11 (1974: 366 Mass. 867, as amended, 1975: 367 Mass. 914).

(14) Related Offense. For further explanation of this definition, see Mass.R.Crim.P. 9 and Reporter's Notes.

(15) Return Day. The "return day" is the date upon which a defendant under arrest first appears in court or the date upon which a defendant not under arrest is scheduled to appear pursuant to summons. It is the date upon which speedy trial rights attach ( Mass.R.Crim.P. 36[b][1] ) and from which other time limits are measured.

(16) Special Magistrate. The office of "Special Magistrate" is defined in terms of its powers and duties. See Mass.R.Crim.P. 47. Special Magistrates are to be distinguished from "Magistrates in the Trial

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Court" under G.L. c. 221, §§ 62B-62C (inserted by St.1978, c. 478, § 250).

(17) Summons. This definition includes process issued pursuant to Mass.R.Crim.P. 6 and 17. The definitions contained in subdivisions (b)(17)(B) and (C) of this rule replace the older term "subpoena."

(18) Superior Court. See G.L. c. 211B, § 1 (inserted by St.1978, c. 478, § 110), c. 212 (as amended, St.1978, c. 478, §§ 115-25).

**\*3862** REFERENCES

CROSS REFERENCES

Construction of statutes, see M.G.L.A. c. 4, §§ 6, 7.

LIBRARY REFERENCES

2002 Main Volume

Courts ⟲85.
Westlaw Topic No. 106.
C.J.S. Courts § 130.

RESEARCH REFERENCES

Treatises and Practice Aids

41 Mass. Prac. Series § 5:19, Table Of Court Rules.

41 Mass. Prac. Series RAP R 8, The Record On Appeal.

30 Mass. Prac. Series § 74, Definition Of Arrest Warrant.

30 Mass. Prac. Series § 83, Summons Must Issue Unless Cause Shown For Issuance Of Warrant.

30 Mass. Prac. Series § 485, The Right To Bail In Capital Cases.

30 Mass. Prac. Series § 594, Importance Of The Rule.

30 Mass. Prac. Series § 617, By Complaint-Superior Court.

30 Mass. Prac. Series § 636, Capital Crime-Defendant Cannot Waive Indictment.

30 Mass. Prac. Series § 639, Written Waiver Of Indictment Must Be Filed.

30 Mass. Prac. Series § 792, The Persons Who May Present Evidence To The Grand Jury.

30 Mass. Prac. Series § 798, Grand Jury May Require Witness To Furnish Things Not Testimonial In Character.

30 Mass. Prac. Series § 845, Introduction.

30 Mass. Prac. Series § 850, Contents Of Summons.

30 Mass. Prac. Series § 855, Service Of Summons-Manner.

30 Mass. Prac. Series § 881, Text Of Rule And Reporter's Notes.

30 Mass. Prac. Series § 885, Introduction.

30 Mass. Prac. Series § 890, Procedure At Initial Appearance-Interview By Probation Department.

**\*3863** 30 Mass. Prac. Series § 951, Text Of Rule And Reporter's Notes.

30 Mass. Prac. Series § 967, Difference Between Appointed And Assigned Counsel.

30 Mass. Prac. Series § 973, District Court.

30 Mass. Prac. Series § 1158, Presence Of Judge Or Special Magistrate Is Not Required.

30 Mass. Prac. Series § 1167, Time Of Filing.

30 Mass. Prac. Series § 1191, Text Of Rule And Reporter's Notes.

30 Mass. Prac. Series § 1271, Text Of Rule And Reporter's Notes.

30A Mass. Prac. Series § 1388, Evidence Must Be In Possession, Custody, Or Control Of Prosecutor.

30A Mass. Prac. Series § 1480, Approval Of District Attorney Or Attorney General Necessary Before Commonwealth May Appeal.

30A Mass. Prac. Series § 1516, Persons Authorized To File Nolle Prosequi.

30A Mass. Prac. Series § 1545, Type Of Summons Discussed In The Rule.

30A Mass. Prac. Series § 1561, Introduction.

30A Mass. Prac. Series § 1573, Manner Of Service.

30A Mass. Prac. Series § 1623, Procedure If Defendant Absents Himself During Trial-If Case Is Capital Crime.

30A Mass. Prac. Series § 1649, Jury Trial Cannot Be Waived In Capital Case.

30A Mass. Prac. Series § 2064, Motion For A New Trial In Capital Cases.

30A Mass. Prac. Series § 2239, Notice Of Hearing On Motion.

30A Mass. Prac. Series § 2261, Text Of Rule And Reporter's Notes.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

30A Mass. Prac. Series § 2274, Time When Defendant Must Be Brought To Trial.

30A Mass. Prac. Series § 2323, Dismissal Of Related Charges.

