# Index

1. Judge wolfe service order 28 U.S.C.A. 2241(c)(3)
2. Order of wolfe Authorizing Amended Complaint.
3. Respondents Motion for more Definite Answer.
4. Mittimusses from Norfolk Superior court Sentence
5. Norfolk & suffolk County Grand Jury Testimony of Police witnesses Mouris & Buckley. & Included charges.
6. suffolk county grand Jury Indictments. & Norfolk Indictments.

SJC-  7  Petition for writ of Habeas corpus to issue & opposition
    A. Docket Entry sheet
    B. single Justice ruling. Deny writ of Habeas corpus
    C. M.G.L.A.c. 41 § 98(A).
    D. RCRP Rule 2.
    e. Harris V. Oklahoma, 433 U.S. 682 (1977)
    F. Thompson V. Oklahoma, 429 U.S. 1053 (1977)
    G. Willhauck V. Flannigaan 448 U.S. 1323 (1980)

## Certificate of Service

Dear Clerk, Barbara, Morse for Judge wolf, find the Aforementioned Attachments Have this date. been delivered via 1st class mail to David Lieber A.A.G. 1 Ashburton Pl, Boston Mass. 02108 Crim.Bureau.

A-1

SCANNED
DATE: 3/31/05
BY: M.P.

DOCKETED

19

United states district Court for
Massachussets suffolk district

C.A. 04-CV-12025 MLW
&
04-CN-12199 MLW

R.D. Glawson (petitioner)

V:

Robert Keaton (et.al)

---

Petitioners motion for Clarification of facts; in Relation
To seperate misunderstood filed Varified civil complaints

1. Petition seeks to seperate 9-23-04 Varified civil
complaint from 12-29-04 Varified civil complaint by Court.

2. (Definite Statement Facts in Support & Clarification)

3. [1.] In 9-13-04 The court docketed, (A) petitioners 28 U.S.C.A.
2241(c)(3). petition for The great writ of Liberty To Issue
against NOCR-2001-00117-1-2 -15 To 20 year Conviction
and sentence, For Lack of 5th amendment Finality in the
sentence & Conviction as required by the privileges & Immunities
Clause & The due process of law clauses in the 5th & Through
The fourteenth amendment U.S.C.A.

4. [2.] In 12-29-04 petitioners Varified Civil Complaint
seeking Injunctive relief against the future prosecution
& punishment on Lessor & Greater Included offences
& "same offences under Identity of offences once
Prosecuted In the Norfolk case above attached. That are being
reprosecuted under the "same evidence" & "same ellement"
and "same conduct; In the suffolk county prosecution, & intends
to reprosecute. & Are not to be considered amended complaints
They are both seperate & distinct claims for relief.

Petitioner shall, (1) By April 22, 2005
file an amended petition and, if he
wishes, a seperate amended complaint. WAL 2/28/05

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RICHARD D. GLAWSON, | ) | |
| Petitioner, | ) | |
| v. | ) | Civil Action No. 04-12025-MLW |
| ROBERT KEATON, et al. | ) | |
| Respondents. | ) | |

## MOTION FOR MORE DEFINITE STATEMENT

Respondents move, pursuant to F.R.C.P. 12(e), for an order requiring Petitioner to a file more definite statement, in particular for an order requiring Petitioner to file a petition that plainly sets forth his claim and is in compliance with Rule 2 of the Rules Governing Section 2254 Cases in the United States District Court [hereinafter "the Habeas Rules"].    In support of the motion, Respondents state that:

1.    On September 13, 2004, Petitioner filed a "Verified Civil Complaint" (Paper No. 2) [hereinafter "the Original Petition"], naming as defendants the Norfolk County District Attorney, and the Superintendent of Souza-Baranowski Correctional Center, where Petitioner was then confined. The Original Petition invoked this Court's jurisdiction under, *inter alia*, 28 U.S.C. § 2241 and sought release from what Petitioner argues is an unlawful conviction.

2.    On December 29, 2004, Petitioner filed a second "Verified Civil Complaint" (Paper No. 5) [hereinafter "the Amended Petition"] that names as defendants the Attorney General of Massachusetts and members of the Suffolk and Norfolk County District Attorneys' Offices, but not Petitioner's current custodian. The Amended Petition does not refer to habeas corpus and does not

ALLOWED. Petitioner shall, by April
22, 2005, file an amended
petition that addresses the
issues raised in this motion. If
he does not, the pending petition may be

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD D. GLAWSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    Civil Action No. 04-12025-MLW |
| | ) |
| ROBERT KEATON, et al. | ) |
| | ) |
| Respondents. | ) |

## MOTION FOR MORE DEFINITE STATEMENT

Respondents move, pursuant to F.R.C.P. 12(e), for an order requiring Petitioner to a file more definite statement, in particular for an order requiring Petitioner to file a petition that plainly sets forth his claim and is in compliance with Rule 2 of the Rules Governing Section 2254 Cases in the United States District Court [hereinafter "the Habeas Rules"].    In support of the motion, Respondents state that:

1.     On September 13, 2004, Petitioner filed a "Verified Civil Complaint" (Paper No. 2) [hereinafter "the Original Petition"], naming as defendants the Norfolk County District Attorney, and the Superintendent of Souza-Baranowski Correctional Center, where Petitioner was then confined. The Original Petition invoked this Court's jurisdiction under, *inter alia*, 28 U.S.C. § 2241 and sought release from what Petitioner argues is an unlawful conviction.

2.     On December 29, 2004, Petitioner filed a second "Verified Civil Complaint" (Paper No. 5) [hereinafter "the Amended Petition"] that names as defendants the Attorney General of Massachusetts and members of the Suffolk and Norfolk County District Attorneys' Offices, but not Petitioner's current custodian. The Amended Petition does not refer to habeas corpus and does not

claim that Petitioner's current imprisonment is illegal, but seeks a "civil injunction" against certain specified criminal proceedings pending in Suffolk County Superior Court.

3.   On January 7, 2005, this Court issued an order requiring Respondents to respond to the Original Petition and the Amended Petition, and further requested that Respondents provide materials indicating whether Petitioner has exhausted the remedies available to him in State court with respect to the matters raised in the pleadings.

4.   As Petitioner sets forth in the Amended Petition, in February, 2001, he embarked on a multi-day campaign of criminal activity across Suffolk, Middlesex and Norfolk counties, which resulted in serious criminal charges in all three jurisdictions. *See* Amended Petition at ¶¶ 4-11, Attachment 5.

5.   Petitioner pleaded guilty to certain of the Norfolk County indictments on February 20, 2003, and was subsequently sentenced to a 15 to 20 year term of imprisonment; the Suffolk County indictments remained pending. *See* Amend. Pet. at Att. 5.