30A Mass. Prac. Series § 2632, Delinquency Proceedings And The Criminal Rules.

44 Mass. Prac. Series § 41, Contempt.

*3864 17B Mass. Prac. Series § 51.1, In General.

17C Mass. Prac. Series § 59.78, Discovery.

14 Mass. Prac. Series § 4.13, Objections.

14 Mass. Prac. Series § 4.55, Right To Appeal Criminal Interlocutory Orders.

14 Mass. Prac. Series § 4.72, Authority Of Trial Court To Issue Report.

14 Mass. Prac. Series § 4.74, Report Of Interlocutory Matter.

14 Mass. Prac. Series § 4.96, Stays In Criminal Cases.

14B Mass. Prac. Series § 14.62, Structure Of Juvenile Court System-In General.

## UNITED STATES CODE ANNOTATED

Purpose and construction of rules. see Fed.Rules Cr.Proc. Rule 2, 18 U.S.C.A.

## ANNOTATIONS

## NOTES OF DECISIONS

In general 1/2
Contempt 4
Parties 1
Probable cause determination 6
Reporters' notes 3
Return day 2
Written statement 5

### 1/2. In general

Application for issuance of process, which may be presented by lay persons or police officers, requests authority of a court to make an arrest or issue a summons, and thus it requires magistrate to exercise good deal of discretion, whereas an application for complaint does not call on the magistrate to exercise substantial discretion, in that it does not call on court to issue process, the arrest is already accomplished, it does not require approval of the validity of the arrest or assess the potential strength of the prosecution, and it is merely an aid to facilitating preparation of the complaint. Com. v. Arias (2002) 778 N.E.2d 523, 55 Mass.App.Ct. 782, review denied 777 N.E.2d 1263, 438 Mass. 1101. Criminal Law ⟨⟩211(1); Criminal Law⟨⟩ 217

### 1. Parties

Term "district attorney" within Rule 15 governing who may authorize interlocutory appeal by the Commonwealth from granting of suppression motion includes assistant district attorneys. Com. v. Dellicolli (1980) 410 N.E.2d 742, 10 Mass.App.Ct. 909, review denied 441 N.E.2d 1042, 383 Mass. 890. District And Prosecuting Attorneys ⟨⟩3(4)

*3865 If the allegedly aggrieved person files a complaint for civil contempt seeking payment of court-ordered support and is represented by private counsel, the probation department would appear to have no rule in prosecuting the case, at least when no public assistance is being provided, but if the contempt hearing includes both civil and criminal features, the plaintiff who initiated the proceedings could act in place of a prosecutor because private parties to civil litigation have the right to press both the civil and criminal aspects of the case. Furtado v. Furtado (1980) 402 N.E.2d 1024, 380 Mass. 137. Child Support ⟨⟩473; Child Support ⟨⟩497

### 2. Return day

Where return day, the day defendant was first before court to answer to charges against him, fell within second 12-month period after effective date of Rules of Criminal Procedure, defendant was to be tried within 18 months. Com. v. Farris (1983) 455 N.E.2d 433, 390 Mass. 300. Criminal Law ⟨⟩577.8(1)

### 3. Reporters' notes

Reporters' Notes are an influential guide when interpreting Rules of Criminal Procedure. Com. v. Sheridan (1996) 667 N.E.2d 279, 40 Mass.App.Ct. 700. Courts ⟨⟩85(3)

### 4. Contempt

Although the Massachusetts Rules of Criminal Procedure pertaining to contempt apply only to proceedings in the Superior, District, Juvenile, and Boston Municipal Courts, judges of other courts possess similar contempt powers under the common law and by statute. Com. v. Rogers (1999) 703 N.E.2d 1199, 46 Mass.App.Ct. 109, review denied 709 N.E.2d 1119, 429 Mass. 1102. Contempt ⟨⟩33

### 5. Written statement

Rule requiring written statement constituting basis for arrest to be attached to application for complaint was satisfied, even though formal application for complaint was not filed, given that judge considered state police report and booking sheet, report set forth in detail that defendant had been target of month-long narcotics investigation, and that defendant was arrested after search of home and vehicle pursuant to

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

warrant revealed that drugs were found in both places. Com. v. Arias (2002) 778 N.E.2d 523, 55 Mass.App.Ct. 782, review denied 777 N.E.2d 1263, 438 Mass. 1101. Criminal Law ⊜⇒211(1)