6.   The Original Petition and Amended Petition are not substantially in form mandated by Rule 2(c) of the Habeas Rules in several important respects that preclude Respondents from meaningfully responding to the pleadings:

(a)   Habeas Corpus Petitions may only be used to challenge confinement arising from proceedings in one state court. Rule 2(d). Petitioner must specify whether he intends to challenge the existing convictions entered by the Norfolk County Superior Court, or instead to challenge the future ability of the Suffolk County Superior Court convict him on the pending charges. If Petitioner intends to make both challenges, he must do so in separate proceedings. Rule 2(d).

(b)    The proper respondent to the Petition depends upon whether Petitioner is challenging his custody on the Norfolk convictions or his future custody on potential Suffolk County convictions. Rules 2(a) and (b).

(c)    The defenses available to Respondents, including failure to exhaust state remedies and the statute of limitations, depend on which state court proceedings Petitioner intends to challenge. *See* 28 U.S.C. §§ 2244(d), 2254(b).

7.    Requiring Petitioner to comply with the Habeas Rules and to file a Petition substantially in the form required by Rule 2(c) would aid Respondents responding to the complaint, and aid this Court in adjudicating the petition in several respects:

(a)    The form petition requires Petitioner to identify clearly what state court proceedings he intends to challenge, which will aid Respondents in identifying the proper respondent to the petition, and in specifying defenses to the petition.

(b)    The form petition requires Petitioner to clearly set forth what previous state proceedings he has used to raise his claims and the dates of those proceedings, which will assist Respondent in identifying what proceedings are relevant for exhaustion and statute of limitations defenses.

(c)    The form petition requires Petitioner to clearly and briefly set forward the basis for his challenge; under the current pleadings, Respondents would be required to speculate as to what the nature of Petitioner's claim or claims is.

For these reasons, Respondents respectfully request that the Court allow their motion for a more definite statement, and require Petitioner to file in a timely fashion a petition clearly setting forth the basis of his habeas corpus challenge in a form substantially in compliance with Rule 2(c) of the Habeas Rules.

Respectfully submitted,
THOMAS F. REILLY
ATTORNEY GENERAL

/s/ David M. Lieber
David M. Lieber (BBO# 653841)
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
Dated:  February 1, 2005                    (617) 727-2200 ext. 2827

- 4 -

# Commonwealth of Massachusetts
## County of Norfolk
## The Superior Court



### MITTIMUS TO Cedar Junction MCI (Walpole)

**Docket #NOCR2001-00117-002**

To the Sheriff of said County of **Norfolk**, his deputies, the Officers hereinafter named and the Superintendent of the **Cedar Junction MCI (Walpole)**

**GREETING:**

**Whereas**, by the consideration of the Superior Court Department of the Trial Court for Criminal Business, holden at **Dedham** within and for the County of **Norfolk**, on the **9th day of June** in the year of our Lord **2003**.

**Richard D Glawson**

now in the custody of the Sheriff of said County of **Norfolk**, convicted of the crime(S) of

| 265/21A/C | CARJACKING, FIREARM-ARMED c265 s21A | 02/16/2001 |

for which crime the said **Richard D Glawson** was sentenced to be confined in the **Cedar Junction MCI (Walpole)**,

We therefore, **command you**, the said Sheriff, Deputies and Officers of the Court to remove the said **Richard D Glawson** from the Jail in **Dedham** in the said County of **Norfolk**, to the **Cedar Junction MCI (Walpole)**, and **we command you**, the said Superintendent to receive the said **Richard D Glawson** and immediately thereon to cause the said **defendant** to be confined therein for **a term of not exceeding 20 years or less than 15 years concurrent with #117- 001 and any sentence now being served or to be served - SENTENCE STAYED TO  9/10/03 - credit time 290 days**

**as aforesaid.**

**WITNESS, Suzanne V. DelVecchio,** Chief Justice of said Court and the seal thereof at **Dedham** aforesaid, this **9th day of June** in the year of our Lord  **2003.**

........................................................
Assistant Clerk

### RETURN

Norfolk, SS.

**Dedham**
_____ **2003**

In obedience to the within warrant, I have conveyed the within named defendant to the **Cedar Junction MCI (Walpole)**, and delivered him to the Superintendent thereof with a copy of this warrant.

Deputy Sheriff, of said County
Officer of the Court named within.

Junction MCI (Walpole)

**Docket #NOCR2001-00117-001**

to the Sheriff of said County of **Norfolk**, his deputies, the Officers hereinafter named and the Superintendent of the **Cedar Junction MCI (Walpole)**

**GREETING:**

**Whereas**, by the consideration of the Superior Court Department of the Trial Court for Criminal Business, holden at **Dedham** within and for the County of **Norfolk**, on the **9th day of June** in the year of our Lord **2003**.

**Richard D Glawson**

now in the custody of the Sheriff of said County of **Norfolk**, convicted of the crime(S) of
265:018:b.2   Assault, armed, intent to murder    02/16/2001

for which crime the said **Richard D Glawson** was sentenced to be confined in the **Cedar Junction MCI (Walpole)**,

We therefore, **command you**, the said Sheriff, Deputies and Officers of the Court to remove the said **Richard D Glawson** from the Jail in **Dedham** in the said County of **Norfolk**, to the **Cedar Junction MCI (Walpole)**, and **we command you**, the said Superintendent to receive the said **Richard D Glawson** and immediately thereon to cause the said **defendant** to be confined therein for **a term of not exceeding 20 years or less than 15 years concurrent with sentence now being served or to be served - DNA sample - credit time 290 days - SENTENCE STAYED TO  9/10/03**

**as aforesaid.**

**WITNESS, Suzanne V. DelVecchio,** Chief Justice of said Court and the seal thereof at **Dedham** aforesaid, this **9th day of June** in the year of our Lord **2003**.

.................................................
**Assistant Clerk**

**RETURN**

Norfolk, SS.

**Dedham**
_____ **2003**

In obedience to the within warrant, I have conveyed the within named defendant to the **Cedar Junction MCI (Walpole)**, and delivered him to the Superintendent thereof with a copy of this warrant.

Deputy Sheriff, of said County
Officer of the Court named within.

Bates #    170    5 - 21
171    22 - 29    AH -10
172    29 - 38
173    39 - 44
174    44 - 48
175    49 - 69

Before the Grand Jury of Norfolk County

March 15, 2001 - Thursday

Dedham, Massachusetts

In the matter of:    RICHARD D. GLAWSAN

ALEJA CAMPBELL

ROBERT NELSON, ESQUIRE

Assistant District Attorney

Norfolk County

SUZANNE MASCIA - COURT REPORTING SERVICES UNLIMITED
(781) 834-3205

6

Q     And were you working in Sears Roebuck, in Dedham, on the evening of February 16th of this year?