6. Probable cause determination

Failure to make prompt judicial determination of probable cause or to admit defendant to bail within requisite time would not have been enough to require dismissal of possession of controlled substance with intent to distribute and school zone violation charges, even if claim had been timely made, and police did not measure distance from school to home at which drugs were found prior to arrest, given that defendant did not demonstrate prejudice in trial or interference with procedural rights therein, police would have taken necessary measurements of distance prior to hearing, and purported prejudice had little to do with evidence. Com. v. Arias (2002) 778 N.E.2d 523, 55 Mass.App.Ct. 782, review denied 777 N.E.2d 1263, 438 Mass. 1101. Bail ⊜⇒42; Criminal Law ⊜⇒223

*3866 State did not have to present clerk-magistrate with facts showing probable cause for school zone violation when complaint was issued, even though police report made no mention of fact that defendant's home where drugs were found was within 1,000 feet of school, where case was commenced by warrantless arrest, which required showing of probable cause for each charge at probable cause determination, not when complaint was issued, and when complaint was issued, police only had to show basis for arrest. Com. v. Arias (2002) 778 N.E.2d 523, 55 Mass.App.Ct. 782, review denied 777 N.E.2d 1263, 438 Mass. 1101. Criminal Law ⊜⇒212

Complaint procedure in arrest cases does not include a probable cause determination. Com. v. Arias (2002) 778 N.E.2d 523, 55 Mass.App.Ct. 782, review denied 777 N.E.2d 1263, 438 Mass. 1101. Arrest ⊜⇒70(2)

Current with amendments received through Jan. 1, 2004

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

*768  97 S.Ct. 768

429 U.S. 1053, 50 L.Ed.2d 770

Supreme Court of the United States

Ellis Lorraine THOMPSON
v.
State of OKLAHOMA

No. 76-5283
January 10, 1977

On petition for writ of certiorari to the Court of Criminal Appeals of Oklahoma.

Jan. 10, 1977.  Mr. Justice BRENNAN, with whom Mr. Justice MARSHALL joins, dissenting.

Petitioner was charged by information in Oklahoma state court with murder.  After a jury trial, he was convicted of Manslaughter in the First Degree. Thereafter, petitioner was charged in separate informations with two additional offenses arising out of the same episode: Burglary in the First Degree and Carrying a Firearm.  He pleaded guilty to these offenses and was sentenced to additional concurrent terms of 10 years imprisonment for each offense. Petitioner then made an application for postconviction relief in the state district court attacking the latter two convictions on grounds of collateral estoppel and double jeopardy.  The district court denied the application, and the Oklahoma Court of Criminal Appeals affirmed.

I would grant the petition for certiorari and reverse the judgment of the Court of Criminal Appeals affirming the [429 U.S. 1054] burglary and firearm convictions. I adhere to the view that the Double Jeopardy Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment, requires the prosecution in one proceeding, except in extremely limited circumstances not present here, of "all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction."  Ashe v. Swenson, 397 U.S. 436, 453-454, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring).  See Cousins v. Maryland, 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976); Dempsey v. United States, 423 U.S. 1079, 96 S.Ct. 867, 47 L.Ed.2d 90 (1976) (Brennan, J., dissenting); Susi v. Flowers, 423 U.S. 1006, 96 S.Ct. 436, 46 L.Ed.2d 378 (1975) (Brennan, J., dissenting); Vardas v. Texas, 423 U.S. 904, 96 S.Ct. 206, 46 L.Ed.2d 135 (1975) (Brennan, J., dissenting); Stewart v. Iowa, 423 U.S. 902, 96 S.Ct. 205, 46 L.Ed.2d 134 (1975) (Brennan, J., dissenting); Waugh v. Gray, 422 U.S. 1027, 96 S.Ct. 2622, 45 L.Ed.2d 684 (1975) (Brennan, J.,  *769. dissenting); Wells v. Missouri, 419 U.S. 1075, 95 S.Ct. 665, 42 L.Ed.2d 671 (1974) (Brennan, J., dissenting); Moton v. Swenson, 417 U.S. 957, 94 S.Ct. 3086, 41 L.Ed.2d 675 (1974) (Brennan, J., dissenting); Tijerina v. New Mexico, 417 U.S. 956, 94 S.Ct. 3085, 41 L.Ed.2d 674 (1974) (Brennan, J., dissenting); Ciuzio v. United States, 416 U.S. 995, 94 S.Ct. 2410, 40 L.Ed.2d 774 (1974) (Brennan, J., dissenting); Harris v. Washington, 404 U.S. 55, 57, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971) (concurring statement); Waller v. Florida, 397 U.S. 387, 395, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1975) (Brennan, J., concurring).  See also People v. White, 390 Mich. 245, 212 N.W.2d 222 (1973); State v. Brown, 262 Or. 442, 497 P.2d 1191 (1972); Commonwealth v. Campana, 452 Pa. 233, 304 A.2d 432, vacated and remanded, 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), adhered to on remand, 455 Pa. 622, 314 A.2d 854 (1974); State v. Gregory, 66 N.J. 510, 333 A.2d 257 (1975).