A     Yes. I was.

Q     And sometime after 9:00 on that evening did you become — or sometime during that evening did you become involved in the investigation of two individuals purchasing items with a credit card at Sears?

A     Yes. I did.

Q     Do you recall about what time you first —

A     It was near closing, about — roughly about 9:20 or so.

Q     Now, are you familiar with security cameras that are located within Sears?

A     Yes. I am.

Q     And did you do anything in reference to the security cameras in Sears as you were investigating these two individuals?

A     Yes. We — I was taping an individual in our men's department, a white male that we picked up, that was picking up

4

Charles Mouris. The next is for assault
and battery of a police officer, that
police officer being Charles Mouris. The
next is for possessing under his control,
in a vehicle, a firearm. The next is
larceny under $250.00, that being credit
cards. The next is larceny over $250.00,
that being clothing, that's the property
of Sears. The next is for possession of
ammunition without having an
identification card. The next is for
operation of a motor vehicle with a
suspended license.

And then Aleja Campbell, on the same
date, this is on February 16th of 2001,
she's charged with larceny over $250.00,
that being, again, the clothing of Sears.
The next presentment against Aleja
Campbell is for uttering, that being a
credit card receipt, knowing that to be
forged, false of altered. The next
against Aleja Campbell is, again, for
forging an instrument, purporting to be a
credit card that was issued to a Natalie

100172   29

1    store, just to be in our office.

2    Q     And at some point in time did Officer

3    Mouris return to your office?

4    A     Only at the very end of the entire

5    incident.

6    Q     Can you tell us what, if anything,

7    happened regarding the female that

8    evening?

9    A     She was eventually arrested.

10   Q     And was Officer Mouris involved in

11   that?

12   A     Yes.

13         MR. NELSON:  Thank you.  I have

14   no other questions of Mr. Punch.  Any

15   questions of Mr. Punch?

16         (no response)

17         MR. NELSON:  Thank you, sir.

18         (witness excused)

19   BY MR. NELSON:

20   CHARLES MOURIS, SWORN

21   Q     And would you identify yourself for

22   the members of the Grand Jury, and could

23   you just spell your last name.

24   A     My name is Charles Mouris, M-O-U-

credit card.  They signed for it and
they put the articles in the car." I said,
"How do you know their credit card is
stolen?"  He said, "We confirmed it
through Sears' telephone system." I
said, "How do you know they stole the
merchandise?"  He said, "We watched
them put it in the car.  They made
several trips back and forty.  My partner,
Michael McSweeney, is holding them in
the store." As he was speaking he was
walking faster with a sense of urgency.

Following him I entered the store,
and I saw Ms. Campbell and Mr.
McSweeney standing thirty feet inside
the doorway from where I was.  Another
fifteen feet back from them, a total of
forty-five feet, was Mr. Richard
Glawsan.  And the – Mr. Glawsan, he
looked at me, he started shacking his
head, backing up.  I saw his breathing
increase, his shoulders hunched up,
brought his hands up in front of his
chest, at about this (indicating) position

33

and he ran fifty-one feet — I later
measured it — towards the door.  Then he
turned right and ran two hundred and
twenty-seven feet down a long corridor
to the back of the store.

Q       And at the time that he was doing
that, what were you doing?

A       Myself and Mr. McSweeney were in
foot pursuit, we were chasing him close
behind him.

Q       At any point in time did you catch up
with him?

A       We did, a total of three hundred and
twenty-five feet later, fly and tackle,
brought him to the ground hard.  And we
rolled on the ground.  I tried to pin him
down and place him under arrest.  I gave
him orders to put his hands behind his
back, which he refused to comply with.
And the three of us struggled.

Q       And can you describe what took place
during the course of the struggle?

A       I had him down on the ground.
Again, I tried to handcuff him on the

1  again. I had him — he was on his back.

2  He was kicking me. At this point I was

3  getting kind of tired, and I said to

4  myself, "Okay, no more kicks. I'm going

5  to stop blocking the kicks. I'm going to

6  take my mace out and spray him." Before

7  I could do that he kicked me more

8  violently, he started hitting me. So I

9  took out my night-stick, my baton,

10  department issued baton. I struck him on

11  his bare foot, because his shoe was off.

12  And there was no response at all. I

13  struck him on his ankle, nothing. His

14  shin, nothing. I couldn't strike him in

15  the groin or the face at that point. You

16  can never strike them on the groin or the

17  face. I put the stick away. I took more

18  kicks and punches while I maced him.

19  That stopped him for a second. We all

20  stood up. I said to Mr. McSweeney,

21  "Give him a few seconds. He's not going

22  anywhere." I fully believed the mace

23  would take affect and holt him, but it

24  didn't. To my surprise and shock he

1    Callahan?

2    A        Michael Callahan.  Let me look at my

3    report.  That's correct.

4    Q        And you spoke with Mr. Callahan at

5    that time?

6    A        Yes.  I did.

7    Q        At some point in time did you return

8    to the store?

9    A        After I spoke to Callahan I obtained

10   a description of the car.  And I broadcast

11   it over the – the incident over the police

12   radio, to the station and all the cruisers.

13   I next entered the store where I went

14   to the Sears' security office, where I was

15   met by Mr. William Punch, a security

16   employee who I know.  And he had Ms.

17   Campbell in his possession in their store

18   office.

19   Q        And at some point in time did you –

20   were you able to obtain her identity?

21   A        Yes.  I was.  She had a license on

22   her.

23   Q        And what was her name?

24   A        Her name is – she was identified as

(witness excused)

BY MR. NELSON:

MICHAEL CALLAHAN, SWORN

Q      Would you identify yourself for the members of the Grand Jury, please.

A      Michael Callahan.

Q      And would you spell your last name?

A      C-A-L-L-A-H-A-N.

Q      And, Mr. Callahan, can you tell us where you live?

A      20 Cotton Street.

Q      And where is that?

A      In Rosenlindale, Massachusetts.

Q      And directing your attention to February the 16th of this year, sometime after 9:00 on that date, did you have occasion to be in the vicinity of the Dedham Mall?

A      Yes.

Q      And can you tell the members of the Grand Jury what you were doing there at

A      I was meeting with one of my friend — worked.  That's it.

took off.

Q      And he took off in your car?

A      Uh-hum.

Q      Did you see your car again?

A      Yea.

Q      And when was the next time you saw your car?

A      At the police station.

Q      What police station?

A      Headquarters.

Q      Where?