The petition for a writ of certiorari is denied.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

97 S.Ct. 2912, 433 U.S. 682, Harris v. Oklahoma, (U.S.Okla. 1977)

Page 1

*2912  97 S.Ct. 2912

433 U.S. 682, 53 L.Ed.2d 1054

Supreme Court of the United States

Thomas Leon HARRIS
v.
State of OKLAHOMA.

No. 76-5663.
June 29, 1977.

Defendant was convicted in the District Court, Tulsa County, of robbery with firearms, and he appealed. The Court of Criminal Appeals, 555 P.2d 76, affirmed. Petition for writ of certiorari was granted.   The Supreme Court held that where proof of underlying felony, i. e., robbery with firearms, was necessary to establish intent necessary for felony-murder conviction of petitioner for fatal shooting of grocery store clerk during armed robbery the double jeopardy clause barred subsequent prosecution and conviction for robbery with firearms.

Reversed.

Mr. Justice Brennan, with whom Mr. Justice Marshall joined, filed concurring statements.

West Headnotes

[1] Double Jeopardy ⚖═164

135H ----
135HV Offenses, Elements, and Issues Foreclosed
135HV(B) Included Offenses
135Hk164 Ruling on Greater as Bar to Prosecution for Lesser Offense.

(Formerly 110k199)

When conviction for a greater crime cannot be had without conviction for the lesser crime, the double jeopardy clause bars prosecution for the lesser crime after conviction for the greater one. U.S.C.A.Const. Amend. 5.

[2] Double Jeopardy ⚖═164

135H ----
135HV Offenses, Elements, and Issues Foreclosed
135HV(B) Included Offenses
135Hk164 Ruling on Greater as Bar to Prosecution for Lesser Offense.

(Formerly 110k200(1))

Since under Oklahoma law proof of underlying felony, i. e., robbery with firearms, was required to prove intent necessary for felony-murder conviction for fatal shooting of grocery store clerk during armed robbery, double jeopardy clause precluded subsequent prosecution and conviction of petitioner for robbery with firearms. U.S.C.A.Const. Amend. 5.

PER CURIAM.

A clerk in a Tulsa, Okla., grocery store was shot and killed by a companion of petitioner in the course of a robbery of the store by the two men. Petitioner was convicted of felony-murder in Oklahoma State court. The opinion of the Oklahoma Court of Criminal Appeals in this case states that '[i]n a felony murder case, the proof of underlying felony [here robbery with firearms] is needed to prove the intent necessary for a felony murder conviction.' 555 P.2d 76, 80-81 (1976). Petitioner nevertheless was thereafter brought to trial and convicted on a seperate information charging the robbery with firearms, after denial  of his motion to dismiss on the ground that this prosecution violated the Double Jeopardy *2913.  Clause of the Fifth Amendment because he had been already convicted of the offense in the felony-murder trial. The Oklahoma Court of Criminal Appeals affirmed.

1,2°  When, as here, conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime, after conviction of the greater one. (FN*) In re [433 U.S. 683] Neilsen, 131 U.S. 176, 9 S.Ct. 672, 33 LEd. 118 (1889);  cf. Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).  '[ ] person [who] has been tried and convicted for a crime which has various incidents included in it, .... cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offence. ' In re Nielsen, supra, 131  U.S., at 188, 9 S.Ct. at 676.  See also Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970); Grafton v. United States, 206 U.S. 333, 352, 27 S.Ct. 749, 754, 51 L.Ed. 1084 (1907).

The motion for leave to proceed in forma pauperis is granted, the petition for writ of certiorari is granted, and the judgment of the Court of Criminal Appeals is Reversed.

Mr. Justice BRENNAN, with whom Mr. Justice

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

MARSHALL joins, concurring.

I join the Court's opinion but in any event would reverse on a ground not addressed by the Court, namely, that the State did not prosecute the two informations in one proceeding. I adhere to the view that the Double Jeopardy Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment, requires the prosecution in one proceeding, except in extremely limited circumstances not present here, of 'all the charges against a defendant that grow out of a single criminal act, occurence, episode, or transaction. ' *Ashe v. Swenson,* 397 U.S. 436, 453-454, 90 S.Ct. 1189, 1199, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring). See *Thompson v. Oklahoma,* 429 U.S. 1053, 97 S.Ct. 768, 50 L.Ed.2d 770 (1977) (Brennan, J., dissenting from denial of certiorari), and cases collected therin.

(FN*) The State conceded in its response to the petition for certiorari that 'in the Murder case, it was necessary for all the ingredients of the underlying felony of Robbery with Firearms to be proved . . . .' Brief in Opposition 4.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.