A      In Downtown Boston.

Q      And can you tell us the time you saw your — the next time you saw your car, what condition was your car in at that time?

A      It was pretty bad.  I don't know.

Q      Keep your voice up.

A      It was banged up.

Q      It was banged up?

A      Yea.  It was totaled.

Q      It was totaled?

A      Yea.

Q      Okay.  When you got out of the car,

1  A        I doubt it.  I mean, I seen a picture

2  of him on the news, that's about it.

3  Q        So you've seen a picture of him on

4  TV?

5  A        Uh-hum.  Yes.

6  Q        Have you ever been asked to look at a

7  photographic array?

8  A        No.

9          MR. NELSON:  I have no further

10  questions of Mr. Callahan.  Questions?

11  Q        (Juror)  Did the person who took your

12  car have any kind of a weapon that you

13  could see?

14  A        I didn't see anything, no.

15  Q        (Juror)  So he shouted at you?

16  A        Yea.  He shouted, "Get out of the

17  car."  And I got out of the car.

18  Q        (Juror)  Did you feel threatened?

19  A        Of course.

20          BY MR. NELSON:

21  Q        After you heard a bang, --

22  A        Uh-hum.

23  Q        -- was there a window in your car

24  that was broken?

1    A        Yes.  I was.

2    Q        And where did you pick up the motor

3    vehicle?

4    A        I observed a white Mustang travelling

5    down Washington Street, heading towards

6    the intersection of Grove Street.  I was

7    actually on Grove Street.

8    Q        And the Grove Street that we're

9    talking about, is that located in West

10   Roxbury?

11   A        Yes.  It is.

12   Q        And can you tell us what you did

13   from that point in time after you picked

14   up the car at Washington and Grove

15   Street?

16   A        Yes.  Myself and Officer Munchback

17   observed the car go through the

18   intersection of Washington Street at

19   Grove Street.  We observed it take a left

20   hand turn onto Grove Street.  We

21   followed the Mustang.  And I was able to

22   get close enough to the Mustang to read

23   off the license plate number, and it was

24   1898TC.  I was able to radio to my

distance on us at that time. And in the
distance, as we rounded the corner, we
saw that the Mustang had lost control.
And we saw the headlights spin around
and actually were facing at us.

And as we approached we saw the
suspect come out the driver's side
window, crawl out the driver's side
window. There was a brief foot pursuit.
I followed the suspect around the corner.
He jumped over a wooden stockade fence.
I ran into this wooden stockade fence,
the gate, and forced it -- forced it open
about ninety degrees. I looked around
the gate. At that time I saw the suspect
in a crouched position with his gun
aimed at me, and he fired two shots. He
hit me in the -- at the time I thought only
in the right hand. He hit me in the right
hand and also hit me in the left thumb.
And my partner, Officer Munchback, was
right behind me. I had yelled to him to
get back.

And there was a group of people

1

NUMBER OF PAGES: 67

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                              SUPERIOR COURT

GRAND JURY

SUFFOLK COUNTY

RE: RICHARD GLAWSON

Presented by:  DANIEL HOURIHAN, ESQUIRE

               Assistant District Attorney

Also Present:  LINDA POULOS, ESQUIRE

               Assistant District Attorney

-----------------------
Tuesday, March 13, 2001
Boston, Massachusetts

J&K COURT REPORTING SERVICES
P.O. BOX 321, SWAMPSCOTT, MASSACHUSETTS 01907
JH    (781) 593-3950    FAX    (781) 593-9769    JH

2

I N D E X

| WITNESS | PAGE |
|---|---|
| LUIS A. CRUZ | 4 |
| MIGUEL NOVO | 7 |
| CHARLES MORRIS | 12 |
| MICHAEL D. BUCKLEY | 27 |
| TIMOTHY P. STANTON | 37 |
| WILLIAM SLYNE | 49 |
| LUIS A. CRUZ | 54 |

E X H I B I T S

| NUMBER | | PAGE |
|---|---|---|
| 37 | Photographic Array | 5 |
| 38 | Photographic Array | 6 |
| 39 | Latent Print Report - 2/16/01 | 11 |
| 40 | Latent Print Report - 2/25/01 | 12 |
| 41 | 2/16/01 - Copy A tape | 14 |
| 42 | Photograph | 27 |
| 43 | Photograph | 31 |
| 44 | Photograph | 31 |
| 45 | Photograph | 31 |

000188

12

1     16, 2001, I reported my findings after processing a 1996

2     Toyota Tercel Mass Reg. 511WYB, in connection with the

3     afore mentioned case.  The two large brown paper bags

4     taken from the front passenger seat have been processed

5     using the chemical Ninhydrin.  Examination of the bags

6     after processing showed no ridge detail after being

7     developed.  These finds are forwarded to you for any and

8     all further action, and it's written by Rosemary

9     McLaughlin and signed.

10    Q     Okay.

11          MR. HOURIHAN: I will offer that report.

12          (Exhibit Number 40 marked; Latent Print Report)

13    Q     No ridge detail.  That indicates, based on your

14          experience, that there wasn't enough of any print left

15          behind to do any types of comparison?

16    A     That's correct.

17          MR. HOURIHAN: That's all I have for Detective Novo

18          at this time.  Any questions ladies and gentlemen?

19          (No response from Jurors)

20          MR. HOURIHAN: Thank you detective.

21          CHARLES MORRIS, SWORN

22    Q     (by Mr. Hourihan) Can you introduce yourself to the

23          members of the Grand Jury, officer?

24    A     My name is Charles Morris.  I'm a police officer from the

13

1       town of Dedham.  I've been employed, I'm in my twenty-

2       fifth year now.

3   Q   Directing your attention, Officer Morris, to Friday

4       evening, February 16th, did you have occasion to be

5       working a paid detail at the Dedham Mall that night?

6   A   Yes, sir.  I was assigned the Dedham Mall from 5:00 p.m.

7       to 10:00 p.m. in uniform.

8   Q   Directing your attention to the evening hours, were you

9       aware of an incident that had taken place the evening

10      before at the Newton Mall involving an incident that the

11      Newton Police Department at the Chestnut Hill Newton

12      Mall?

13  A   Yes, I was.  I saw coverage on TV and the newspapers and

14      on the internet and I discussed that with several of the

15      employees that night at the mall.

16  Q   Was it kind of a rainy, snowy, cold night that night?

17  A   It was drizzling rain, and the mall's stores close at

18      10:00, most at 9:30, and by 9:00 most of the stores had

19      closed.  It was desolate.  I was the only person left in

20      the mall within view from where I was standing from.

21  Q   Now, have you worked a detail in the Sears at that mall

22      prior to the evening of the sixteenth?

23  A   Yes, sir.  I have.

24  Q   Are you aware that they have a video surveillance,

14

1           television surveillance system inside the Sears?

2    A    Yes, sir.  I've seen those cameras, and I've used them.

3           Yes.

4           MR. HOURIHAN:  This time I'm going to offer a tape

5           that on it, for the record, is tape A copy 21601.  It

6           would be copy A.  I'm going to offer that tape at this

7           time.

8           (Exhibit Number 41 marked; Copy A tape)

9    Q    Now, directing your attention to around 9:00 in the

10         evening, did you have an occasion to have a conversation

11         with a Sears Roebuck security officer in the mall?

12    A    Yes, sir.  I did.

13    Q    What was that person's name?

14    A    Mr. William Punch.

15    Q    Okay.  Tell us about that conversation.  What did he say

16         to you, and what did you say to him?

17    A    Mr. Punch had approached me and said there was a couple,

18         a male and a female in the store shoplifting, using a

19         stolen credit card.  I asked him how he knew that, and he

20         stated that he had called Sears main office, and the card

21         was indeed reported stolen.  Asked him how he knew these

22         people involved, and he said they've been following them

23         for a while in the store, and they had seen them take

24         merchandise from the store to a car parked in the parking

15

1  lot, put in the back seat area of the car, and then

2  return to the store.  He said he was following them for

3  several minutes, him and his Sears security partner.

4 Q Okay.  With that information, what did you do then?

5 A Based on that information, I formed the intent that I was

6  going to go in the store and place both individuals under

7  arrest for larceny of merchandise, uttering of a stolen

8  credit card, forgery and perhaps other charges pending

9  further investigation.

10 Q Did the officer point out which individuals they were

11  referring to when you entered the store?

12 A As I entered the store, yes.  They were -- I recall six

13  individuals there.  Four of them were involved in this

14  incident.  Two were either customers or employees of the

15  store.

16 Q At some point did you walk up to the female, there was a

17  women and a man; correct?

18 A It was female and apparently a partner, a man, and a

19  Sears security officer.

20 Q Did you later learn that the identity of that female was

21  Aleja Campbell spelled A-L-E-J-A Campbell?

22 A That's correct.

23 Q Describe the man that was with her?

24 A The man was a white male, I guess early thirties.  He's

16

```
 1        approximately 5'7", 5'8".  I believe he weighed one
 2        hundred and eighty pounds.  He had large shoulders on
 3        him.  It appeared like he was physically fit in shape.
 4        He was dressed in casual wear with sneakers on.  He
 5        became very excited upon seeing me.
 6   Q    Then what did you do?
 7   A    Identified myself as a police officer.  I saw him tense
 8        up.  His eyes opened.  His nostrils flared.  He started
 9        breathing heavy.  His chest started heaving.  He raised
10        his hands up in front of me.  I took this body language
11        as a sign that he was not going to be cooperative.  In
12        fact, I thought he might start to run.  He started
13        looking around nervously and backing up, taking steps
14        backward.  I said, stay right where you are.  I'm a
15        police officer.
16   Q    You were in uniform; correct?
17   A    Yes, I was.
18   Q    Then what happened?
19   A    He backed up.  He kept shaking his head, no, no, from
20        side to side in a negative manner, and he turned, and he
21        started to run on foot.  He ran fifty-one feet towards
22        the door, and then he took a right where he ran two
23        hundred and twenty-five feet towards the end of the
24        store.
```

17

1    Q    Was he knocking some things over as he went?

2    A    He was running.  He was knocking over display racks with

3         clothes on it to slow me down, and to strike me in my

4         face.

5    Q    Then what happened?

6    A    At the end of the two hundred and twenty-five feet, he

7         turned left, and he ran another forty-five feet, and a

8         flying tackle from behind brought him down hard onto the

9         Sears floor.

10   Q    Was that you and the store security officer that tackled

11        him?

12   A    Simultaneously I believe, yes.

13   Q    Then what happened?

14   A    We began a struggle.  I ran up top, and I was laying on

15        the side.  I knelt on his back.  I told him to put his

16        hands behind his back.

17   Q    What did he do?

18   A    He failed to comply.  He started -- his breathing slowed

19        down noticeably.  I, again, told him to put his hands

20        behind his back that he was under arrest, and I wanted to

21        handcuff him.  He kept putting his hands in front near

22        his groin area on his back.  ,Slowly he managed to get

23        into the push up position where he -- I could feel his

24        neck muscles in his shoulder tensing.  He did a complete

18

1     push up and then threw me off onto the ground.

2   Q   Then what happened next?

3   A   He kneeled on top of me, and at this time I became

4       concerned for my safety and also, the safety of the Sears

5       security officer.  On the ground there was several metal

6       racks that he had thrown and knocked over.  I saw that

7       they could be used as weapons.  So I stuck him in the

8       neck and throat area in attempt to get him off of me

9       which worked.

10  Q   Then what happened after that?

11  A   I rolled on top of him.  I, again, got him in a position

12      that I thought he would conform to my request.  He

13      refused.  I stated, put your hands behind your back.

14      You're under arrest.  He again refused.  He threw me off

15      a second time.  He stood up, and he started kicking me in

16      the face while I was kneeling on the ground.  I raised my

17      hands across to block his kicks.  I grabbed his foot in

18      attempt to stop the kicks.  I twisted his foot, his shoe

19      came off.  He continued to kick me with his bare foot in

20      the face and in the nose.

21  Q   Did he have socks on?

22  A   He did, yes.

23  Q   Then what happened?

24  A   As he was kicking me in my face, I felt I was losing

1    control of the situation.  I took out my department
2    issued baton.  I struck him on his bare foot.  The top of
3    his barefoot right on the bone in the center of his foot.
4    I can show you here.  Right here.  I was in the kneeling
5    position.  I brought my club up, my baton up as high as I
6    could.  I swung with all my might.  Strike him across the
7    foot to stop him front kicking and hitting me.
8  Q  Did it stop him?
9  A  No.  That failed.  I next struck him on the ankles.  I
10   struck him on the shin.  I thought of striking him on the
11   knee, but decided not to.  Legally, that's all I can
12   strike him, so I put my club back in my pocket, and we
13   continued to wrestle some more when again, he got on top
14   of me.  Now he was kicking me in the chest area.
15 Q  At some point did you pull out your pepper spray and try
16   to spray him with your pepper spray?
17 A  I did.  I was blocking his kicks again with my arms
18   crossed, and obviously this wasn't working.  I said, I'm
19   going to go with the pepper spray, so I dropped my hands,
20   so I can reach for my spray.  As I did so, he took
21   several more kicks with his barefoot to my face.  I
22   sprayed him with three or four short bursts.  We were
23   both on the ground.  He was lying on his back kicking.  I
24   was kneeling at his feet taking the kicks in my face and

1         chin area.  I sprayed him several times as I was trained

2         in the chest, the clothes and the face.

3   Q   What happened then?

4   A   As advertised, he stopped kicking.  He stood up.  I stood

5         up.  His eyes were blurring.  He was trying to clear his

6         face.  Mall security -- I'm sorry, the Sears security

7         office was with us and attempted to help me.  I said,

8         stand back.  Give him a few seconds.  He's not going to

9         go anywhere.  I thought with the pepper mace, he would be

10       confused and fall down, and I'd have an easy arrest.

11  Q   Then what happened?

12  A   To my surprise and shock, he ran.  He ran the three

13       hundred feet heading towards the Sears door where the

14       security officer pursued him.

15  Q   Is that the pick-up door?

16  A   Yes, it is.  I gathered my belongings, my hat, dusted

17       myself off and said, I'll catch him a few feet from now

18       cause he's not going too far.

19  Q   Is that because you expected the pepper spray to take

20       effect?

21  A   Fully expected it, yes.

22  Q   Then what happened?

23  A   I followed the suspect and the Sears security guard.  I

24       lost sight of them within the store.  There were a couple

21

```
 1        of items that he knocked off the shelves were now in my

 2        way.  I lost sight of him.  When they came to the pick-up

 3        doors which is the outside entrance to the door to the

 4        mall, to the parking lot, two separate doors, the Sears

 5        security guard was stopped and was waving at me pointing

 6        to the floor.

 7   Q    What did he say to you?

 8   A    He was in awe at that time.  At that moment my -- at that

 9        moment I was trying to zero in on the suspect.  My

10        attention, I'm sorry.  My attention was focused on the

11        suspect.

12   Q    Did you know where he went?

13   A    He went outside the doors.  I could tell by several

14        customers and employees pointing to me saying, officer,

15        he went that way.  He went that way.

16   Q    When you ran outside, did you run into a guy named

17        Michael Callahan?

18   A    Yes, I did.  Michael Callahan was a young man, early

19        twenties standing there and saying, shouting, officer, he

20        just stole my car.  Someone just stole my car.  He fired

21        a shot at me.  He had a gun.  I said, are you sure he had

22        a gun.  He goes, yes.  Here's the broken glass.  He

23        pointed to the ground, and I saw what I believed to be

24        shattered glass, safety glass, from an automobile lying
```

22

```
 1         there on the ground.
 2    Q    Now, at that point did you determine that Mr. Callahan's
 3         car was a white Mustang convertible bearing registration
 4         189STC?
 5    A    That's correct.  That's the information he gave me.  I
 6         asked him if he was sure.  He said yes.  The car belonged
 7         to his mother.  He was positive of the plate.  I radioed
 8         the incident to the police station.  To my knowledge,
 9         that's the first time the police station became aware of
10         the incident.
11    Q    Did you have occasion to talk to the Sears security
12         officer as they chased him outside at that point?
13    A    Yes, I did.  Once I broadcast a description of the car,
14         the person who was driving it, the fact that a weapon was
15         used, a shot was fired, that he was maced, that the
16         officers might find him outside the car in the parking
17         lot covered with mace.  I entered the Sears store where I
18         spoke to Sears security officer William Punch had
19         detained the female in the security office for me.
20    Q    Now, after you put out that broadcast, did you have to
21         take a preliminary statement from Mr. Callahan?
22    A    I did, yes.
23    Q    What did he indicate to you in that statement?
24    A    If I can refer to my report here, page 18 second
```

23

1     paragraph.

2         MR. HOURIHAN: I'm going to show you a copy of your

3     report.

4  A  Can I read from my report?

5  Q  Go ahead.

6  A  I isolated the victim, Callahan, took a preliminary

7     statement from him.  Callahan stated "I was sitting in my

8     car right outside the door to Sears waiting for a friend

9     of mine who works in the Sears store.  A man came out

10    with a gun and ran along side my window and yelled, get

11    out.  Get out of the car".  Mr. Callahan stated he was

12    confused, and the man then fired the gun shattering his

13    window.  Mr. Callahan then stated "at this point I got

14    the message and got out of the car quick.  He drove away.

15    The glass from the window is right here on the ground".

16    I observed what I believed to be shattered motor vehicle

17    glass on the ground approximately twenty-six feet from

18    the Sears door.

19  Q  After that, did you take a report, a further report from

20    the store security officer that chased him outside?

21  A  Yes.  When I went back inside the store to take charge of

22    the prisoner, Campbell, Sears Security Officer McSweeney,

23    the man who had chased the suspect with me and helped me,

24    said, I'll quote directly from my report.  "Officer

24

1          Morris, he, meaning Glawson, pulled a gun from his front

2          waist band and pointed it at me inside the store.  A

3          holster fell out of his pants and onto the floor.

4          Mr. McSweeney then handed me an inside shoulder holster,

5          inside pocket holster he used what I believe to be a

6          small caliber gun."  McSweeney said, "when I saw the

7          suspect, Glawson, turned and pointed the gun at me, I

8          stopped chasing him and turned back.  It scared the hell

9          out of me.  I said to myself, forget it".

10   Q    Now, did you put out a broadcast of the direction of

11        travel of the white Mustang and a description of the

12        suspect?

13   A    Yes, I did.

14   Q    Later on, did you retrieve a white colored Nike sneaker,

15        one sneaker?

16   A    Yes, I did.  The female manager of the store came to me

17        and said, officer, the sneaker, and she handed me several

18        items that were located from where we were fighting.

19   Q    Okay.  Shortly thereafter, did an officer, another Dedham

20        Police Officer approach you at some point and show you a

21        police blotter, a single photograph?

22   A    Yes.  That was actually immediately after I spoke to

23        Callahan, and he stated his car was shot while I was

24        still outside the store before I went into Sears.

25

1 Q That was Officer Wildes?

2 A Officer William Wildes from the Dedham Police Department,

3   yes.

4 Q Did he show you a Boston Police computer generated mug

5   shot containing a photograph of somebody that was wanted

6   from the Chestnut Hill Mall from the night before?

7 A Yes, he did.

8 Q Did you recognize the person depicted in that photograph?

9 A Oh, definitely.  Officer Wildes held it up and said, did

10   he look like this.  I jumped at it and said, yes.  That's

11   the guy.  That's the guy I was fighting.  It was quite

12   clear to me.

13 Q Did you later learn that person's name was Richard

14   Glawson?

15 A I did, yes.

16 Q Now, later on after you returned to the police station,

17   did you have occasion to meet with Detective FitzHenry

18   from the Dedham Police Department and look at a

19   photographic array?

20 A Yes, I did.

21 Q Did you pick out a photograph of the person that you had

22   fought with at the mall and had fired the gun from the

23   parking lot at Mr. Callahan?

24 A Yes, I did.

26

1    Q    Did you later learn that person was Richard Glawson in

2         that photograph?

3    A    That's correct.

4              MR. HOURIHAN: Those are all the questions I have for

5         Officer Morris at this time.   Any questions ladies and

6         gentlemen?

7              JUROR: You said you decided not to hit him in the

8         knees?

9    A    That's correct.

10             JUROR: Why was that?

11   A    At this point he was unarmed.   I was fighting off his

12        hands and fist which allows me to use a baton, but if you

13        hit someone in the knees, that could be a serious injury.

14        We're taught not to use the knees.   There's several areas

15        that are called green areas which you can strike at any

16        time.   A yellow area which would include the knee which

17        is more caution.   A strike there might cause more serious

18        injury.   A red area which would be the face and groin

19        which is taboo.   Don't touch all together.

20             MR. HOURIHAN: Any other questions at this time?

21                  (No response from Jurors)

22             MR. HOURIHAN: Thank you, Officer.

23   Q    Let me just ask you a couple of other questions.   I'm

24        showing you a Polaroid photograph of a garment.   Do you

000139                                        27

1        recognize that as a garment that Mr. Glawson was wearing

2        that night?

3    A   That's similar to what he was wearing, yes.

4            MR. HOURIHAN: I will offer this photograph at this

5        time.

6            (Exhibit Number 42 marked; Photograph)

7            MR. HOURIHAN: That's all I have for this officer at

8        this time.  Thank you.

9                     MICHAEL D. BUCKLEY, SWORN

10   Q   (by Mr. Hourihan) In a nice loud voice, can you tell the

11       people your name.

12   A   Michael D. Buckley.

13   Q   How are you employed, sir?

14   A   I'm a police officer in the Town of Dedham.

15   Q   How long have you been a police officer?

16   A   Since 1993.

17   Q   I'm going to direct your attention, Officer Buckley, to

18       the Friday evening February 16th, were you working that

19       evening?

20   A   Yes, I was.

21   Q   During the evening hours prior to 9:30 in the evening,

22       did you have occasion to be in contact with Officer

23       Arthur Munchbach who was working at the Dedham Showcase

24       Cinemas?

28

1    A    Yes.  I was sent to assist Officer Munchbach for

2         transporting three youths from the Showcase Cinema to

3         their home.

4    Q    Did you do that?

5    A    Yes, I did.

6    Q    So did Officer Munchbach get in the car with you?

7    A    Yes, he did.

8    Q    What happened after Officer Munchbach and these three

9         youths got in the car.  Tell us what you did?

10   A    Myself and Officer Munchbach dropped off the first youth

11        at his home.  We went to the second youth's home which

12        was on Whitehall Street in the town of Dedham, and as we

13        pulled away, we heard Officer Morris who was a Dedham

14        Mall detail officer at the time, he called Dedham

15        control.  I could hear that Officer Morris was winded.

16        Officer Morris called Dedham Control for a second

17        time.  This time he requested a unit to go to the Sears

18        pick-up door right away.  Dedham control dispatched my

19        cruiser 621.  I radioed back to them that I was on my

20        way, but requested a second unit to be started that way

21        because I was still transporting the last youth with

22        Officer Munchbach.

23   Q    At some point did you get a description of a white

24        Mustang convertible that was involved in an incident at

1        the mall?

2    A    Yes, I did.

3    Q    Okay.  Then what happened?

4    A    While we were -- myself and Officer Munchbach were in

5         route to the Dedham Mall, it was reported by Officer

6         Morris that there were shots fired at the mall, and that

7         a white 1986 Ford Mustang was involved.  Officer Morris

8         radioed a partial plate of 189 as the first three numbers

9         of the Mustang's plate.  Officer Morris also said that --

10        he didn't believe that the suspect could have gotten too

11        far because he had been sprayed with pepper spray.

12   Q    Then what happened?

13   A    As Officer Munchbach and I approached the intersection of

14        Grove Street and Washington Street, we observed an older

15        white Mustang traveling northbound on Washington Street

16        from Dedham towards Boston.  The Mustang was weaving in

17        and out of traffic as it approached us.   The Mustang

18        entered the intersection of Washington and Grove Street

19        and then took a left onto Grove Street heading towards

20        Centre Street.  We followed the Mustang across the

21        intersection and were able to get close enough to the

22        Mustang for just a moment to read the entire plate and

23        radio to Dedham control that we were behind the Mustang

24        with the number 1899TC.  I tried to repeat this

30

1        information, but the Mustang had pulled away at a high

2        rate of speed.

3  Q   How was he operating at that time?

4  A   The Mustang was having difficulty staying on the road

5        during the time that you could see him swerving.

6  Q   Was there other traffic on the road?

7  A   Not on this particular stretch of road, no.

8  Q   Then what happened?

9  A   We had difficulty staying with him.  The roads were

10       slippery and wet.  He would disappear around the next

11       corner.  I radioed Dedham control that the mustang was

12       continuing on Grove Street heading towards the landmark

13       which was West Roxbury Crushed Stone.  As we approached

14       West Roxbury Crushed Stone, the Mustang had gained

15       considerable distance on us, and we could see him in the

16       distance that he had lost control.  I could see his

17       headlights spin around.

18  Q   Could you tell whether he had hit another car?

19  A   No.  I didn't know that at the time.

20  Q   Tell us what happened as you approached that white

21       Mustang?

22  A   As we approached the white Mustang, I saw the suspect

23       crawl out of the window, the driver's side window, and

24       run around the corner of a house.

31

```
 1    Q    I'm going to show you a series of photographs, and I

 2         guess we'll go through those one at a time.  Is that the

 3         white Mustang that you were chasing on the evening of the

 4         sixteenth?

 5    A    Yes, it is.

 6              MR. HOURIHAN: I'll offer that photograph.

 7              (Exhibit Number 43 marked; Photograph)

 8    Q    When you said that he had lost control and crashed, was

 9         that the location where the car stopped?

10    A    Yes, it is.

11              MR. HOURIHAN: I will offer that photograph.

12              (Exhibit Number 44 marked; Photograph)

13    Q    I'm showing you another photograph.  Is that your cruiser

14         that was parked on Centre Street?

15    A    Yes, it is.

16    Q    Did you later learn that this blue car in the photograph

17         was hit by the suspect's car?

18    A    Yes, I later learned that.  Yes.

19              MR. HOURIHAN: I will offer that photograph.

20              (Exhibit Number 45 marked; Photograph)

21    Q    Okay.  What happened after the suspect jumped out the

22         window of the car?

23    A    I radioed our location, and Officer Munchbach and myself

24         began to follow on foot.  Sometime after I left the
```

32

1    cruiser fearing for my own personal safety, I removed my

2    firearm and held it in the ready position.  I turned the

3    corner from the front yard of the house heading towards

4    the rear of this house along the right side of the home.

5    When I turned the corner, the suspect was climbing over

6    the gate of a wooded stockade fence.  I ran at the gate

7    of the stockade fence and hit it with my right shoulder

8    causing the gate to open.  The gate swung inward to my

9    right.  The area on the other side of the fence was tight

10   and confined because there was a set of stairs that led

11   up to a porch right in front of me.

12       As I looked around the corner of the gate to my

13   right, I saw the suspect in a crouched position waiting

14   to ambush me with what I believed to be a snub-nose

15   revolver.  At the same instance I saw a muzzle glass and

16   heard two gunshots.  I felt that I was hit in the right

17   hand.  I stepped back and told Officer Munchbach to get

18   back and remove the group of people that now had

19   gathered.

20   Q   Where were you shot?

21   A   At that point I realized I was shot it the right hand.

22       Moments later I also realized that I had been shot in the

23       left thumb.

24   Q   Just backing you up for a minute officer, the guy that

1    jumped out the window of the car and entered the yard,

2    was he a white male?

3  A    Yes.  He was.

4  Q    Was he dressed in black?

5  A    He was dressed in black, and there was light gray on the

6    sleeves of the jacket.

7  Q    I'm just going to go through a couple of photographs at

8    this point.  I'll only have a few more question for you.

9    Is that a fair representation of how your car stopped in

10    front of that address on Centre Street by the white

11    Mustang?

12  A    Yes.

13        MR. HOURIHAN: I'll offer that photograph.

14        (Exhibit Number 46 marked; Photograph)

15  Q    Now showing you this next photograph, it appears to have

16    an address of 2369 Centre Street.  Does this photograph

17    depict the side of the house where the suspect ran?

18  A    Yes, it does.

19        (Exhibit Number 47 marked; Photograph)

20  Q    Now, I'm going to show you another photograph.  Does that

21    photograph show you the fence near the gate area that he

22    went over?

23  A    Yes, it does.

24        (Exhibit Number 48 marked; Photograph)

34

1    Q    I'm going to show you another photograph of the corner of

2         2369 Centre Street.  Is that a view from further back of

3         that fence and gate area?

4    A    Yes, it is.

5             MR. HOURIHAN: I will offer that photograph.

6             (Exhibit Number 49 marked; Photograph)

7    Q    Now, is that a close up of the gate?

8    A    Yes, it is.

9    Q    Fair representation of how it looked that night?

10   A    Yes.

11            MR. HOURIHAN: Offer that photograph.

12            (Exhibit Number 50 marked; Photograph)

13   Q    Now, this photograph, is that a photograph taken from the

14        backyard looking back at that the gate area?

15   A    That's what it appears to be, yes.

16   Q    Fair representation of how that yard looked that night?

17   A    Yes.

18            MR. HOURIHAN: I'm going to ask that this be marked.

19            (Exhibit Number 51 marked; Photograph)

20   Q    I'm going to hold this photograph up, Officer Buckley.

21        If you could point to the area where the suspect was when

22        he was in a crouched position shooting at you?

23   A    He was right in this area here.

24   Q    So this is the gate area here with the porch in the

35

1      center?

2    A   That's right.

3    Q   And the gate opens toward the left hand side of the

4        photograph?

5    A   That's right.

6    Q   So he was on the other side of the gate; correct?

7    A   That's correct.

8    Q   Just one other photograph.  Does that appear to be some

9        blood in the snow and several footprints leading to the

10       back of the yard?

11   A   That's what it looks like, yes.

12           MR. HOURIHAN: I will offer that photograph.

13           (Exhibit Number 52 marked; Photograph)

14   Q   I just have a couple more questions.  After you got shot,

15       what did you do?

16   A   I went to -- after I was shot I tried to call my

17       dispatcher.  I wasn't sure if I got through because I

18       left the siren on my cruiser on.  I went to the left hand

19       side of the house to avoid being ambushed again.  I

20       thought he was still behind the fence.  I looked for the

21       suspect, and I was unable to find him.

22   Q   Then what happened?

23   A   It was at that time that I realized that my left thumb

24       had also been hurt.  I holstered my weapon and went to

36

1    seek medical attention.

2    Q    Did you put out a broadcast as to the possibility of who

3         the suspect might be that night at that point?

4    A    When I got back to the street I radioed for an ambulance

5         myself and I said on the radio that I thought it was the

6         suspect that they were looking for the night before that

7         from the Newton incident.

8    Q    What type of medical treatment and procedures have you

9         received for your injuries, sir?

10   A    So far I've had the bullet fragments taken out of my

11        hand, and the bone that was shattered.

12   Q    How long did you spend in the hospital?

13   A    I was in there on the sixteenth, and I left on the

14        eighteenth.

15   Q    You're still facing some more reconstructive surgery for

16        your right hand?

17   A    Yes.  At least one more for the right and another for the

18        left.

19        MR. HOURIHAN: Those are all the questions I have for

20   Officer Buckley at this time.  Any questions from the

21   Grand Jury?

22                   (No response from Jurors)

23        MR. HOURIHAN: Thank you, sir.

24

000190

1                   TIMOTHY P. STANTON, SWORN

2    Q    (by Mr. Hourihan) In a nice loud voice can you tell us

3         your name.

4    A    Timothy P. Stanton.

5    Q    How are you employed, sir?

6    A    I'm a member of the Boston Police Department.

7    Q    What unit within the Police Department are you employed?

8    A    The Youth Violence Strike Force.

9    Q    Officer Stanton, I'm going to direct your attention to

10        the evening of February 15th, Thursday evening.  Did you

11        have occasion to become involved in an investigation

12        involving an incident that took place in Newton,

13        Massachusetts at the Chestnut Hill Mall?

14   A    I did.

15   Q    As part of your role in that investigation, did you and

16        another officer go to the Newton Police Station that

17        evening?

18   A    I did.

19   Q    What was your purpose in going there?

20   A    There was a suspect that was in custody from a shooting

21        that occurred in the Chestnut Hill Mall, and I believe

22        that I was familiar with the suspect that was in custody.

23        So we went to offer our assistance to the Newton Police.

24   Q    You were also aware that the suspect that was with the